0.6 CA 1 0 5 1 4 RGS

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2006 MAR 22 P 3:39

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| DENNIS MAHER,<br><br>                Plaintiff,<br><br>      v.<br><br>TOWN OF AYER, THE AYER POLICE DEPARTMENT, NANCY TAYLOR-HARRIS a/k/a NANCY TAYLOR, in her individual capacity, and JOHN and JANE DOES NOS. 1-15, in their individual capacities, CITY OF LOWELL, THE LOWELL POLICE DEPARTMENT, EDWARD F. DAVIS III, in his individual capacity, GARRETT SHEEHAN, in his individual capacity, MARK T. GRANT, in his individual capacity, and JOHN AND JANE DOES NOS. 16-30.<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     MAGISTRATE JUDGE _____<br><br>Civil Action No. _____ |

## COMPLAINT AND JURY DEMAND

Plaintiff Dennis Maher, by and through his attorneys, hereby makes on personal knowledge and information and belief the following allegations:

### INTRODUCTION

1. Dennis Maher was imprisoned for more than nineteen years for two rapes and a sexual assault he did not commit. After DNA testing proved his innocence, Maher's convictions were vacated and the charges against him were dismissed. Only by the unconstitutional acts of the police did three victims of three separate attacks come to falsely identify Dennis Maher as their attacker. The resulting wrongful conviction not only led to the imprisonment of an innocent man for 19 years, 2 months, and 29 days, but allowed the true perpetrators of these crimes the freedom to terrorize other victims.

2. Maher's wrongful convictions were not an accident, but the result of unconstitutional and tortious acts by the individual defendants, their supervisors, and municipal policies, customs and practices deliberately indifferent to civil rights. Despite Maher's actual innocence and the lack of evidence against him, defendants used unconstitutional techniques to obtain the erroneous convictions.

3. Acting under color of law, one or more of the defendants used improper identification techniques, failed to disclose evidence and fabricated evidence against Maher.

4. Beyond compensating Maher for the years stolen from him, this action seeks to redress the unlawful municipal policies and practices pursuant to which the defendants, acting under color of law, violated his clearly established rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

5. Title 28 U.S.C. § 1331 provides federal question jurisdiction, and 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law claims.

6. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Massachusetts, the judicial district in which the claim arose and in which, upon information and belief, all defendants resided and/or conducted business at the time of the events in question.

## PARTIES

7. Plaintiff Dennis Maher ("Maher") is a resident of Tewksbury, Massachusetts.

8. Defendant Town of Ayer is an incorporated township within the County of Middlesex.

9. The Ayer Police Department ("APD") is a department of the Town of Ayer. During the investigation and trial of Maher, the final policymakers for the APD included, without limitation, then Police Chief David L. Young and the Board of Selectmen.

10. Defendant Nancy Taylor-Harris ("Taylor") was at all times relevant to this complaint employed by the APD and acting under color of law. She is sued in her individual capacity. At the time of the investigation and trial of Maher, she was known as Nancy Taylor, and will be referred to as such in this complaint.

11. Defendant John and Jane Does 1-15 were at all times relevant to this complaint employed by the APD and acting under color of law. They were members of the APD involved in the investigation and prosecution of Maher, and their supervisors. At this time, their identities are unknown. They are named in their individual capacities. Doe Defendants 1-15 are collectively referred to as "Ayer Doe Defendants."

12. Defendant City of Lowell is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts.

13. The Lowell Police Department ("LPD") is a department of the City of Lowell. During the investigation and trial of Maher, the final policymakers for the LPD included, without limitation, Lowell's then-Police Chief and City Council.

14. Defendant Edward F. Davis III ("Davis") was at all times relevant to this complaint employed by the LPD and acting under color of law. He is sued in his individual capacity.

15. Defendant Garrett Sheehan ("Sheehan") was at all times relevant to this complaint employed by the LPD and acting under color of law. He is sued in his individual capacity.

