UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENNIS MAHER,

                Plaintiff,

v.

TOWN OF AYER, THE AYER POLICE DEPARTMENT, NANCY TAYLOR-HARRIS a/k/a NANCY TAYLOR, in her individual capacity, and JOHN and JANE DOES NOS. 1-15, in their individual capacities, CITY OF LOWELL, THE LOWELL POLICE DEPARTMENT, EDWARD F. DAVIS III, in his individual capacity, GARRETT SHEEHAN, in his individual capacity, MARK T. GRANT, in his individual capacity, and JOHN AND JANE DOES NOS. 16-30.

                Defendants.

Civil Action No. 06-10514-RGS

**PLAINTIFF DENNIS MAHER'S MEMORANDUM OF LAW
(1) IN OPPOSITION TO MARK T. GRANT'S SECOND MOTION TO DISMISS
AND (2) IN SUPPORT OF MAHER'S MOTION TO STRIKE AFFIDAVITS
OR, IN THE ALTERNATIVE, FOR DISCOVERY PURSUANT TO RULE 56(f)**

Plaintiff Dennis Maher ("Maher") hereby submits his Memorandum of Law (1) in Opposition to Mark T. Grant's ("Grant") Second Motion to Dismiss and (2) in Support of Maher's Motion to Strike Affidavits or, in the Alternative, for Discovery Pursuant to Rule 56(f). For the reasons set forth below, Grant's Motion should be denied on the present record.

**PRELIMINARY STATEMENT**

Maher's claims arise out of his wrongful convictions in 1984 for three separate crimes that occurred in Massachusetts: the alleged August 17, 1983 rape of a woman in Ayer, the November 16, 1983 rape of a woman in Lowell ("Lowell Victim 1"), and the November 17, 1983 assault of another woman in Lowell ("Lowell Victim 2"). Nineteen years after his conviction for these crimes, DNA tests were performed on semen that had been collected at the

crime scenes. The DNA tests revealed that Maher could not have committed the crimes for which he was convicted. After a motion for new trial was granted, recognizing Maher's actual innocence, the government filed a nolle prosequi as to each of the charges. This civil action followed.

Maher alleges that Grant, together with the other Defendants, violated Maher's civil rights by, among other things, failing to disclose before trial the existence of seminal fluid that could have been – and ultimately was – Maher's key to freedom. Maher further alleges that Grant's and his co-Defendants' failure to disclose this evidence was not merely inadvertent, but was instead knowing, reckless or intentional. To support this allegation, Maher references Grant's undisclosed handwritten notes, which reflect test results consistent with the presence of seminal fluid on one of the victim's underpants. The report Grant provided to the Lowell police three days prior to Maher's trial, however, contradicted Grant's own undisclosed notes by denying the existence of seminal fluid on the underpants.

On May 5, 2006, Grant moved to dismiss all of Maher's claims against him. In his response, Maher conceded to dismissal of certain of the causes of action alleged against Grant, but opposed dismissal as to four causes of action against Grant under 42 U.S.C. § 1983 (Brady violation (Count I) and conspiracy (Count XI)) and state tort law (malicious prosecution / abuse of process (Count XII) and intentional infliction of emotional distress (Count XIV)). On June 14, 2006, the Court issued an Order dismissing the conceded causes of action, and ruling that Grant's Motion was "[o]therwise, [d]enied, without prejudice to be renewed in conjunction with the anticipated motion to dismiss to be filed on behalf of the remaining defendants." Grant filed his Second Motion to Dismiss on September 15, 2006. A hearing on this Motion is scheduled for November 6, 2006, during which oral argument on the Lowell Defendants' motion to

dismiss, the Ayer Defendants' motion for summary judgment, and Maher's ancillary motions in response will also be heard.

