UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

DENNIS MAHER,                                                    )
                                                        Plaintiff,              )
                                    v.                                          )
                                                                                )
TOWN OF AYER, THE APD, NANCY TAYLOR-          )
HARRIS a/k/a NANCY TAYLOR, in her individual      )
capacity, and JOHN and JANE DOES NOS. 1-15, in    )   Civil Action No. 06-10514 (RGS)
their individual capacities, CITY OF LOWELL,         )
EDWARD F. DAVIS III, in his individual capacity,     )
GARRETT SHEEHAN, in his individual capacity, and  )
JOHN AND JANE DOES NOS. 16-30,                       )
                                                                                )
                                                Defendants.                )
_____                  )

## PLAINTIFF'S OPPOSITION TO DEFENDANT NANCY TAYLOR-HARRIS' RENEWED MOTION FOR SUMMARY JUDGMENT

Plaintiff Dennis Maher hereby submits his opposition to Nancy Taylor-Harris' Renewed

Motion for Summary Judgment, and respectfully requests that the motion be denied.

## I.    INTRODUCTION

In December 1983, Ayer police officer Nancy Taylor-Harris ("Taylor") learned that

Dennis Maher had been arrested for two sexual assaults in the City of Lowell.  Then and there

began Taylor's effort to "solve" a languishing and open rape case in Ayer by pinning that crime

on Maher, a man who decades later would be proven innocent.  Taylor took the steps necessary

to manufacture a winning case against Maher, including suborning perjury and suppressing

evidence.  On April 19, 1984, as a result of Taylor's misconduct, Maher was convicted.  Years

later, DNA testing proved him innocent.  He was released on April 3, 2003, after more than

nineteen years of incarceration.

II.     **SUMMARY OF FACTS CRITICAL TO SUMMARY JUDGMENT**[1]

    A.     **Background**

In August 1983, Marilyn Goss reported that she had been raped at the Caza Manor Motel. RSF ¶ 15.  Taylor, who had been a clerk, dispatcher and "special officer" with Ayer Police Department ("APD") since 1977, was the lead case investigator.  CSF ¶ 73.  Little was done in August to investigate and no suspects were identified.  *Id.* ¶¶ 16, 19.  In September 1983, Taylor, for the first time, began receiving formal police training at the Massachusetts Police Academy. RSF ¶ 35.  While she was at the Academy, in November 1983, two women were sexually assaulted in the City of Lowell.  CSF ¶ 36.  Both victims allegedly identified Maher from a photo array and he was arrested for the Lowell crimes on November 17, 1983.  *Id.*

In December 1983, Taylor received notice of the Lowell attacks and a photo of a man (Maher) who had been arrested for them.  RSF ¶¶ 39-41.  Taylor brought Maher's photo to Goss' home on January 4, 1984.  CSF ¶ 37.  During that visit, Goss allegedly selected Maher's photo among a stack of ten.  *Id.* ¶ 40.  Based on that identification, Taylor obtained a warrant and Maher was arrested.  RSF ¶ 61.

Maher was tried for the Goss rape in April 1984.  *Id.* ¶ 98.  Assistant District Attorney J.W. Carney, Jr. ("Carney") prosecuted the case on behalf of the Commonwealth.  RSF ¶ 64. The Commonwealth's case was based on the testimony of two main witnesses:  (1) Goss, the victim; and (2) Richard Nichols, a corroborating witness who placed Maher at the scene of the crime.  CSF ¶¶ 46-52.  As a result of their testimony, Maher was convicted and sentenced to a term of life imprisonment.  *Id.* ¶ 51.  Maher served more than nineteen years of that sentence,

---

[1]  As the Court is familiar with the basic background of the case, Maher here focuses on the core facts requiring denial of Taylor's motion, and respectfully refers the Court to the accompanying Response to the Ayer Defendants' Statement of Undisputed Facts ("RSF") and Plaintiff's Counter-statement of Additional Facts as to Which There Is a Genuine Dispute ("CSF") for the complete factual record.

until he was released in 2003 after DNA conclusively established his actual innocence.  *Id.* ¶¶ 54-55.

### B.       Trial Evidence Against Maher

#### 1.       Goss – The Victim and Eyewitness

At trial, Goss described the attack and the events leading up to it.  RSF ¶ 100.  She testified that on August 17, 1983, she had taken a room at the Caza Manor Motel to get some distance from her husband.  *Id.* ¶ 91.  During the course of the evening, she observed a suspicious man in the parking lot of the motel, and called the APD to report it.  *Id.* ¶¶ 4-6.  Later that night, the suspicious man entered her room – by way of a door she left ajar to get some fresh air – and raped her.  *Id.* ¶¶ 9-11.  During her trial testimony, Goss identified Maher as her attacker.  CSF ¶ 46.

Maher did not commit the Goss rape.  *Id.* ¶¶ 54-55.  He maintained his innocence from the moment he was first arrested.

#### 2.       Nichols – The Corroborating Witness

The Commonwealth's second key witness, Richard Nichols, corroborated Goss' testimony by placing Maher at the Caza Manor Motel in the days surrounding the Goss rape.  *Id.* ¶ 47.  Carney described Nichols as being an "unbelievable gift" – a witness who at the time "convinced [Carney] beyond a reasonable doubt that Marilyn Goss' identification was accurate." *Id.* ¶ 29.

Nichols, who is now deceased, lived next door to the Caza Manor Motel and testified that he had met Maher in August 1983 and repeatedly had seen him around the motel.  *Id.* ¶¶ 26, 47.  Nichols told the jurors that he had seen Maher three or four times during the second or third week of August, and would see Maher park his car in a lot near the motel "between 10:00 and 11:00 o'clock at night," and "head towards the Casa Manor."  *Id.* ¶¶ 47.  Nichols specifically

identified Maher's car as a green Ford Maverick.  *Id.*  Nichols provided additional testimony about his contact with Maher in August 1983.  He testified that Maher approached him and several other men who were working on a car in the lot next to the Caza Manor Motel; that he was able to remember the name "Dennis Maher" because he once worked with a man named "Maher;" and that when he had previously seen Maher, Maher was not wearing the "low-cut shoes" he wore at trial.  *Id.*

     **C.**    **Taylor's Role In The Presentation Of False Testimony Against Maher**

     **1.**    **Nichols**

Nichols' testimony at trial was false.  Maher had never met Nichols or been to the Caza Manor Motel.  *Id.* ¶ 28.  In the words of Carney:

> I believe now that his testimony was completely and totally fabricated.  It is bizarre when someone comes forward and makes up out of [whole] cloth incriminating evidence against an individual, especially when it contains such specificity, such as the make and model of the car the person supposedly was driving, and the person's very name.