16.     Defendant John and Jane Does 16-30 were at all times relevant to this complaint employed by the LPD and acting under color of law. They were members of the LPD involved in the investigation and prosecution of Maher, and their supervisors. At this time, their identities are unknown. They are named in their individual capacities. Doe Defendants 16-30 are collectively referred to as "Lowell Doe Defendants."

17.     Defendant Mark T. Grant ("Grant") was at all times relevant to this complaint employed by the Chemical Laboratory of the Department of Public Safety of the Commonwealth of Massachusetts and acting under color of law. He is sued in his individual capacity.

## FACTS

18.     Maher's claims arise out of his wrongful convictions in 1984 for three separate crimes.[1]

19.     At the time of his arrest for the crimes he did not commit, Maher was a Sergeant in the United States Army. He had no criminal record.

### *The Ayer Rape – August 17, 1983*

20.     On August 17, 1983, a woman in her late forties informed the APD that she had been raped at the Casa Manor Motel in Ayer, Massachusetts ("Ayer Victim").

21.     According to her testimony, the Ayer Victim fought with her husband, and decided to stay at the Casa Manor Motel for the evening. She brought three envelopes of money with her to the motel that evening.

22.     After purchasing two bottles of brandy, the Ayer Victim, along with other of the motel guests, sat outside their motel rooms due to the warm evening weather. While sitting

---

[1] The facts alleged concerning the crimes for which Maher was wrongly convicted are based on the trial record, police reports and other similar sources. Maher, therefore, makes such allegations on information and belief.

outside her motel room, the Ayer Victim noticed a suspicious looking man. She then called the APD to report him.

23.  After an APD officer came to the Casa Manor Motel to investigate, according to the Ayer Victim, the officer left and she returned to her motel room. Once inside, the Ayer Victim elected not to open the window or turn on the air conditioner, but instead decided to leave the door ajar to get relief from the heat.

24.  At some point later that evening, according to the Ayer Victim, a man entered her motel room and raped her.

25.  The Ayer Victim stated to police that after the rapist left, she paced around her hotel room for a while and then left the motel room and drove around Ayer for some period of time. The Ayer Victim finally returned to her home the next morning, and called the APD at approximately 7:00 a.m.

26.  Shortly thereafter, Defendant Taylor arrived and questioned the Ayer Victim about the prior night's events.

27.  In August 1983, Defendant Taylor had just completed her work in connection with another high-profile Ayer crime: the murder of Katherina Brow. On information and belief, based in large part on Defendant Taylor's efforts, including the solicitation of key prosecution witness testimony, Kenneth Waters was convicted of killing Ms. Brow. Mr. Waters, who was convicted in May 1983, was released in March 2001 when DNA testing demonstrated that Defendants Taylor and the APD built their case against the wrong man. (Defendant Taylor's and the APD's alleged misconduct in the Waters case is the subject of a civil rights suit in this Court. See Civil Action No. 04-10521-GAO).

28.     On August 18, 1983, Defendant Taylor accompanied the Ayer Victim to the Nashoba Community Hospital in Ayer where the Ayer Victim was examined by hospital staff.

29.     Evidence collected from the Ayer rape included the victim's semen-stained underclothing, semen-stained bedding, and a rape kit from the Ayer Victim's medical examination after the rape.

30.     At the time this alleged rape occurred, Maher was home in his bed sleeping.

31.     Days after the August 17, 1983 attack, Defendant Taylor reported that she had the Ayer Victim review 200 photographs to see if she could identify the perpetrator. The Ayer Victim was not able to identify her attacker from the photographs.

32.     Between August 17, 1983 and mid-December, 1983, it is unclear, what, if anything, Defendant Taylor and/or the APD did by way of investigating the attack on the Ayer Victim.

### *The Lowell Rape -- November 16, 1983*

33.     On November 16, 1983, at approximately 5:15 p.m., Dennis Maher was in his Commanding Officer's office at Fort Devens in Ayer, Massachusetts. After this meeting, Maher left Fort Devens and went directly home.

34.     At approximately 5:20 p.m. on November 16, 1983, a 28 year-old woman ("Lowell Victim 1") was walking home on Westford Street in Lowell, Massachusetts.