Grant's memorandum in support of his Second Motion to Dismiss largely parrots the first. He has attempted to bolster his arguments (improperly at the motion to dismiss stage) with affidavits from two individuals – himself, and Paul J. Zambella, who apparently is Grant's expert in this litigation.[1] Try as they might, none of the factual assertions made by Grant or Zambella change the fact that Grant's written report, disclosed to prosecutors days before Maher's trial, was directly contradicted by his internal, undisclosed handwritten notes. Defendant Grant and his fellow affiant may wish to minimize the importance of this alleged Brady violation, but Maher intends to prove at trial that the failure to disclose the presence of seminal fluid on the victim's underwear – seminal fluid that would become the key to Maher's 2003 exoneration – was made in bad faith and was the difference between freedom and almost twenty years behind bars.

## RELEVANT FACTUAL BACKGROUND[2]

Grant's actionable conduct relates to Maher's prosecution for the rape of Lowell Victim 1. After the crime was reported, the Lowell police escorted Lowell Victim 1 to Lowell General Hospital, where her pants and underpants were collected as evidence. Complt. ¶ 42.

---

[1] As requested in Maher's Motion to Strike Affidavits or, in the Alternative, Motion for Discovery Pursuant to Rule 56(f), submitted herewith, the affidavits Grant relies upon in connection with his Motion should be excluded from consideration, and he should not be allowed to ask the Court to make factual findings upon which his Motion depends without Maher having a full opportunity to conduct discovery and fully oppose what is, in sum and substance, a motion for summary judgment.

[2] The facts recited herein, which on a motion to dismiss must be taken as true, are only those specifically related to Grant's conduct. Maher respectfully refers the Court to his Complaint for a detailed recitation of the facts supporting his claims generally, or to his opposition to the Lowell Defendants' motion to dismiss for a recitation of the factual allegations supporting his claims against the Town of Lowell, Edward Davis and Garrett Sheehan. To the extent that Grant relies upon or incorporates by reference the arguments made by the Lowell Defendants in this matter, Maher hereby incorporates his arguments in opposition to the same.

On December 9, 1983, the Lowell Police Department submitted the Lowell Victim 1 rape kit, Lowell Victim 1's underpants, and other related material to the Commonwealth's Chemical Laboratory for forensic testing. Id. ¶ 104. On March 5, 1984 (three days before Maher's trial started), the Commonwealth's chemist, Grant, issued a report to the Lowell Police Department. Id. ¶ 105. In his report, Grant stated that there was no seminal fluid or spermatozoa cells detected on Lowell Victim 1's underpants. Id. This statement was not true. Id. ¶¶ 106-07. In particular, Grant's statement regarding the absence of seminal fluid was belied by Grant's own prior handwritten notes prepared days earlier. These undisclosed notes, which Grant attached to his original motion to dismiss papers, revealed a positive reaction for acid phosphatase – a reaction indicative of the presence of seminal fluid. See generally Complt. ¶ 107.

Almost twenty years later, DNA testing confirmed what Grant had written in his undisclosed notes – specifically, that Lowell Victim 1's underpants did contain the biology of the perpetrator. Id. ¶ 106. If this information had been disclosed to Maher prior to his trial, he could have used the evidence to try to demonstrate his innocence at trial. Id.

On March 8, 1984, the Commonwealth went forward with its prosecution of Maher for the attacks on both Lowell victims. Id. ¶ 99. At the conclusion of his trial, Maher was convicted and sentenced to over 20 years in prison. Maher was next prosecuted for the Ayer rape. Id. ¶ 109. After two days of trial, he was convicted and then sentenced to serve a life term. Id. ¶ 116.

Years later, in July 2001, a law student volunteering on Maher's behalf located certain evidence from Maher's case, including Lowell Victim 1's pants and underpants. Id. ¶ 121. Subsequent testing of the underpants – the same underpants which Maher had been told lacked biological evidence, despite internal notes to the contrary – revealed the presence of semen, which yielded a genetic profile that excluded Maher as the perpetrator. Id. ¶¶ 122-32. On April

3, 2003, Maher's unopposed motion for new trial was granted, the Commonwealth filed a nolle prosequi as to each of Maher's indictments, and, after serving 19 years, 2 months, and 29 days for three crimes he did not commit, Maher was released from confinement. Id. ¶¶ 139-45.