*Id.* ¶ 30.

Maher did not visit the Caza Manor Motel in August 1983.  *Id.* ¶ 28.  He did not park his car in the area and head toward the motel between 10:00 and 11:00p.m. on several occasions in August 1983.  Maher did not introduce himself to Nichols while several men were standing around a car in the parking lot adjacent to the motel.  And while Maher *was* driving a green Ford Maverick in January 1984 (when he was arrested), in August 1983 he was driving a yellow Mercury Comet and the green Ford Maverick was on cinderblocks without an engine.  *Id.* ¶ 27.

At his deposition, Carney explained how Nichols came to the District Attorney's Office as a key witness with specific and incriminating evidence against Maher:  "[Nichols] came to me from Nancy Taylor."  *Id.* ¶ 29.  Nichols' false testimony directly matched information that only Taylor and the APD possessed.  Nichols testified that he and Taylor discussed Maher's name and

photo.  *Id.* ¶ 25.  Taylor knew that Maher was driving a green Ford Maverick at the time he was

arrested in January 1984.  Regarding the Goss attack, Taylor knew the date (August 17) and time

(just before midnight), and the type of shoes the assailant was wearing (boots).  *Id.* ¶¶ 1,8.  What

Taylor did not know until trial was that in August 1983, Maher was driving a 1972 yellow

Comet.  *Id.* ¶ 27.

At her deposition in this matter, Taylor denied knowing Nichols and claims to have no

memory of him:  "There was a man who I have no knowledge of at all, who testified, and I

believe he did, but I draw a blank when it comes to him."  *Id.* ¶ 32.  There are no reports, notes,

statements or other evidence of the communications between Taylor and Nichols that shed light

on how Nichols came to possess specific – but false – information implicating Maher.  The only

documentary reference to Nichols was a "log" entry showing that Taylor visited Nichols' home

address on April 16, 1984, the day before Maher's trial began.  *Id.* ¶ 44.

In 1984, Nichols was unemployed, living on social security disability and veterans'

disability.  *Id.* ¶ 48.  He had a prior history with the APD, both as an arrestee (multiple times)

and through familial relations with people who worked there.  *Id.* ¶ 25, 33.  Both Nichols'

mother, Forrestine Nichols, and a more distant relative, Jackie Drew, served as "police matron"

for the APD.  *Id.* 33.  Taylor knew Forrestine Nichols by name, and she knew Jackie Drew.  *Id.*

Taylor did not inform Carney about Nichols' ties to the APD.  *Id.* ¶ 34.  Carney stated in his

deposition that, had he known about Nichols' previous arrests and the fact that he was related to

APD employees, Carney would have disclosed that information to Maher and his counsel.  *Id.*

    2.    **<u>Goss</u>**

        a.    **<u>The Agreement to Drop Criminal Charges</u>**

On November 18, 1983, Goss was arrested and charged with assault and battery.  *Id.* ¶

20.  Taylor was at the police station when Goss was brought in for biting Ayer police officer

Donald Haapakoski, after he attempted to take the keys out of the ignition of her car. *Id.* Taylor believes that Goss' actions may have been "a traumatic response to all that had happened to her." *Id.* ¶ 21.

After the incident and her arrest, Goss informed Taylor that she was unwilling to assist in the rape investigation with the criminal charges pending against her. *Id.* ¶ 22. Taylor went to Goss' house to discuss the situation. *Id.* Goss testified at her deposition: "[s]he came to the house, and – I can't remember exactly. But she dropped the charges, they dropped the charges, that is all I remember, because they wanted to go on with the rape case, I believe." *Id.* After Goss identified Maher as her attacker, the assault and battery charges against her were dismissed. *Id.* ¶ 23.

Neither Carney nor defense counsel was told about the arrangement that Taylor had engineered with Goss. *Id.* ¶ 24. It did not come to light until Goss' deposition in this matter, twenty-three years later. *Id.* Having reviewed Goss' deposition transcript on this subject, Carney testified at his deposition: "Officer Taylor, in my opinion, engaged in misconduct by working some side arrangement with the victim not to prosecute her for a criminal case against the police department, and withheld that information from me." *Id.* ¶ 52. Had Carney known about the arrangement, he would have disclosed it, because "[a]ny promise, reward, or inducement given to a witness must be disclosed to defense counsel." *Id.* ¶ 24.

### b.  The Suggestive Misidentification

On January 4, 1984, Taylor traveled to Goss' home with ten photos, including one of Maher. *Id.* ¶ 37. Taylor sat across from Goss while she viewed the photos. RSF ¶ 48. After Goss picked up the photo of Maher, Taylor told her that she had begun to tremble. CSF ¶ 39. Goss had not realized she was trembling until Taylor so indicated. *Id.* Taylor then asked Goss to lay Maher's photo down and look at the others. *Id.* Goss did as told, then picked Maher as her

attacker.  *Id.* ¶ 40.  Based on this identification, Taylor sought and received an arrest warrant for

Maher.  RSF ¶ 61.  Goss subsequently identified Maher at a corporal line-up on February 1,

1984, and again at trial.  CSF ¶¶ 43, 46.  At his deposition, Carney observed that Goss grew

more confident in her identification of Maher over time, after "a lot of contact" with Taylor:

> when I first met Marilyn Goss, she was so timid, and trembling, and insecure
> that I could barely talk to her, and as the case went along, I knew that Officer
> Taylor was having a lot of contact with her . . .
>     . . . and what would be remarkable would be how Ms. Goss grew in self-
> confidence in the case that by the time it got to the trial and I asked her do you
> see the man in the courtroom who raped you, and she pointed with
> assertiveness and said, It's that man, and gave a completely 100 percent
> confident identification.
>     I remember thinking to myself at the moment that was happening, I
> wonder what the jury would think if they could compare this woman with the
> woman I first saw after the identification was made of Dennis Maher . . . .