35.     Westford Street in Lowell is approximately 20 miles from Fort Devens.

36.     Near the intersection of Loring and Westford Streets, Lowell Victim 1 was approached by a man who briefly engaged her in conversation.

37. The man asked Lowell Victim 1 if she lived in the area and if she would like to go out with him. He then grabbed Lowell Victim 1's arm and forcibly moved her into a nearby yard.

38. The man pushed Lowell Victim 1 to the ground onto her back, took off her pants, and raped her. Lowell Victim 1 testified that she was looking at the assailant's face during the rape and that she specifically looked at the assailant's eyes, which she described as brown with a drugged appearance.

39. Lowell Victim 1 also testified that during the rape she noticed that her attacker was wearing a green rain slicker, and that the site of the rape had been illuminated by street lights and the outdoor light from a nearby garage.

40. After raping her, the attacker told Lowell Victim 1, "next time don't scream, or I'll kill you," and then kissed Lowell Victim 1. The attacker then ran away.

41. Lowell Victim 1 dressed and went immediately to her neighbor's apartment. Her neighbor called the police.

42. The police escorted Lowell Victim 1 to Lowell General Hospital, where her pants and underpants were collected as evidence.

43. At the hospital, with Defendants Davis and Sheehan present, Lowell Victim 1 provided a description of her attacker to the attending medical care professionals. Lowell Victim 1 stated to the medical care professionals that she was assaulted at 5:20 p.m., and that her attacker was a tall, white male. This information was recorded in a written report.

44. At or about this time, Lowell Victim 1 also informed Defendants Davis and Sheehan that her assailant did not have a mustache.

45.     During her examination at the hospital, Lowell Victim 1's blood type was determined to be type O. This information was recorded in a written report.

### *The Lowell Sexual Assault -- November 17, 1983*

46.     The next day, on November 17, 1983, at approximately 5:30 p.m., a 20-year old Lowell resident ("Lowell Victim 2") was walking home in the same area as the Lowell Victim 1 attack.

47.     Near the intersection of Loring and Westford Streets, Lowell Victim 2 was approached by a man who asked Lowell Victim 2 for a match. Lowell Victim 2 responded, "no," and attempted to keep walking.

48.     The man then grabbed Lowell Victim 2's arm and forced her onto the ground with her face down. While Lowell Victim 2 was lying face down on the ground, the attacker attempted to pin Lowell Victim 2 with his knees.

49.     Lowell Victim 2 screamed, and her attacker threatened her with a knife.

50.     Lowell Victim 2 was then able to kick her attacker in the groin and flee. Lowell Victim 2 testified at trial that in the interval between kicking her assailant and fleeing, she was able to observe her assailant's face. As she fled, she looked back and saw the attacker briefly follow her.

51.     At trial, Lowell Victim 2 testified that prior to, during, and after the attack, she was able to observe that her attacker had glassy eyes and was wearing a green army jacket and a red hooded sweatshirt.

52.     After evading her attacker, Lowell Victim 2 ran to her parents' house, and her father called the police.

53.     Lowell Victim 2 was escorted to the Lowell Police Station, where she gave her report and assisted police in making up a composite drawing of her attacker. At the station, Lowell Victim 2 also looked at an array of 480 photographs but could not identify the image of her attacker.

### *Maher Initial Identification -- Lowell Attacks*

54.     On the evening of the second attack, November 17, 1983, Defendant Davis went to the area where both of the attacks occurred.

55.     According to the November 20, 1983 Arrest Report, at approximately 8:15 p.m. on November 17, Defendant Davis observed Dennis Maher walking near the site of Lowell Victim 2's attack. Maher, who had a mustache, was wearing a red sweatshirt.

56.     Defendant Davis stopped Maher for questioning, and arrested Maher for possession of marijuana.

57.     After taking Maher into custody, Defendant Davis obtained Maher's red sweatshirt as well his photograph.

58.     While Maher remained in custody on the possession charge, according to the Arrest Report prepared days later, Defendant Davis then placed Maher's photograph in an array of approximately 100 other photographs and brought them first to Lowell Victim 2, and then to Lowell Victim 1.