## ARGUMENT

In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), "a court must accept the plaintiff's sufficiently plead[ed] facts as true and grant all reasonable inferences in the plaintiff's favor." Charles v. City of Boston, 365 F. Supp.2d 82, 87 (D. Mass. 2005) (Gertner, J.) (citing Cooperman v. Individual, 171 F.3d 43, 46 (1st Cir. 1999)). "A motion to dismiss is only allowed where it is clear that the plaintiff can prove no set of facts to support his or her cognizable claim." Id. (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). "Where state of mind is relevant to the claim, knowledge, motive and intent may be averred generally." Id. at 87-88 (citing Educadores Puertorriquenos en Action v. Hernandez, 367 F.3d 61, 66 (1st Cir. 2004)). "Under Rule 12(b), 'any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under [Fed. R. Civ. P.] 56.'" Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 993 F.2d 269, 273 (1st Cir. 1993) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

### I. Grant's Motion Should Be Denied Because No Immunity Protects A Chemist From Liability Under § 1983 When He Fails To Disclose Potentially Exculpatory Evidence.

When stripped of the affidavit testimony, the arguments in Grant's Second Motion to Dismiss differ little from the first go around, and continue to rely on an incorrect reading of the law. Consequently, Grant's motion should be rejected. See Charles, 365 F. Supp.2d at 88 ("the Complaint . . . more than suffices to meet the standards of Rule 12(b)(6) and the applicable law").

Grant contends that Maher's § 1983 claim should be dismissed because: "(1) at the time of the alleged violation, the evidence was not favorable to Maher; (2) Grant did not suppress any evidence; (3) the evidence was not material to Maher's conviction; and (4) Grant is entitled to qualified immunity." Grant's Mem. at 8. None of these arguments has any merit. Since the first three arguments are subsumed within the qualified immunity analysis, Maher addresses them below within that framework.

### A. Grant Does Not Enjoy Qualified Immunity From Maher's Well-Pled § 1983 Allegations.

The First Circuit has developed "a three-step process" for determining the existence or absence of qualified immunity:

> (1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

Wilson v. City of Boston, 421 F.3d 45, 52 (1st Cir. 2005) (citation omitted). Stated alternatively, "the qualified immunity question is 'whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of the allegedly unlawful conduct.'" Charles, 365 F. Supp.2d at 89 (quoting Lowinger v. Broderick, 50 F.3d 61, 65 (1st Cir. 1995)). The answer here, as in Charles, "is an unequivocal 'no.'" Id.

### 1. The Complaint Alleges That Grant Violated Maher's Constitutional Rights.

Maher alleges that the documents contradicting Grant's statement were <u>not</u> provided to the defense at trial, although such information could have prevented Maher's near-two decades of confinement for crimes he did not commit. See Complt. ¶¶ 105-07. Such non-disclosure of

6

potentially exculpatory evidence makes out a classic § 1983 claim for violation of a defendant's rights under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, particularly when the result was the conviction of a man who is indisputably innocent. See Charles, 365 F. Supp.2d 82 (denying motion to dismiss § 1983 claim asserted by wrongfully convicted plaintiff against forensic criminalist).

"There are three components of a true Brady violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). "This 'does not mean that the reviewing court must be certain that a different result would obtain.'" Norton v. Spencer, 253 F. Supp.2d 65, 73 (D. Mass. 2003) (quoting United States v. Dumas, 207 F.3d 11, 15 (1st Cir. 2000)).