*Id.* ¶ 46.  Years later, after learning some of the information that was not known to him at

the time of Maher's trial, Carney has come to view the Goss case in a new light:

> upon reflection, knowing with certainty that Marilyn Goss got her
> identification wrong, feeling with confidence that a witness was produced
> who was devastating to the defendant under pretty suspicious circumstances,
> and that Officer Taylor, in my opinion, engaged in misconduct by working
> some side arrangement with the victim not to prosecute her for a criminal case
> against the police department, and withheld that information from me, has
> made me very suspicious of how the Marilyn Goss case came together.

*Id.* ¶ 52.

### D.    Taylor's Pattern of Misconduct:  The *Waters* Case

Maher was not the only innocent person who was wrongfully convicted for a crime in

which Taylor was the lead investigator.  In May1983, Kenneth Waters was convicted for the

murder of Katharina Brow.  *Id.* ¶ 64.  Like Maher, Waters was later exonerated by DNA

evidence.  *Id.*  Waters' estate has brought a § 1983 action against Taylor and others (*Waters v.*

*Town of Ayer, et al.*, No. 04-CV-10521-GAO (D. Mass.)), seeking damages for Waters'

wrongful conviction and incarceration.  Specific evidence concerning Taylor's conduct has emerged in the *Waters* case.[2]

On May 21, 1980, Brow was murdered in her home.  *Id.* ¶ 56.  Taylor was assigned to investigate the homicide.  *Id* .  As part of her investigation into the Brow homicide, Taylor sent fingerprints of suspects – including Kenneth Waters – to state police officer John Baliunas, asking him to compare those fingerprints to prints that were found at the scene.  *Id.* ¶ 57.  On November 10, 1982, Taylor testified before the grand jury that the prints found at the scene were "all smeared" and were of no use in the investigation.  *Id.* ¶ 60.

A handwritten note authored by Taylor and just recently uncovered in *Waters* (more than a quarter century after the events in question) demonstrates that Taylor's grand jury testimony was false and that fingerprint analysis had excluded Waters as the source of prints found at the scene.  *Id.* ¶ 58.  In her note, Taylor wrote:  "Check Waters prints against partial print on faucet & 3 from kitchen table.  *All negative*."  *Id.* (emphasis added).  Neither Taylor's note, nor the fact that Waters' prints did not match any of the prints found at the scene, was disclosed to the prosecutor or to Waters or his attorney.  *Id.* ¶ 59.

One of the prosecution witnesses at Waters' trial was Brenda Marsh, who testified that Waters had confessed to her that he had killed Brow.  *Id.* ¶ 62.  Marsh later recanted her testimony.  *Id.*  At her deposition, Marsh explained that after she told Taylor and another officer that she knew nothing about the murder, they repeatedly threatened her, telling her that she could be charged as an accessory and would lose custody of her children.  *Id.*  Marsh took these threats seriously.  *Id.*  She stated at her deposition that Taylor had suggested additional false testimony Marsh should give, beyond the critical confession.  *Id.*  For example, Taylor suggested to Marsh

---

[2]  Magistrate Judge Dein heard summary judgment argument in *Waters* on August 28, 2008.  A decision is pending.

that she should say Waters had a long scratch on his face when he came home in the morning, and that he had in his possession a knife used to commit the murder.  *Id.*  Marsh confirmed at her deposition that she gave the false testimony Taylor had suggested because of the threats made against her.  *Id.*

## III.   <u>ARGUMENT</u>

Taylor has moved for summary judgment on all claims against her.[3]  Summary judgment is the exception, not the rule, and must be denied when there is a genuine dispute of any material fact.  *See* Fed. R. Civ. P. 56(c); *Perez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir. 2001).  As the nonmoving party, Maher is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him."  *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987).

### A.   <u>SUBSTANTIAL EVIDENCE SUPPORTS MAHER'S § 1983 CLAIMS</u>

In its prior summary judgment decision in this matter, the Court correctly observed that Maher's claims against Taylor fall into two "separate but related categories":

> (1) that Taylor violated his Fourth Amendment rights by orchestrating his arrest without probable cause; [and] (2) that Taylor violated his right to substantive due process by (a) suborning perjury (the testimony of Goss and Nichols), (b) by withholding exculpatory evidence (the inducement to Goss . . .), and (c) by persuading Goss to identify him falsely.

*Maher v. Town of Ayer,* 463 F. Supp. 2d 117, 120 (D. Mass. 2006) ("*Maher I*").  Each of these claims is examined below, beginning with the due process category.

---

[3]  Maher does not oppose Taylor's motion for summary judgment as it applies to conspiracy (Count XI).

### 1.    **Taylor Violated Maher's Fourteenth Amendment Rights**

Violations of criminal defendants' Fourteenth Amendment rights to a fair trial are redressable under § 1983.  *See, e.g., Reid v. New Hampshire*, 56 F.3d 332, 342 (1st Cir. 1995) ("section 1983 claim" gave rise to question of "whether the individual defendants attempted to withhold *Brady* material from the prosecutors"); *Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 211 (D. Mass. 2001) ("'When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983'") (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).  Here, Taylor violated Maher's due process rights by knowingly presenting false evidence to, and concealing favorable evidence from, the prosecutor, the court and the jury.

As a result of Taylor's actions, the jury was led into believing that they should credit the testimony of the two key prosecution witnesses rather than Maher's testimony.  Had Taylor been forthright, the jury would have seen the Commonwealth's case against Maher for what it really was – a case pulled together by an officer with a single-minded determination to convict Maher, a case that rested on a suggestive identification, the testimony of a woman who used her own victimization as leverage to have criminal charges against her dropped, and a man with an undisclosed criminal history and family connections to the police department, who told a story that seemed too good to be true because it was.  The jury would have scrutinized Goss' trial testimony and improperly suggestive identification of Maher in light of the deal that she struck with Taylor, and would have wondered, as did Carney, whether that deal played any role in the development of Goss' increasingly strong identification of Maher.  Had the jury been privy to this information, it would have questioned how Nichols, a man with connections to the police

department, became a witness in a case to which he had no ties and told a story with facts that only the police department knew.  The jury would have realized that the only connection between the suggestive identification, Goss' inducement to cooperate and testify, and Nichols' suspiciously detailed testimony was Nancy Taylor, and would have assessed the case against Maher in light of the lead investigator's shattered credibility.  But because Nancy Taylor, the only person who knew all of this, did not disclose it to the jury, to the prosecutor, or to Maher, the jury was deprived of information critical to its decision-making, and Maher was deprived of a fair trial.