59.     According to Defendant Davis, Lowell Victim 2 identified only Maher's photograph among the 100 photographs.

60.     According to Defendant Davis, Lowell Victim 1 also identified only Maher's photograph from the same array.

### *Building The False Case Against Maher — Lowell*

61.     Later that evening, Defendant Davis located Maher's car, a green Ford Maverick, parked outside a local tavern.

62.     Without a search warrant, Defendant Davis broke into Maher's parked car and seized a number of standard issue military items, including a green Army jacket and a knife.

63.     During the evening of November 17, 1983, without informing Maher he was suspected of committing the two Lowell sexual assaults and without Maher having counsel present, Defendants Davis and Sheehan proceeded to question Maher about the attacks on Lowell Victim 1 and Lowell Victim 2.

64.     Maher was asked a series of questions about where he was earlier that evening, and where he was the prior evening.

65.     Maher informed Defendants Davis and Sheehan that on the evening of November 16, 1983 he completed his official duties at 4:30 p.m., and stated that he then remained on base and went to his Commanding Officer's office. Maher stated to Defendants Davis and Sheehan that he remained in his Commanding Officer's office until approximately 5:15 p.m.

66.     During this questioning, Maher provided Defendants Davis and Sheehan with his Commanding Officer's name and contact information so that Defendants Davis and Sheehan could confirm the information Maher had provided.

67.     Maher further told Defendants Davis and Sheehan that on the afternoon of November 17, 1983 he arrived home at approximately 3:30 p.m., and remained there until after 5:00 p.m., when he went directly to a friend's house.

68. Maher provided this information at the request of Defendants Davis and Sheehan, despite the fact that Maher did not know, nor did Defendants Davis and Sheehan disclose, that they were questioning him about the Lowell Victim 1 and Lowell Victim 2 crimes.

69. When Maher was finally told why he was being questioned regarding his whereabouts over the prior 48 hours, Maher asked to speak with an attorney.

70. After Maher made this request, Defendant Davis told Maher that he was going to take Maher down, and see to it that Maher was convicted of the Lowell Victim 1 and Lowell Victim 2 attacks. Maher remained in custody overnight.

71. The next morning, on November 18, 1983, Defendant Davis escorted Lowell Victim 2 to the Lowell County Courthouse for a planned "show up," where Lowell Victim 2 was expected to identify Maher as her assailant.

72. When Lowell Victim 2 came into the courtroom to make the planned identification, Maher was seated in the courtroom.

73. Things did not go according to plan, as Lowell Victim 2 not only failed to identify Maher as her attacker, but she selected someone else as the person who most resembled the assailant.

74. Lowell Victim 1 also was supposed to participate in the "show up" identification on November 18, 1983, but after the Lowell Victim 2 identification did not go according to plan, Defendants Davis and Sheehan abandoned the Lowell Victim 1 identification and sent her home.

75. After the failed "show up" identification, Maher was released, but then immediately arrested before leaving the courthouse and charged with the Lowell attacks.

76. On information and belief, after the November 18, 1983 failed "show up," Defendants Davis and Sheehan engaged in improper conduct to make certain that Lowell Victim 1 and Lowell Victim 2 were persuaded that Maher was their assailant.

77. Two days later, on November 20, 1983, Defendants Davis and Sheehan prepared their Arrest Report.

78. The Arrest Report falsely states, among other things, that Lowell Victim 1 was attacked at approximately 5:40 p.m.

79. The Arrest Report also fails to include Maher's exculpatory statement that he was in his Commanding Officer's office until 5:15 p.m. on November 16, 1983.

80. Instead, the Arrest Report falsely states that Maher told Davis and Sheehan that he had finished work at 4:30 p.m. on November 16, 1983, and went directly home.

81. On information and belief, Defendants Davis and Sheehan intentionally omitted critical alibi information provided by Maher concerning his whereabouts at the time of the Lowell Victim 1 attack.