Maher quite clearly alleges that Grant withheld information that could have led to Maher's acquittal. Maher specifically alleges:

> 105.   On March 5, 1984 (three days before Maher's trial started), the Commonwealth's Chemist, Mark T. Grant, issued a report to the [Lowell Police Department]. In his report, Grant stated that there was no seminal fluid or spermatozoa cells detected on Lowell Victim 1's underpants.
>
> 106.   Grant's conclusion was contradicted by subsequent forensic testing. Specifically, subsequent analysis revealed that Lowell Victim 1's underpants did contain spermatozoa and biological evidence from the perpetrator. If this information had been disclosed to Maher prior to his trial, Maher could have used this evidence to try to demonstrate his innocence at the time of his trial. The evidence that was erroneously omitted from Grant's report was, eventually, used to clear Maher's name 19 years later.
>
> 107.   On information and belief, Grant's March 5, 1984 report contains knowingly false statements and omissions, including the statement that no seminal fluid was detected on Lowell Victim 1's

>underpants, which are contradicted by documents not provided to the
>defense at the time of trial, and were made for the purpose of
>misleading Maher's counsel and preventing Maher to gain access to
>critical biological evidence that could have been used to prevent his
>wrongful conviction.

Complt. ¶¶ 105-07 (emphasis added).[3] Paragraph 107 of the Complaint includes the core allegation that Grant knew that Lowell Victim 1's underpants tested positive for the presence of seminal fluid, despite what Grant later reported to the police on the eve of trial. In short, the statement in Grant's report indicating absence of seminal fluid on the underpants was false.

Notwithstanding these allegations of wrongdoing, Grant seeks to diminish the role he played in Maher's prosecution and conviction, hoping to latch on to the Charles court's dicta that "it is true that some criminalists who have minor law enforcement roles (e.g., lab technicians who merely test numbered vials) may not have independent Brady obligations." 365 F. Supp.2d at 89. See Grant's Mem. at 5 ("the affirmative duty to disclose favorable evidence does not extend to Grant's limited role as a forensic chemist"). The Court should not accept Grant's attempt to marginalize his own actions in order to avoid liability.

Here, as in Charles, "from the face of the Complaint, [the defendant forensic criminalist]'s role in [plaintiff]'s prosecution was hardly insignificant." Id. Grant submitted his report to the police and thus to the prosecutor just three days before Maher's criminal trial, when it was critical for the prosecution that there be no evidence tending to exclude Maher from being the perpetrator. Had Grant disclosed evidence of seminal fluid prior to trial, Maher could have used that evidence to create reasonable doubt that he was the perpertrator, as the government claimed. Despite the fact that DNA analysis was not available in the early 1980s, the semen could have been tested for blood type that had a significant likelihood of excluding Maher as the

---

[3] Maher's Complaint also describes in detail the post-conviction forensic testing that revealed the presence of spermatozoa that contained the DNA evidence that led to Maher's exoneration. See Complt., ¶¶ 121-32.

perpetrator. The non-disclosure of the forensic evidence suppressed by Grant and others precluded Maher from asserting this factual defense, and thus plainly constituted a violation of Maher's constitutional rights.

Nonetheless, Grant argues that the evidence he withheld – i.e., his lab notes that contradicted his report's conclusion that no biological evidence was found on the victim's underpants – is not encompassed by Brady because "there is no allegation that the documentation allegedly suppressed was *actually exculpatory*, nor that such evidence *would have prevented* the wrongful conviction." Grant's Mem. at 8 (emphasis in original). Grant cites no case to suggest that evidence must be unequivocally exculpatory in order to trigger the Brady obligation to disclose. To the contrary, there is no requirement that the undisclosed evidence would necessarily lead to a different result; rather, it is a question of "reasonable probability" (United States v. Bagley, 473 U.S. 667, 682 (1985)), and "does not mean that a defendant must convince the court of the certainty of a different outcome." United States v. Cunan, 152 F.3d 29, 34 (1st Cir. 1998). Cf. Kyles v. Whitley, 514 U.S. 419, 435 (1995) (Brady violation may be shown if the "evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict"); Pierce v. Gilchrist, 359 F.3d 1279, 1287 (10th Cir. 2004) ("we cannot say that the false information supplied by [forensic chemist] and the accurate exculpatory information disregarded by [her] were not significant enough to prejudice [plaintiff's] constitutional rights").