        **a.**        <u>**Taylor Acted Deliberately, Or In Bad Faith, To Conceal The Truth**</u>

Taylor's primary argument that she is entitled to summary judgment on Maher's Fourteenth Amendment claims is that "[t]here is no evidence of bad faith."  Taylor Mem. at 12-13.  The record demonstrates otherwise.  Abundant evidence, discussed in detail below, shows that Taylor acted out of a desire to close an open rape file by creating a false case against a convenient target – a man who was already charged with two other sexual assaults.[4]  In supplying Richard Nichols with false information, Taylor acted deliberately and knowingly.  Taylor did not disclose her link to Nichols, or her deal with Goss to drop criminal charges, because she knew those truths would cripple the case against Maher.  Indeed, a jury may *infer* bad faith from Taylor's "deliberate concealment" of this "plainly exculpatory" evidence.  *Reid v. Simmons*, 163 F. Supp. 2d 81, 91 (D.N.H. 2001).[5]

---

[4]  While Taylor's investigation of the Goss rape was woefully inadequate from the start (*see* CSF ¶¶ 11-19), once Taylor learned that Maher had been arrested for two sexual assaults in Lowell, she did not investigate further; she simply constructed a case against him.  Investigation becomes unnecessary when false testimony will suffice. Taylor did so little investigation that she did not even confirm the car Maher was driving in August 1983, before she provided information about the car to Nichols.  Taylor's failure to pursue a full and complete investigation was part and parcel of her plan to pin the crime on Maher; it also constituted an independent violation of Maher's due process rights.  *See Lowery v. County of Riley*, No. 04-3101-JTM, 2006 U.S. Dist. LEXIS 66505, at *48 (D. Kan. Sept. 15, 2006) (attached hereto as exhibit 1) (denying summary judgment and rejecting qualified immunity where officers

Further evidence of Taylor's state of mind comes from her acts revealed in the *Waters* case. Substantial evidence shows that Taylor (1) coerced Brenda Marsh's false testimony, (2) suppressed fingerprint evidence that excluded her suspect, and (3) lied in the grand jury about the existence of such evidence. This evidence of Taylor's willingness to manufacture and manipulate evidence goes directly to Taylor's state of mind in the present case, and shows that, just as in *Waters*, Taylor's manipulation of witnesses and nondisclosure of information helpful to the defense was neither an accident nor a mistake. *See* Fed R. Evid. 404(b) (evidence of other acts admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"); *Ismail v. Cohen*, 899 F.2d 183, 188-89 (2d Cir. 1990) (evidence that an officer was involved in other similar incidents involving other arrestees may be admitted to show pattern, intent and absence of mistake); *Unites States. v. Oppon*, 863 F.2d 141, 147 (1st Cir. 1988) (evidence of other acts tending to show intent admissible under Fed. R. Evid. 404(b)).

Nothing in the Court's prior summary judgment decision (or in *Limone v. Condon,* 372 F.3d 39, 44-45 (1st Cir. 2004) or *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008)) sets

---

failed to fulfill their obligation to investigate other suspects); *Wilson v. Lawrence County*, 260 F.3d 946, 955 (8th Cir. 2001) (intentionally or recklessly failing to investigate leads violated due process); *Wyniemko v. Ostin*, No. 03-CV-74749, slip op. at 43 (E.D. Mich. Mar. 3, 2005) (attached hereto as exhibit 2) (denying summary judgment on failure to investigate claim where the defendants "were focused solely on a conviction of the plaintiff, irrespective of whether he was the perpetrator").

[5]  Much of Taylor's argument for summary judgment rests on her own denial of any deal with Goss or fabrication of Nichols' testimony. Summary judgment cannot be granted on the basis of those self-serving denials, particularly where there is evidence of Taylor's dishonesty in the past, as well as in connection with this litigation. In her deposition in this case, Taylor testified that she recalled her grand jury testimony in *Waters* concerning smeared prints found at the scene, but that she was not aware that this information was inaccurate. As evidenced by the note that was recently discovered, which states, in Taylor's handwriting, that Waters's prints were compared with prints at the scene and were "all negative," Taylor's deposition testimony in this case was clearly false. When, as here, the moving party relies heavily on the credibility of a witness, and there is evidence that calls the credibility of that witness into question, summary judgment must be denied. *See Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 490 (1st Cir. 1992) ("a number of courts, including our own, have been reluctant to permit summary judgment where the nonmoving party *demonstrates a genuine dispute as to the credibility* of the witness whose subjective intent is at issue, particularly where cross-examination offers the only realistic prospect for resolving the credibility concern") (emphasis added; citations omitted).

forth a requirement that Maher show an "improper motive for acting in bad faith towards <u>a</u> <u>particular suspect</u>," as Taylor suggests.  Taylor Mem. at 13.  Rather, in this context the plaintiff need only show that "the officer acted in bad faith, or with the intent to violate the plaintiff's constitutional rights, or with deliberate indifference to those rights."  *Reid*, 163 F. Supp. 2d at 90, *aff'd* 47 F. App'x. 5, 5 (1st Cir. 2002) (attached hereto as exhibit 3) (approving "deliberately or with reckless indifference" standard).  *See also Ramirez v. Garcia*, 898 F.2d 224, 227 (1st Cir. 1990) (in this circuit, "government officials may be held liable for conduct that 'reflects a reckless or callous indifference to an individual's rights'") (citations omitted).[6]

Whatever the precise state of mind requirement may be, in light of the record evidence, a definitive determination of what Taylor's state of mind actually was, at the time, cannot be made at the summary judgment stage.  *See Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008) ("summary judgment is to be used sparingly when intent or motive is at issue") (quoting *Catrone v. Thoroughbred Racing Ass'ns of N. Am., Inc.*, 929 F.2d 881, 889 (1st Cir. 1991)).