82. Moreover, by falsely recording in the Arrest Report that Maher told them that he left Fort Devens at 4:30 p.m. on November 16, 1983, Defendants Davis and Sheehan knowingly and intentionally created a false record that would make it possible for Maher to have traveled from Ayer to Lowell in time to commit the Lowell Victim 1 rape.

83. Finally, in a further effort to make it possible for Maher to have been the Lowell Victim 1 attacker, the Arrest Report also falsely states that Lowell Victim 1 reported that she was raped at 5:40 p.m., not 5:20 p.m. The Arrest Report was in direct contradiction to what Lowell Victim 1 told Defendants Davis and Sheehan and the medical care professionals within two hours of her attack. Again, Defendants Davis and Sheehan knowingly and intentionally created a

false record in order to undermine Maher's truthful alibi. Maher, his counsel and the prosecutor were unaware that Defendants Davis and Sheehan were creating a false record.

84. In reckless disregard of basic investigatory protocol, Defendants Davis and Sheehan failed to contact Maher's Commanding Officer to determine whether Maher had provided accurate information concerning Maher's whereabouts at the time of the Lowell Victim 1 rape.

85. On December 15, 1983, Lowell Victim 1 was called to the Lowell County Courthouse to view a lineup of seven men. Lowell Victim 1 then identified Maher as the man who had raped her even though she originally identified her attacker as having no mustache. Maher, at the time of the attack, and at the time of the line up, did have a mustache.

86. On December 23, 1983, Lowell Victim 2 was called back into the Lowell County Courthouse where she viewed a lineup of six men, including Maher. In the line up, a chair was placed in front of Maher. This time, despite her prior identification of someone other than Maher, Lowell Victim 2 identified Maher as her assailant.

87. On information and belief, Defendants Davis and Sheehan engaged in improper conduct that caused Lowell Victim 1 and Lowell Victim 2 to identify Maher as their assailant.

### *Building The False Case Against Maher -- Ayer*

88. By late 1983, the August 17, 1983 rape at the Casa Manor Motel remained unsolved.

89. According to Defendant Taylor's trial testimony, in December 1983, Richard Nichols, an actor/stuntman who lived near the Casa Manor Motel, was contacted by the APD and called down to the Ayer police station to meet Defendant Taylor and discuss the August 17, 1983 rape.

90. According to trial testimony, Defendant Taylor asked Nichols if he had ever seen Dennis Maher near the Casa Manor Motel.

91. According to Defendant Taylor, Nichols informed her that he had met Maher in August 1983 near the Casa Manor Motel, and had spotted Maher parking his Green Ford Maverick near the Casa Manor Motel on multiple occasions in August 1983.

92. Defendant Taylor also testified that she came into possession of a photograph of Dennis Maher in December 1983.

93. On or about January 4, 1984, Defendant Taylor went to the Ayer Victim's home with Maher's photograph, along with nine others, and a photograph of the knife seized in the Lowell cases.

94. According to Defendant Taylor, the Ayer Victim began to shake when she saw the photograph of Maher. According to trial testimony, the Ayer Victim also recognized the blade of the knife as having the same shape as the knife used by her rapist.

95. On or about January 13, 1984, Paul J. Mahoney, a Chemist with the Massachusetts Department of Safety, Chemical Laboratory, issued a report in which he concluded that semen was detected on a vaginal smear slide, one bed sheet, and, possibly, the Ayer Victim's underpants.

96. On information and belief, Defendant Taylor never requested that forensic testing be conducted on the biological evidence identified by Mahoney.

97. On or about February 1, 1984, an in-person line up was conducted, and the Ayer Victim identified Maher as looking like the person who attacked her in August 1983.

98.     On information and belief, prior to the February 1, 1984 identification of Maher, Defendant Taylor engaged in improper conduct that caused the Ayer Victim to identify Maher as her assailant.

### *Trials And Convictions Of Dennis Maher*

99.     On March 8, 1984, the Commonwealth went forward with its prosecution of Maher for the attacks on both Lowell Victim 1 and Lowell Victim 2. The prosecution's theory was that the same perpetrator had committed both attacks. The prosecution based that theory on the similar description of the attacker provided by the two victims, the physical proximity of the two attacks, and the fact that the attacks had taken place on consecutive evenings.