Further, Grant mistakenly suggests that Maher's knowledge of the existence of seminal fluid on the underpants would not have yielded "at least a reasonable probability of altering the outcome [of his trial]." Grant's Mem. at 9. Although not appropriate for consideration on a motion to dismiss, there is a substantial likelihood that blood-type analysis would have excluded

9

Maher as the perpetrator of the crime against Lowell Victim 1. Specifically, Maher intends to rely on expert testimony that will show that forensic testing readily available in 1983 would have had a substantial likelihood of determining the blood type of the perpetrator from the undisclosed seminal fluid. Such blood-type information then could have been used by Maher to show that he was not the perpetrator of the crime for which he was convicted.

Finally, recognizing that his position is virtually indistinguishable from that of the chemist in Charles whose similar motion was denied by Judge Gertner, Grant is left to argue that Charles should not be followed as it has no precedential value. See Grant's Mem. at 6 n.3. While it is true that Charles is not binding, it is a reasoned decision of a court in this District, and was decided within the framework established by the First Circuit for analyzing the same question presented by Grant's motion – i.e., whether a forensic chemist who withheld evidence may be subject to suit under 42 U.S.C. § 1983. Cf. Kilmartin v. H.C. Wainwright & Co., 580 F. Supp 604, 609 (D. Mass. 1984) ("Although the Court recognizes that it is not bound by the decisions of other district courts in this Circuit, it rules that the reasoning of these district courts is persuasive.").

### 2. Maher's Constitutional Rights Were Clearly Established At The Time.

Grant makes the same argument that was rejected by the court in Charles – i.e., that Brady obligations did not extend to him. See Grant's Mem. at 11 ("There is no binding precedent establishing an absolute duty to disclose favorable evidence on forensic chemists in Grant's position."). The Charles court concluded that the "[forensic criminalist defendant]'s duty to disclose Brady information *to the prosecutor* was clearly established at the time of his investigation into the 1980 rapes." 365 F. Supp.2d at 89 (emphasis in original). As such, Grant's duty to disclose the existence of potentially exculpatory evidence – evidence that in fact

led to Maher's exoneration – was most certainly clearly established four years later. Grant's failure to disclose such evidence was inexcusable, and it led to the nineteen-year imprisonment of an innocent man.

Grant relies on cases outside the First Circuit (see Grant's Mem. at 7), despite the fact that the First Circuit has recently recognized that "[t]he intentional or reckless fabrication of inculpatory evidence or omission of material exculpatory evidence by a forensic examiner in support of probable cause may amount to a constitutional violation." Burke v. Town of Walpole, 405 F.3d 66, 89 (1st Cir. 2005) (citations omitted). Grant's citation to pre-Burke cases in the Fifth and Eighth Circuits also is unavailing because Charles is the case most on point, and because the majority of Circuit Courts of Appeal to have recently addressed the question have recognized that Brady obligations extend beyond the prosecutor to those who investigate the crime. See, e.g., Gregory v. City of Louisville, 444 F.3d 725, 760 (6th Cir. 2006) (in § 1983 action brought by wrongfully convicted plaintiff, summary judgment inappropriate to dispose of Brady claims against forensic examiner); Pierce, 359 F.3d at 1287 (affirming denial of forensic analyst's motion to dismiss § 1983 claims based on post-arrest fabrication of hair sample opinion); United States v. Blanco, 392 F.3d 382, 393 (9th Cir. 2004) (the obligation to disclose under Brady "is the obligation of the government, not just the obligation of the prosecutor"); Newsome v. McCabe, 256 F.3d 747, 752 (7th Cir. 2001) (clearly established in 1979 and 1980 that police could not withhold Brady evidence from prosecutor). Even the court in Villasana v. Wilhoit, 368 F.3d 976, 979 (8th Cir. 2004), cert. denied, 543 U.S. 1153 (2005), cited by Grant, recognized that "the duty imposed by Brady extends to evidence in the State's possession not known to the prosecutor." In the absence of a First Circuit pronouncement to the contrary, Grant offers this Court no sufficient basis to diverge from the conclusion reached in the Charles case.