### b.    <u>Taylor Fabricated Richard Nichols' Testimony</u>

It has long been established that an official who fabricates evidence for use in a criminal proceeding violates the Fourteenth Amendment.  *See Miller v. Pate*, 386 U.S. 1, 7 (1967); *Limone,* 372 F.3d at 44-45 ("if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit").  Given the uncontroverted evidence that Maher has adduced here, reasonable jurors could conclude, as has ADA Carney, that Taylor was responsible for the fabrication of Nichols' trial testimony against Maher.

---

[6]  To the extent that Taylor seeks to fasten upon the Court's description of conduct that would shock all but the most "hardened conscience," *Maher I,* 463 F. Supp. 2d at 122, Maher has found no case that articulates a "sinister motive" or "personal animus" requirement in the context of § 1983 claims predicated on *Brady* violations and fabrication of evidence.

Taylor's "culpability is an issue of fact for a jury." *See Gregory v. City of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006) (reversing grant of summary judgment on fabrication of evidence claim).

Nichols' fabricated testimony was a critical factor in the prosecution of Maher. At the time, Nichols' testimony convinced Carney "beyond a reasonable doubt that Marilyn Goss' identification was accurate." CSF ¶ 29. Carney viewed the information from Nichols as an "unbelievable gift." *Id.* And indeed it was. The evidence is clear that Nichols' testimony was false because Maher had never met Nichols or been to the Caza Manor Motel. It is for the jury to decide which inference about Nichols' conduct is more reasonable: (a) that Nichols had in fact met a man named Dennis Maher, who repeatedly parked his green Ford Maverick near the Caza Manor Motel on August nights, and who looked like and had the same name as the plaintiff in this case but was not, or (b) that Nichols was lying on the witness stand.

Further evidence that Nichols' testimony was fabricated is that it had a level of specificity and certainty that would have been impossible without receiving information from Taylor: the green Ford Maverick; the right time of night that Maher supposedly parked his car (10:00 or 11:00p.m.) in relation to the time of the attack (midnight); and even the height of the shoes that Maher supposedly wore (Goss' assailant wore boots, in contrast to the "low-cut shoes" that Nichols pointed out Maher was wearing during the trial).[7] At one point during his trial

---

[7] On this point, *Laughman v. Pennsylvania*, No. 1:05-CV-1033, 2007 U.S. Dist. LEXIS 60079, at *25-26 (M.D. Pa. Aug. 16, 2007) (attached hereto as exhibit 4), is instructive. The plaintiff, who had an IQ of 69-71, was convicted for the murder and rape of his distant relative, based largely on his confession. *Id.* at *4. After DNA proved his innocence, Laughman filed a § 1983 action against the two officers who were present when his confession was obtained. *Id.* at *11. The court denied the defendants' motion for summary judgment, because the level of detail in Laughman's confession was such that a jury could conclude it had been supplied by the defendants. *Id.* at *18. The court rejected the defendants' contention that "Laughman's only evidence [was] his claimed innocence," finding that "Laughman has also shown, for example, that if he *is* innocent the confession contains descriptions and language that could lead a reasonable juror to conclude that Laughman did not actually confess or that it would have been entirely unreasonable for the officers to believe that Laughman's affirmations and inculpatory statements were worthy of evidence." *Id.* at *25-26 (emphasis in original). *See also Lowery*, 2006 U.S. Dist. LEXIS 66505, at *43-

testimony, Nichols seemed to catch himself over-reaching with the details he was providing.

When asked by Carney to "describe what the car looked like," Nichols first replied that "it was a

green, small, compact car.  *A Ford Maverick* or one of those small ones."  CSF ¶ 47 (emphasis

added).  But then he immediately backpedaled, claiming, "I can't identify it as a definite make or

model."  *Id.*

     Taylor points to no evidence that would suggest Nichols obtained this detailed

information from sources other than Taylor.  In fact, Taylor points to no evidence at all with

respect to Nichols.  Although she has many specific memories about the Goss case, RSF ¶¶ 21,

43, Taylor now denies any memory whatsoever of Nichols.  At her deposition, Taylor's

convenient denials of recollection regarding Nichols were neatly packaged:  "I just flat out do

not remember this man, interviewing him, talking to him.  I don't even remember him on the

witness stand."  CSF ¶ 32.  Absence of recall is not evidence, however.  *See Yanez v. City of New

York*, 29 F. Supp. 2d 100, 108 (E.D.N.Y. 1998) ("While [defendant]'s deposition testimony is

not necessarily evasive, these memory lapses are significant in generating questions of fact to

defeat the motion for summary judgment.").  Lacking evidence, Taylor resorts to

mischaracterizing Maher's claim with respect to Nichols as "an absurd proposition" that "there

was misconduct . . . merely because he gave testimony adverse to Maher."  *See* Taylor Mem. at

14.  In her summary judgment memorandum, Taylor devotes a mere paragraph to Nichols – a

paragraph composed of conclusory statements.  *See id.*  She does not even attempt to explain

how it could be that Nichols' trial testimony was truthful or how Nichols could have obtained

detailed (but incorrect) information about Maher's car, if not from Taylor.

---

44 (denying summary judgment on fabrication of evidence claim where confession contained non-public specific
details that led to trial and conviction).

By stark contrast, Maher offers substantial evidence that Taylor was in a position to, and did, knowingly and deliberately suborn Nichols' perjury.  Nichols testified at trial that he met with Taylor at the Ayer police station.  CSF ¶ 47.  According to Carney, it was Taylor who identified Nichols as a witness.  *Id.* ¶ 29.  Ayer police logs indicate that Taylor visited 14 Page Street, Nichols' residence, the day before Maher's trial began.  *Id.* ¶ 44.  Nichols had a criminal history with the APD, and members of his family worked for the APD.  *Id.* ¶¶ 25, 33.

Given these facts, and the absence of any countervailing evidence, a reasonable factfinder would likely reach the conclusion that Taylor orchestrated Nichols' false testimony.[8]  At a minimum, there exists a trialworthy issue as to this critical factual question.  *See Atkins v. County of Riverside*, 151 F. App'x. 501, 505 (9th Cir. 2005) (attached hereto as exhibit 5) (reversing summary judgment on fabrication claim).  To rule otherwise on a motion for summary judgment would be to usurp the jury's function by choosing to credit Taylor's testimony rather than Maher's.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) ("'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'") (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986)).  *Cf. Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir. 1994) ("when facts, though undisputed, are capable of supporting conflicting yet plausible inferences . . . then the choice between those inferences is not for the court on summary judgment") (citations omitted).