100.    Maher presented an alibi defense, testifying truthfully that he was at a meeting called by his Commanding Officer at Fort Devens from 4:30 p.m. until approximately 5:15 p.m. on November 16, 1983 at Fort Devens.

101.    As noted above, when first questioned by Defendant Davis and Sheehan, Maher provided the police the names (and, in some instances, phone numbers) of his Commanding Officer and others who were with him at times that made it impossible for Maher to have committed the crimes Defendants Davis and Sheehan were investigating.

102.    Had Defendants Davis and Sheehan taken the most elementary steps, they would have eliminated Maher as a suspect, and could have focused their attention on finding the true rapist.

103.    Defendants Davis, Sheehan and Grant also failed to disclose critical forensic information that could have been used by Maher to prove his innocence at the time of trial.

104. Specifically, records reveal that on December 9, 1983, the LPD submitted the Lowell Victim 1 rape kit, Lowell Victim 1's underpants, and other related material to the Commonwealth's Chemical Laboratory for forensic testing.

105. On March 5, 1984 (three days before Maher's trial started), the Commonwealth's Chemist, Mark T. Grant, issued a report to the LPD. In his report, Grant stated that there was no seminal fluid or spermatozoa cells detected on Lowell Victim 1's underpants.

106. Grant's conclusion was contradicted by subsequent forensic testing. Specifically, subsequent analysis revealed that Lowell Victim 1's underpants did contain spermatozoa and biological evidence from the perpetrator. If this information had been disclosed to Maher prior to his trial, Maher could have used this evidence to try to demonstrate his innocence at the time of his trial. The evidence that was erroneously omitted from Grant's report was, eventually, used to clear Maher's name 19 years later.

107. On information and belief, Grant's March 5, 1984 report contains knowingly false statements and omissions, including the statement that no seminal fluid was detected on Lowell Victim 1's underpants, which are contradicted by documents not provided to the defense at the time of trial, and were made for the purpose of misleading Maher's counsel and preventing Maher to gain access to critical biological evidence that could have been used to prevent his wrongful conviction.

108. At the conclusion of his trial, Maher was convicted of rape and assault and battery of Lowell Victim 1. He was given a sentence of 12-20 years for the rape of Lowell Victim 1. His sentence for the assault and battery was 8-10 years to run concurrently. Maher was also convicted of assault with intent to commit rape and assault and battery with a dangerous weapon

of Lowell Victim 2. He was given a sentence of 8-10 years for the crimes against Lowell Victim 2. The 8-10 year sentence was to run "on and after."

109.  After securing convictions for the Lowell crimes, Maher was next prosecuted for the Ayer rape.

110.  On or about April 17, 1984, the Ayer rape trial began.

111.  In addition to the Ayer Victim's testimony, the prosecution offered key false evidence that placed Maher at the Casa Manor Motel in the days surrounding the rape.

112.  Specifically, at trial, Richard Nichols testified that he met Dennis Maher in August 1983.

113.  Nichols testified that he saw Maher driving a green Ford Maverick or similar model car, which Nichols said Maher would regularly park in a lot next to the Casa Manor in mid-August 1983.

114.  Nichols' testimony was demonstrably false and, on information and belief, the testimony was created, coached and/or fabricated by and with the assistance of Defendants Taylor and the APD.

115.  In particular, contrary to his false testimony: (a) Nichols never met Maher; (b) Maher never parked his car at or near the Casa Manor Motel; and (c) for the entire month of August 1983, Maher's green Ford Maverick was sitting at his parents' home on cinder blocks without an engine. (The car was not drivable and not put on the road until September 1983.)

116.  Two days after the trial commenced, Maher was convicted of, among other things, aggravated rape in connection with the Ayer crime. He was sentenced to serve a life term.

### *Maher's Civil Commitment*

117.    On or about June 27, 1986 and on or about July 25, 1986, as a result of his multiple convictions for sexually-related offenses, Maher was determined to be a "sexually dangerous person" and, pursuant to M.G.L. c. 123A, Maher was committed to the Treatment Center at Bridgewater for a term of one-day-to-life.