### 3. An Objectively Reasonable Official Would Have Believed That Withholding Potentially Exculpatory Physical Evidence Violated A Criminal Defendant's Clearly Established Constitutional Rights.

No objectively reasonable forensic chemist would believe that it was constitutional to withhold potentially exculpatory evidence from an innocent criminal defendant. As the Gregory court observed in ruling that the § 1983 liability of the forensic examiner (Katz) could not be determined on summary judgment:

> If Plaintiff's allegations are correct, then Katz deliberately withheld the existence of those two nonmatching hairs. Katz "cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional rights."

Gregory, 444 F.3d at 744 (quoting Spurlock v. Satterfield, 167 F.3d 995, 1005 (6th Cir. 1999)).

The facts here fit into the same mold. Maher's Complaint clearly identifies the problem with Grant's inconsistent disclosures. Grant's failure to disclose the positive results for the acid phosphatase test (which, as Grant and his expert must concede, indicates the likely presence of semen or seminal fluid), coupled with Grant's false report denying the presence of seminal fluid on Lowell Victim 1's underpants, amounts to a deliberate withholding of potentially exculpatory forensic evidence. Maher's grievance is not simply a claim regarding the failure to disclose the notes, but the more pernicious fact that the undisclosed notes establish that Grant's written report was false and misleading to the prosecutor, Maher, and Maher's counsel. Thus, like Katz in Gregory, Grant "cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional rights." Id.[4]

---

[4] Grant's assertion, without citation to authority, that "a chemist in [his] situation could not reasonably believe that withholding notes and/or concluding no seminal fluid was present in compliance with crime lab procedures would violate a known constitutional right" (Grant's Mem. at 12), is premised on factual conclusions outside the pleadings, and cannot be considered on a motion to dismiss.

### B.     Maher's Complaint States A § 1983 Conspiracy Against Grant.

Grant argues that Maher does not state a § 1983 conspiracy claim because "at no point . . . did Grant ever come into contact with the alleged co-conspirators," so there could be no "meeting of the minds." Grant's Mem. at 14. Apart from its reliance on facts beyond the four corners of the complaint, this argument ignores Maher's allegations that the as-yet-unidentified Doe Defendants participated in the conspiracy. See Complt. ¶ 196. Additionally, at the pleading stage a § 1983 conspiracy claim does not require facts showing the existence of an express agreement:

> agreement between the conspirators – the glue of the conspiracy – can be inferred from all of the factual circumstances alleged. United States v. Tormos-Vega, 959 F.2d 1103, 1117 (1st Cir. 1992); Earle v. Benoit, 850 F.2d 836, 843 (1st Cir. 1988). Plaintiff need not show an express agreement in order to state a claim for conspiracy. Earle, 850 F.2d at 845; see also Limone v. Condon, 372 F.3d 39, 49 (1st Cir. 2004) (for Rule 12(b)(6) purposes, the facts alleged in the complaint need only "support a plausible inference that" the alleged co-conspirators acted in concert).

Charles, 365 F. Supp.2d at 90. Maher's complaint sets forth detailed factual allegations describing the myriad ways in which the Defendants distorted and/or hid the truth in order to convict Maher, including through the non-disclosure of key forensic evidence. Judged by the standards recited above, Maher's Complaint alleges more than ample circumstantial detail, at least at the motion to dismiss stage, from which to infer an unlawful agreement among Grant and the other law enforcement officials who are defendants in this action. See id. at 89-90 (refusing to dismiss § 1983 conspiracy claim against forensic criminalist who was "implicated in this conspiracy through the withholding of physical evidence, which culminated in his false testimony at trial"); Limone v. Condon, 372 F.3d 39, 49 (2004) (conspiracy allegations in complaint sufficient to withstand motion to dismiss in light of factual allegations pertaining to defendant and plausible inferences to be drawn in plaintiff's favor).