---

[8]  It is no answer that Maher's evidence is circumstantial rather than direct evidence.  *See SEC v. Sargent*, 229 F.3d 68, 75 (1st Cir. 2000) (plaintiff is not required to produce direct evidence; "'circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and should be given whatever weight the jury deems it should be given under the circumstances within which it unfolds'") (quoting *United States v. Gamache*, 156 F.3d 1, 8 (1st Cir. 1998)).

c.      **Taylor Did Not Disclose Impeachment Evidence**

Taylor also violated Maher's Fourteenth Amendment rights by suppressing evidence favorable to Maher that could have been used to impeach Goss.  *See Brady v. Maryland*, 373 U.S. 83, 86 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972).  As this Court previously stated, "a substantive due process claim based on a deliberate *Brady* violation constitutes a viable cause of action under section 1983."  *Maher I*, 463 F. Supp. 2d at 122.  A successful *Brady* claim requires that evidence (1) be "favorable to the accused, either because it is exculpatory, or it is impeaching," (2) was suppressed, and (3) is "material," such that a "reasonable probability" exists that disclosure of the suppressed evidence would have produced a different result at trial. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).[9]

Here, Taylor did not disclose to Carney or anyone else that she and Goss had discussed the assault and battery charges Goss faced, and their agreement that the charges would be dropped if Goss was to cooperate in the rape investigation.  CSF ¶ 24.  As articulated by Carney himself (after reviewing Goss' deposition transcript), Taylor "engaged in misconduct by working some side arrangement with the victim not to prosecute her for a criminal case against the police department, and withheld that information from me."  *Id.* ¶ 52.  Consistent with long-standing Supreme Court precedent, had Carney been made aware of this inducement, he would have disclosed it.  *Id.* ¶ 24.

In *Giglio*, the Supreme Court ruled that the government's promise of a benefit to a witness must be disclosed under *Brady* (thus satisfying the first prong of a *Brady* claim).  405

---

[9] Taylor contends that there is an additional requirement in the § 1983 context that a *Brady* claimant must also show that it was a violation that resulted in the overturning of his conviction.  *See* Taylor Mem. at 16.  This is plainly incorrect.  A *Brady* violation can be established as the requisite constitutional injury underlying a valid § 1983 claim even if the *Brady* violation was not the reason for overturning a conviction.  *See, e.g., Charles v. City of Boston*, 365 F. Supp. 2d 82, 89 (D. Mass. 2005) (denying motion to dismiss *Brady* count, where plaintiff had his convictions overturned after DNA testing).

U.S. at 154-55.  Following *Giglio*, "[c]ourts have required the disclosure of *all agreements*

reached between prosecution witnesses and the State, even if the agreements were not binding,

involved an unrelated matter, or were not expressly made in exchange for the testimony at trial."

*Bragan v. Morgan*, 791 F. Supp. 704, 715 (M.D. Tenn. 1992) (emphasis added) (collecting

cases).  The constitutionally-mandated disclosure requirement extends to "all agreements struck

with witnesses, even agreements which are not on a quid pro quo basis, since this evidence may

be highly relevant to the jury's deliberation."  *Id.*  "This duty of disclosure is even more

important where the witness provides the key testimony against the accused."  *Haber v.

Wainwright*, 756 F.2d 1520, 1523 (11th Cir. 1985) (citing *Giglio*, 405 U.S. at 154-55).  Such is

the case here:  Goss provided the key testimony against Maher – she was the sole eyewitness –

and according to Goss' deposition testimony, an understanding was reached with Taylor that the

serious criminal charge pending against Goss would be dropped if she cooperated in the rape

case.  CSF ¶ 22 ("they dropped the charges . . . because they wanted to go on with the rape

case").[10]

Any information bearing on Goss' reliability was particularly important because her

testimony was uncorroborated and essential to Maher's conviction.  There is more than a

---

[10]  In an attempt to explain away this area of disputed fact, Taylor has submitted a recently executed affidavit by
Goss, in which Goss disavows any quid pro quo.  Goss' affidavit cannot vitiate her earlier sworn testimony.  Taylor
asks the Court to credit Goss' affidavit prepared in anticipation of a summary judgment motion, rather than her prior
spontaneous testimony.  On a motion for summary judgment, the Court may not do so.  *See Greenburg*, 835 F.2d at
936 ("The precincts patrolled by Rule 56 admit of no room for credibility determinations, no room for the measured
weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own
ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold
record.").  Goss' conflicting testimony only highlights that the existence of a deal between her and Taylor continues
to be a disputed material fact.

Taylor also tries to divert attention from this factual dispute by focusing on what she claims Maher did *not* do in
discovery.  *See* Taylor Mem. at 6-7.  Yet Taylor acknowledges that Maher conducted "exhaustive discovery" in this
case (Taylor Mem. at 3), including depositions of those individuals who Maher believed had information relevant to
this case.  The fact that Maher chose not to depose certain individuals after independently investigating what
knowledge they possessed (or did not possess) does not mean that Maher made "no effort" to develop his claims.
Taylor's focus on what she says Maher *has not* done ignores what Maher *has* done, which is provide evidence
raising triable issues.

reasonable probability that, had the jury known of the deal struck between Goss and Taylor, the

outcome of Maher's criminal trial would have been different.  *See Norton v. Spencer*, 351 F.3d 1,

9 (1st Cir. 2003).  This information was unique, not cumulative of any other available materials,

and would have greatly affected Goss' credibility, and the entire case, as her testimony was

critical to the prosecution's argument.  *See Conley v. U.S.*, 415 F.3d 183, 189 (1st Cir. 2005)

(stating that where there is no other similar material to allow a party to impeach a witness at trial,

suppression of impeachment evidence deprives the jury of critical information).