118.    Maher served a majority of his term of incarceration at the Treatment Center with many violent sex offenders.

### *Maher's Exoneration*

119.    Beginning as early as 1993 and for years thereafter, at times with the assistance of the Innocence Project in New York and the New England Innocence Project, *pro bono* organizations committed to helping wrongly convicted individuals establish their innocence through DNA testing, Maher sought to locate evidence collected in connection with the Lowell and Ayer crimes and submit that evidence for DNA testing.

120.    On information and belief, when Maher first requested DNA testing, he was told by Defendants and the Middlesex County District Attorney's Office that the biological evidence that would ultimately become the key to Maher's freedom was lost or destroyed. As events ten years later proved, this was not true.

121.    In July 2001, a law student volunteering for the New England Innocence Project, with the assistance of a Middlesex County Court Officer, located at the Middlesex County Courthouse certain evidence from Maher's case, including the pants and underpants of Lowell Victim 1.

122. After extensive negotiations with the Middlesex County District Attorney's Office, on November 9, 2001, the identified evidence was submitted to the State Police Crime Laboratory.

123. On December 17, 2001, Chemist Kellie Bogosian of the Massachusetts State Police Crime Lab inventoried and examined the located evidence and determined that the pants and underpants of Lowell Victim 1 should be tested further for the presence of biological evidence.

124. On September 30, 2002, pursuant to a stipulated agreement between the Commonwealth and Maher's counsel, the evidence was delivered to Forensic Science Associates ("FSA"), an independent lab in California, for DNA testing.

125. Dr. Edward Blake of FSA examined Lowell Victim 1's pants and underpants.

126. Contrary to the March 5, 1984 Grant report, initial tests on Lowell Victim 1's underpants revealed the presence of semen.

127. FSA's DNA testing on the semen revealed a genetic profile.

128. Subsequently, a blood sample was obtained from Maher and was submitted to FSA for DNA testing and comparison.

129. Maher's genetic profile was compared with the genetic profile of the semen deposited on Lowell Victim 1's underpants.

130. As reported by FSA in a January 7, 2003 report, the two genetic profiles did not match, which meant that Maher could not have been the donor of the seminal evidence found on the Lowell Victim 1's underpants.

131. After Maher was excluded as the source of semen found on Lowell Victim 1's underpants, the Commonwealth obtained a hospital report on Lowell Victim 1, compiled at

Lowell General Hospital hours after the November 16, 1983 rape. The report states that Lowell Victim 1 had never had sexual intercourse prior to the rape.

132. Thus, the semen found on Lowell Victim 1's underpants could not have belonged to a consensual sexual partner, and could only have been deposited by the man who raped her -- someone other than Maher.

133. Six weeks later, and after years of being told that all of the biological evidence from the Ayer crime had been lost or destroyed, on or about February 20, 2003, Maher was informed that a slide had been located from the Ayer Victim's rape kit.

134. On or about March 7, 2003, Chemist Bogosian inventoried and examined the slide and determined that the slide should be tested for the presence of biological evidence.

135. On or about March 13, 2003, the Commonwealth submitted the Ayer slide to Orchid Cellmark ("Cellmark") in Germantown, Maryland for DNA testing.

136. DNA testing revealed the presence of biological material from two individuals. Cellmark performed a comparison of the genetic profiles from the Ayer rape kit and Maher.

137. On March 25, 2003, Cellmark determined that neither of the two genetic profiles matched Maher.

138. As further evidence of the APD's misconduct in connection with the identification of Maher as the Ayer rapist, the DNA profiles from the Ayer rape did not match the DNA profile from the Lowell Victim 1 case.

### *Maher's Release, Nolle Prosequi And Other Relief*

139. On April 3, 2003, based on the DNA evidence from the Lowell Victim 1 case and the Ayer case, and the belief that the Lowell crimes were committed by the same person, Maher's unopposed motion for new trial was granted.