### C. Maher's Allegations Support A Claim Against Grant For Malicious Prosecution And Abuse Of Process.

To state a claim for abuse of process, a plaintiff must show that: "(1) 'process' was used, (2) for an ulterior or illegitimate purpose; (3) resulting in damage." Gutierrez v. Massachusetts Bay Transportation Auth., 437 Mass. 396, 407 (2002) (citations omitted). A claim for malicious prosecution is similar, requiring a plaintiff to show "(1) the institution of criminal process against the plaintiff with malice; and (2) without probable cause; and (3) the termination of the criminal proceeding in favor of the plaintiff." Id. at 405 (citations omitted). It is not a prerequisite that the defendant himself or herself "initiate," "insitute" or "instigate" the process against plaintiff. Rather,

> Even if defendants did not, by themselves, "initiate" the prosecution, a person "who takes an active part in continuing or procuring the continuation of criminal proceedings initiated . . . by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings."

Limone v. United States, 271 F. Supp.2d 345, 358 (D. Mass. 2003), aff'd, 372 F.3d 39 (2004) (quoting Mitchell v. City of Boston, 130 F. Supp.2d 201, 215 (D. Mass. 2001), citing Restatement (Second) of Torts § 655 (1976)). Grant clearly took an active part in the continuation of criminal proceedings against Maher, when he failed to disclose evidence that could have exculpated Maher. Cf. Pierce, 359 F.3d at 1293 ("a police forensic analyst who prevaricates and distorts evidence" "cannot 'hide behind' the fact that she neither initiated nor filed the charges against [wrongfully convicted plaintiff]"). The deliberate withholding of such exculpatory evidence in order to secure the conviction of an innocent person – which is what Maher alleges – plainly reflects the "illegitimate purpose" and "malice" elements of these claims. At the pleading stage, it is sufficient to aver state of mind generally. See Fed. R. Civ. P. 9(b) ("[m]alice, intent, knowledge, and other condition of mind of a person may be averred

14

generally"); Educadores Puertorriquenos en Action v. Hernandez, 367 F.3d 61, 68 (1st Cir. 2004) (a pleading asserting a § 1983 claim must set forth "minimal facts as to who did what to whom, when, where, and why – although the why, when why means the actor's state of mind, can be averred generally.").

### D. Grant Articulates No Basis Upon Which To Dismiss Maher's Claim For Intentional Infliction Of Emotional Distress.

Maher has alleged that Grant's report issued three days before trial, which claimed the absence of seminal fluid on Lowell Victim 1's underpants, when in fact seminal fluid was present, was "knowingly false." Complt. ¶ 107. The allegation that Grant purposefully withheld information contained in "documents not provided to the defense at the time of trial," in order to obtain a conviction of an innocent man, more than meets the standard for "extreme and outrageous" conduct. Cf. Limone, 271 F. Supp.2d at 363 ("There can be little doubt that the acts of law enforcement personnel who framed innocent men for murder give rise to a claim of intentional infliction of emotional distress under Massachusetts law.") As such, Maher's claim against Grant for intentional infliction of emotional distress should stand.

## II. The Affidavits Should Be Stricken And Grant's Motion Should Not Be Converted.

In his Second Motion to Dismiss, Grant appends and relies heavily upon two affidavits. The first is an affidavit of Paul J. Zambella, a Senior Chemist at the Massachusetts Crime Laboratory's facility in Danvers, relating to standard crime lab practice, policy and procedure. See Grant's Mem., Ex. 1. Apparently, Mr. Zambella is Grant's expert in this litigation. The second is an affidavit of Grant himself, testifying generally to forensic lab standards, practices and procedures, and specifically to his actions and lab notes regarding the Lowell Victim 1 evidence. See Grant's Mem., Ex. 2.