Taylor attempts to mask her wrongdoing by arguing that Maher's defense counsel was

aware of the charges against Goss, so that Maher was on notice and Taylor's failure to disclose

could not amount to a *Brady* violation.  *See* Taylor Mem. at 15.  The facts of the instant case are

not like those of *Reid*, 163 F. Supp. 2d at 86, however.  The allegedly undisclosed materials in

*Reid* were police reports about which the officer testified during a probable cause hearing, and

copies of which "Reid (or his counsel) . . . could have obtained . . . simply by asking."  *Id.*

Here, by contrast, the facts related to the dropping of the Goss assault charges could only

have been known to those present for the conversation described during Goss' deposition and

any other related conversations.  Maher never received any notice of an arrangement in exchange

for Goss' cooperation with Taylor, and no document would have reflected such an arrangement.

The facts here more closely resemble those in *Wyniemko,* at 2, where a wrongfully-convicted §

1983 plaintiff brought *Brady* claims based on an undisclosed meeting and agreement between a

witness and an investigating officer.  Similar to Goss here, the witness understood the officer to

be saying that: "if I could provide information helpful to them in their case against Mr.

Wyniemko, they could help me avoid a possible life sentence as a habitual offender as a result of

the charge that I had pending against me." *Id.* at 15.  That court denied summary judgment; so too should this Court.

Taylor also violated *Brady* by failing to disclose her role in the fabricating Nichols' testimony.  Evidence of a police officer's involvement in the fabrication of evidence is material impeachment evidence that must be disclosed.  *See Atkins,* 151 F. App'x. at 504-05 (denying summary judgment on *Brady* and fabrication claims, even where allegedly fabricated statement by witness in police report was not presented at trial).  In *Atkins*, the plaintiff had served eight years on a robbery conviction when DNA proved him innocent.  *Id.* at 503.  He brought a § 1983 action against a county deputy sheriff (Miller), claiming that Miller had falsified evidence by falsely stating in a police report that a witness had "told him he knew Atkins and knew that Atkins frequented the general vicinity of the crimes."  *Id.* at 504.  Just like Taylor here, "Atkins' allegations and evidence paint[ed] a picture of an investigator willing to compromise his professional obligations out of a desire to pin a crime on a particular defendant."  *See id.* at 505. The court concluded that Atkins had provided sufficient evidence to avoid summary judgment on his *Brady* claim (as well as his fabrication claim), noting that "[e]vidence that a chief investigator fabricated evidence while attempting to build the case against the defendant *undermines the credibility of that investigator* as well as the evidence compiled in that investigation."  *Id.* at 504 (emphasis added).[11]  Similarly, here, evidence of Taylor's role in fabricating Nichols' testimony would have undermined her credibility, and should have been disclosed.  Thus, Taylor is not entitled to summary judgment on the *Brady* claim.

---

[11]  The *Atkins* court rejected the proposition that "demonstrating an issue of fact regarding a police officer's veracity cannot create 'significant probative evidence' of a *Brady* violation."  *Id.* at 504 n.1.

**d.** **Taylor Used Unduly Suggestive Identification Procedures To Prompt An Identification Of The Wrong Man That Strengthened Over Time**

"Criminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gregory*, 444 F.3d at 746 (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). Due process claims based on suggestive identification are evaluated in a two-step process: (1) "whether the identification procedure was impermissibly suggestive," and if so, (2) "whether, under the totality of the circumstances, the suggestiveness is such that there is a very substantial likelihood of irreparable misidentification." *United States v. Bouthot*, 878 F.2d 1506, 1514 (1st Cir. 1989).

Taylor claims that her comment to Goss, telling Goss that she was trembling as she viewed Maher's photo, was a "post-identification comment" that did not render the identification suggestive. Taylor Mem. at 18. This argument is based on a strained and unnatural interpretation of Goss' grand jury testimony, in which Goss stated: "I was going through them and I came upon one photo, which I held in my hand and I kept looking at it. Officer Taylor told me afterwards, I had started to tremble, which I didn't realize myself that I was doing. She asked me to lay the photo down and to go through the others, which I did." CSF ¶ 39. Taylor's interpretation of "afterwards" to refer to after the photo array was completed, rather than after Goss picked up Maher's photo, unreasonably ignores the context in which that statement was made. A more reasonable interpretation of Goss' testimony, which describes the photo array chronologically, is that Taylor told her she was trembling *after* she picked up Maher's photo, *before* telling her to put it aside and look at the other photos. At the very least, there are two possible interpretations of Goss' testimony, and it should be for a jury to decide which it believes.

In *Maher I*, the Court stated that, "[a]t some point during the process, Taylor told Goss that she had observed Goss tremble visibly while viewing Maher's photo," noting further that, "[w]hether this was said before or after Goss identified Maher is a matter of dispute."  463 F. Supp. 2d at 119 & n.5.  While there can be no dispute that a misidentification did in fact occur, Taylor's level of impropriety during the photo array continues to be an area of disputed fact precluding summary judgment.  *See United States v. Torres*, --- F.3d ---, No. 06-55817, 2008 WL 4878904, at *7-9 (9th Cir. Nov. 13, 2008) (attached hereto as exhibit 6) (reversing probable cause finding because a reasonable jury could have found that the identification procedure, in which the officer commented before handing the witness photos that they had "possibly identified" the perpetrator, was impermissibly suggestive); *Geter v. Fortenberry*, 849 F.2d 1550, 1560 (5th Cir. 1988) (denying summary judgment on qualified immunity defense because factual dispute existed as to whether officer used improperly suggestive techniques in identification procedure, including through "active coercion").[12]

## 2.      Taylor Violated Maher's Fourth Amendment Rights

Taylor violated Maher's Fourth Amendment rights by arresting him without probable cause.  U.S. Const. amend. IV.  In order to establish a claim for malicious prosecution under § 1983 arising out of a Fourth Amendment violation, the plaintiff must show the common law

---

[12]   Taylor argues that the fact that Goss contradicted her original grand jury testimony during her deposition, by reversing course and saying she did realize she was trembling, somehow resolves the dispute as to the timing of Taylor's improper comment.  *See* Taylor Mem. at 5.  Taylor's reliance on *Santos v. Murdock*, 243 F.3d 681 (2d Cir. 2001), is misplaced.  In *Santos*, the Second Circuit held that an affidavit by a third party witness that was inconsistent with his prior testimony could not alone establish a genuine issue of material fact.  *Id.* at 683.  The court concluded that the affidavit was inadmissible hearsay for substantive purposes because it was not a statement made "at a trial, hearing, or other proceeding, or in a deposition," unlike Goss' sworn grand jury testimony at issue here. *Id.* at 684 (quoting Fed. R. Evid. 801 (d)(1)(A)).  *Santos* does not stand for the proposition that deposition testimony erases earlier contradictory sworn testimony.

elements of a malicious prosecution claim[13] and that he was seized "pursuant to legal process." *Nieves v. McSweeney*, 241 F.3d 46, 54 (1st Cir. 2001).