By definition, these affidavits contain information that falls outside the four corners of the Complaint. However, Grant has not prayed for summary judgment in the alternative, and he has offered neither any reason at all why the Court should consider outside affidavits (including one from an apparent expert witness) in deciding a motion to dismiss, nor any suggestion that the Court should treat the motion as one for summary judgment, nor why, if converted to a motion for a summary judgment, the motion should be decided on an incomplete record, without ample time for discovery. Accordingly, the Court should exclude the affidavits from its consideration of Grant's Second Motion to Dismiss. See In re Digital Equip. Corp. Sec. Litig., 601 F. Supp. 311, 312 (D. Mass. 1984) (granting motion to strike affidavit submitted with motion to dismiss and observing that "it would be inappropriate at this stage of the pleadings for me to consider the facts contained in the affidavit").

As the First Circuit has stated, "[w]hen discovery has barely begun and the nonmovant has had no reasonable opportunity to obtain and submit additional evidentiary materials to counter the movant's affidavits, conversion of a Rule 12 motion to a Rule 56 motion is inappropriate." Whiting v. Maiolini, 921 F.2d 5, 7 (1st Cir. 1990) (citation omitted). The district court in Whiting converted the civil rights defendants' motion to dismiss into a motion for summary judgment, which the court then granted. The First Circuit reversed, concluding that "the plaintiff was not afforded a meaningful opportunity to respond to the treatment of defendants' motion as one for summary judgment. At this stage of the proceedings, it was premature to dispose of the case in this manner." Id. (citation omitted). It similarly would be premature to dispose of Maher's case on a converted motion for summary judgment in which Maher has not had the opportunity to examine the affiants whose testimony Grant has offered in support of his Motion and present expert testimony of his own.

## III. If The Court Deigns To Convert Grant's Motion To One For Summary Judgment, It Should Allow Ample Time For Discovery Pursuant To Rule 56(f).

Grant relies on the affidavits appended to his Motion to argue, essentially, that Grant cannot be liable because his actions conformed to standard practice. See Grant's Mem. at 9-10. If the Court is inclined to convert Grant's motion into one for summary judgment, it should permit Maher the opportunity to take discovery pursuant to Fed. R. Civ. P. 56(f), in order to refute Grant's claims concerning his conduct.

There can be no question that, "upon conversion to summary judgment, 'all parties shall be given a reasonable opportunity to present all material made pertinent' by the conversion." Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 993 F.2d 269, 273 (1st Cir. 1993) (quoting Fed. R. Civ. P. 12(b)). It would be patently improper to allow a converted motion for summary judgment based on one side's affidavits alone, without affording the other side the opportunity to examine the affiants or counter their testimony. This is particularly true when, as here, the motion raises issues that inherently involve factual questions (such as what the applicable standards were and whether Grant complied with them) that may not be ripe for decision on summary judgment. Cf. Gregory, 444 F.3d at 750 ("Because reasonable minds could differ on the question of what [forensic examiner] Katz did and whether Katz's fabrication or failure to disclose would have dissolved probable cause, this is a question for the jury.").

If Grant's motion is to be construed as one for summary judgment, Maher is entitled, at a minimum, to depose Grant and his expert, Mr. Zambella, and to proffer expert opinion testimony of his own.[5] Maher therefore respectfully requests that the Court decline to rule until sufficient discovery may be had, to enable a fair consideration of the issues raised by Grant's Motion.

---

[5] The Affidavit of Robert N. Feldman in Support of Plaintiff Dennis Maher's Alternative Motion for Discovery Pursuant to Rule 56(f) ("Feldman Aff."), submitted herewith, sets forth additional discovery that Maher intends to seek concerning Grant's conduct. See Feldman Aff., ¶ 8.

17

## **CONCLUSION**

For the foregoing reasons, Grant's Second Motion to Dismiss should be denied.

>Respectfully submitted,
>
>**DENNIS MAHER,**
>
>By his attorney,
>
>/s/ Robert N. Feldman
>Robert N. Feldman (BBO# 630734)
>BIRNBAUM & GODKIN, LLP
>280 Summer Street
>Boston, MA  02210-1108
>Telephone:  (617) 307-6100
>Fax:  (617) 307-6101

Dated:  October 16, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was delivered to all counsel of record on October 16, 2006, by electronic service.

/s/ Robert N. Feldman
Robert N. Feldman