Here, the malicious prosecution claim boils down to the question of probable cause. In turn, "the existence of probable cause is a question of fact." *Gregory*, 444 F.3d at 743. As set forth above, there is sufficient evidence in the record from which reasonable jurors could conclude that Taylor prompted Goss' identification of Maher through use of suggestive comments, and that Goss' identification of Maher also was the result of her understanding that she would cooperate with Taylor if the assault and battery charges against her were dropped. These facts, if the jury found them to be true, would tend to undermine probable cause based on the identification of Maher. *See Ramirez v. County of Los Angeles*, 397 F. Supp. 2d 1208, 1222, 1225-26 (C.D. Cal. 2005) (refusing to grant summary judgment on § 1983 malicious prosecution claim, because material issues of fact existed as to whether witness' identification was tainted by officer's suggestive comments, and as to whether the officer provided false information to the prosecution); *Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2003) (a constitutional claim for damages arises in the identification context "if the officer conceals information tending to undercut the identification").

Taylor argues that, because Goss testified as to Taylor's trembling comment during the grand jury, the grand jury indictment affords a complete defense to a malicious prosecution claim. *See* Taylor Mem. at 4-5. An officer cannot insulate herself from § 1983 liability for misrepresenting material facts merely because a grand jury indicts. *See, e.g., Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004) ("This Court has previously held that officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for

---

[13]   The common law elements are:  "(1) commencement or continuation of a criminal proceeding against the eventual Plaintiff at the behest of the eventual defendant; (2) termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges and (4) actual malice." *Nieves*, 241 F.3d at 54.

malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions."); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him.").

Where, as here, the facts relevant to the question of probable cause are in dispute, the existence or absence of probable cause cannot be determined as a matter of law, and is a question of fact for the jury.

### 3.      Taylor Is Not Entitled to Qualified Immunity

Taylor claims she should be immune from liability for her wrongdoing because it was "so subtle, particularly from the perspective of a non-lawyer, one cannot reasonably infer bad faith on [her] part." Taylor Mem. at 19.  To the contrary, no reasonable officer could have concluded that Taylor's actions were reasonable. *See Limone*, 372 F.3d at 50 (rejecting qualified immunity defense for eliciting perjurous testimony and suppressing evidence).

Where constitutional rights are clearly established, and a reasonable officer would have known that her actions violated these rights, the officer is not entitled to qualified immunity. *See Limone*, 372 F.3d at 48.  Here, all of Maher's constitutional rights that Taylor violated were clearly established at the time of her actions in 1983 and 1984. *See Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005) (the "constitutional right not to be deprived of evidence by an investigating officer . . . was clearly established in 1983"); *Limone*, 372 F.3d at 48 ("*Mooney* and its pre-1967 progeny provided reasonable law enforcement officers fair warning that framing innocent persons would violate the constitutional rights of the falsely accused.").

A reasonable officer in Taylor's position would know that signaling a witness the identity of a target in a photo array and then relying on that identification to support probable cause

constituted a constitutional violation.  *See Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir.

1999) ("[defendant] cannot seriously contend that a reasonable police officer would not know

that such actions [fabricating evidence and manufacturing probable cause] were inappropriate

and performed in violation of an individual's constitutional and/or statutory rights"); *Hervey v.

Estes*, 65 F.3d 784, 789 (9th Cir. 1995) ("objectively unreasonable for a law enforcement officer

to deliberately or recklessly misstate facts material to the probable cause determination").

Taylor argues that, because she discussed the warrant with Sergeant MacDonald, and he

approved of her applying for the warrant, she is shielded from liability.  This argument assumes

that Taylor described her wrongful conduct to MacDonald, and there is no evidence that

occurred.  MacDonald was not present for the two key meetings between Goss and Taylor (the

assault and battery discussion and the photo array).  Moreover, in order for an officer to

reasonably rely on a superior officer, the circumstance must be such that a reasonable officer

would conclude that there was legal justification for her actions.  *See Bilida v. McCleod*, 211

F.3d 166, 174-75 (1st Cir. 2000).  No such justification can be found here.

### B.   <u>TAYLOR IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE STATE LAW CLAIMS</u>

With respect to Maher's state law claims, Taylor simply refers to the Ayer defendants'

memorandum in support of their initial summary judgment motion.  *See* Taylor Mem. at 20.

Maher likewise refers the Court to his opposition to that motion (Dkt # 54) (and his opposition to

the Lowell defendants motion to dismiss (Dkt # 27), which is incorporated by reference), for

responsive arguments.  Maher adds only that the same evidence that supports his § 1983 claims

also supports his state tort claims and his claim under the Massachusetts Civil Rights Act.[14]

---

[14]  Maher is prepared to submit further briefing on the state law claims if the Court so requests.

IV.   **CONCLUSION**

For the foregoing reasons, Maher respectfully requests that the court deny Taylor's

renewed motion for summary judgment.

**Dennis Maher**,

By his attorneys,

/s/ Joseph F. Savage, Jr.
Joseph F. Savage, Jr. (BBO # 443030)
Jennifer L. Chunias (BBO # 644980)
Lisa M. English (BBO  # 660975)
Marcy D. Smirnoff (BBO # 663662)
Yvonne W. Chan (BBO #669223)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000 (Tel.)
(617) 523-1231 (Fax)
jsavage@goodwinprocter.com
jchunias@goodwinprocter.com
lenglish@goodwinprocter.com
msmirnoff@goodwinprocter.com
ychan@goodwinprocter.com

Robert N. Feldman (BBO# 630734)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA  02210-1108
Telephone:  (617) 307-6100
Fax:  (617) 307-6101
feldman@birnbaumgodkin.com

Dated: December 3, 2008

**CERTIFICATE OF SERVICE**

The undersigned certifies that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 3, 2008.

/s/ Joseph F. Savage, Jr.