LEXSEE 2006 US DIST LEXIS 66505



Warning
As of: Dec 03, 2008

**EDDIE JAMES LOWERY and AMANDA MARIE LOWERY, Plaintiffs, vs. THE COUNTY OF RILEY et al., Defendants.**

**Case No. 04-3101-JTM**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

*2006 U.S. Dist. LEXIS 66505*

**September 15, 2006, Decided**
**September 15, 2006, Filed**

**SUBSEQUENT HISTORY:** Stay granted by, Motion denied by *Lowery v. County of Riley, 2007 U.S. Dist. LEXIS 95530 (D. Kan., Dec. 27, 2007)*
Appeal dismissed by, in part, Affirmed in part and reversed in part by *Lowery v. County of Riley, 2008 U.S. App. LEXIS 7985 (10th Cir. Kan., Apr. 14, 2008)*

**PRIOR HISTORY:** *Lowery v. County of Riley, 2005 U.S. Dist. LEXIS 10183 (D. Kan., May 25, 2005)*

**COUNSEL:** [*1] For Eddie James Lowery, Amanda Marie Lowery, Plaintiffs: Barry A. Clark, Clark & Kellstrom, Chtd., Manhattan, KS; Barry C. Scheck, Nick J. Brustin, Ramzi Kassem, Cochran Neufeld & Scheck, LLP, New York, NY; Craig J. Altenhofen, Hornbaker, Altenhofen, McCulley, and Alt, Chartered Lawyers, Junction City, KS.

For Riley, County of, Riley County Board of Commissioners, Manhattan, City of, Manhattan Board of City Commissioners, Ogden, City of Ogden Board of City Commissioners, Defendants: David R. Cooper, Donald Patterson, Teresa L. Watson, Fisher, Patterson, Sayler & Smith-Topeka, Topeka, KS.

For Riley County Law Enforcement Department also known as Riley County Police Department, Defendant: Michael T. Jilka, Jeffrey A. Bullins, Holbrook & Osborn, PA -- OP, Overland Park, KS; Michael C. Gillespie, Seaton, Seaton & Gillespie, L.L.P., Manhattan, KS.

For Harry L Malugani, in his individual capacity, Douglass Johnson, in his individual capacity, Steve

French, Allen Raynor, Larry Woodyard, Defendants: Michael T. Jilka, Jeffrey A. Bullins, Holbrook & Osborn, PA - OP, Overland Park, KS

For Riley County Law Enforcement Agency, The Law Board, Defendant: Jeffrey A. Bullins, Holbrook [*2] & Osborn, PA - OP, Overland Park, KS.

For William "Mike" Watson, Alvan Johnson, Defendants: Michael T. Jilka, Jeffrey A. Bullins, Holbrook & Osborn, PA - OP, Overland Park, KS; Michael C. Gillespie, Seaton, Seaton & Gillespie, L.L.P., Manhattan, KS.

**JUDGES:** J. THOMAS MARTEN, JUDGE.

**OPINION BY:** J. THOMAS MARTEN

**OPINION**

**MEMORANDUM AND ORDER**

This matter comes before the court on the defendants' Motion for Qualified Immunity (Dkt. No. 56). Defendants also filed a separate Motion for Summary Judgment on State Law Claims (Dkt. No. 62), which defendant Riley County Law Enforcement Agency joined (Dkt. No. 77). The parties' briefs review a number of constitutional rights. Since defendants do not dispute that several of these rights were clearly established, the court will proceed directly to plaintiffs' burden of proof. After reviewing the parties' arguments, the court finds as set forth herein.

## I. BACKGROUND

In 1981, Eddie James Lowery was convicted (after an initial hung jury) of raping an elderly woman in her home. The first trial resulted in a hung jury with more than one juror recommending acquittal. Mr. Lowery spent more than ten years in prison and another ten years living [*3] under the stigma of being a registered sex offender. Consistent with the victim's own account, the case was investigated as a single assailant crime, and there is no evidence that more than one perpetrator was involved. All of the evidence demonstrates that one assailant broke into the victim's home and raped her.

Mr. Lowery's conviction was based primarily upon a confession he allegedly gave to police investigators, defendants Malugani and Johnson.

## II. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law. *Fed.R.Civ.P. 56(c)*. In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp., 158 F.3d 506, 510 (10th Cir. 1998)*. The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993)*. [*4] The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987)*.

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quoting *Fed. R. Civ. P. 56(e)*) (emphasis in Matsushita). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

In determining whether a material issue of fact exists, the court may not ignore an affidavit because it conflicts with the affiant's prior sworn statements.

*Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)* [*5] (citations omitted). "In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." Id. Relevant factors to establishing the existence of sham fact issues include "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." Id.

## III. FINDINGS OF FACT

The findings of fact constitute the uncontroverted testimony of the parties. Where a fact is controverted, the court views it in the light most favorable to plaintiff. The testimony cited in the here are drawn from: 1) the hearing on Lowery's Motion to Suppress Confession held on November 12, 1981; 2) the testimony from Lowery's first trial held on November 19-20, 1981; and 3) the testimony from Lowery's second trial held on January 5-7, 1982.

Arta Kroeplin was raped in her home during the early morning hours of July 26, 1981.

Eddie James [*6] Lowery was involved in a car accident in Ogden, Kansas on the morning of July 26, 1981. The exact time of the accident is unclear. Mr. Lowery testified that he left his trailer at 3 a.m., and the police report reflects that the car accident occurred at 3:36 or 3:38 a.m.

### A. Events of July 27, 1981

When Mr. Lowery returned home from work on Monday, July 27, 1981, he had a message to call Officer Harry L. Malugani. Mr. Lowery called Malugani, who asked Mr. Lowery if he could come down to talk to him or if Mr. Lowery could come up to the police station to talk to him. Mr. Lowery told Malugani he had no transportation, and Malugani offered to pick Mr. Lowery up. The officers came to pick Mr. Lowery up at approximately 4 p.m.

Mr. Lowery was not under arrest when Malugani and another officer, Douglass Johnson, came to his house and picked him up and took him to the police station. Mr. Lowery was placed inside an interview room at the Riley County Police Department. The interview room was a square room with a table in the middle with two chairs on each side. Mr. Lowery was not handcuffed. Officer Malugani read Mr. Lowery his Miranda rights, and Mr. Lowery signed a waiver of rights [*7] form at 4:30 p.m. on July 27, 1981.

2006 U.S. Dist. LEXIS 66505, *

Officers Malugani and Johnson questioned Mr. Lowery about the Kroeplin rape. Mr. Lowery was questioned for about 45 minutes to an hour. Mr. Lowery signed a waiver of search at 5:48 p.m. After Mr. Lowery signed the waiver of search form, he was taken out of the interview room and taken back to his trailer in Ogden.

After the officers completed their search, they asked Mr. Lowery if he could come back the next day at 8 a.m., and Mr. Lowery told them yes. Mr. Lowery told Malugani that he might have to find a ride. Malugani replied, "If you can't find a ride, call me." (First Trial Tr. 41:21- 42:1, Nov. 19-20, 1981.) [1] At no time while Mr. Lowery was with either Officer Malugani or Johnson was Mr. Lowery ever told he was under arrest.

1    Testimony of Mr. Lowery at his first trial, Dkt. No. 67, Ex. B.

## B. Events of July 28, 1981

After Mr. Lowery woke up on July 28, 1981, he went to a friend's house to see if he could borrow a car to go down to the police station, [*8] but the friend had already left for work. Mr. Lowery returned to his trailer and called Officer Malugani and told him he had no transportation. Officer Malugani told Mr. Lowery he would come by and pick him up. Officer Malugani picked Mr. Lowery up at 8:20 or 8:25 on the morning of July 28, 1981. Mr. Lowery voluntarily came to the police station on July 28, 1981.

Mr. Lowery was taken to the Riley County Police Department and placed in another interview room. Mr. Lowery was read his Miranda rights and signed a waiver of Miranda rights at 8:51 a.m. Mr. Lowery is a high school graduate and knows how to read.

Mr. Lowery asked Malugani if he could see a lawyer and Malugani told him that there was no need for one right now, the officers just want to ask him questions, and that Mr. Lowery was not under arrest. Plaintiff alleges that this conversation occurred only after the defendant officers had intensely interrogated him.

Mr. Lowery spoke with Officer Allen Raynor from about 9:30 a.m. to about 12:30. During this time, Officer Raynor administered a polygraph test on Mr. Lowery and subsequently interrogated him. The polygraph examination took place in the juvenile detention facility recreation [*9] room. Although Officer Raynor acknowledges that polygraph examination result reports were maintained pursuant to department procedures, the results relating to Mr. Lowery's polygraph examination are missing from the police files and defendants have no explanation for the missing files. However, defendants note that the record indicates that a copy of the polygraph examination had been provided to Mr. Lowery's attorney at the time of his trial.

Officer Raynor read Mr. Lowery his Miranda rights. Mr. Lowery was not under arrest while talking to Officer Raynor. Mr. Lowery did not make any kind of admissions to Officer Raynor.

After Officer Raynor conducted the polygraph test and interrogation, Officers Johnson and Malugani took Mr. Lowery back to the interview room on the other side of the station.

Mr. Lowery never requested food while at the police station and never told Officers Johnson and Malugani that he was hungry. At the same time, neither defendants offered Mr. Lowery anything to eat during his interrogation and confession on July 28.

Mr. Lowery testified at his jury trial in the District Court of Riley County that he just made up a confession and told Officers Malugani and [*10] Johnson. However, Mr. Lowery clarifies that he could not have made up some of the specific details because only the perpetrator, victim and police officers could have known these details since they were non-public facts. Malugani and Johnson admit that guessing one precise detail, let alone each precise detail concerning the manner in which the crime occurred and relating them to the officers the way they claim the statement was made is virtually impossible. Officers Malugani and Johnson both admit that only someone present or someone who was fed the facts could have known such details.

Plaintiff provided a lengthy objection to the events on the morning of July 28, 1981. The key issues Mr. Lowery raises are whether he was improperly questioned after he was Mirandized and whether he requested an attorney. Officers Malugani and Johnson read Mr. Lowery his Miranda rights, and Mr. Lowery signed a waiver at 8:51 a.m. Although Malugani and Johnson now deny questioning Mr. Lowery between his being Mirandized and the polygraph test at 9:30 or 9:45 a.m., Mr. Lowery testified that he was questioned intensely during this time period. In prior testimony, Johnson admitted that he questioned Mr. [*11] Lowery for ten or fifteen minutes during this 54-minute interval after he was Mirandized, though he cannot now recall the tenor of his questions. At the same time, Johnson testified that no interrogation took place during that 54-minute period because of a clear and firm department policy barring the interrogation of suspects or potential suspects immediately before a polygraph examination, though he could not provide evidence of such policy. Malugani testified that he was free to interrogate Mr. Lowery during that 54-minute period but did not because he had nothing more to talk to him about.

2006 U.S. Dist. LEXIS 66505, *

Plaintiff maintains that he requested an attorney before the polygraph test. However, Officers Malugani and Johnson testified in conversations with the prosecutor, at the suppression hearing, at trial and at their depositions that Mr. Lowery never requested an attorney prior to making his statement about the crime.

Mr. Lowery told Officers Malugani and Johnson that he stopped in front of somebody's house. Again, Mr. Lowery clarifies that he could not and did not tell the officers he stopped in front of someone's house because he was not aware of these non-public facts. Rather, he adopted the [*12] questions and agreed with the officers' suggestions as to the details of the crime. Officers Malugani and Johnson represented that Mr. Lowery volunteered information about stopping in front of a house in their official report, in their communications with the prosecutor before their testimony, at pretrial hearings, at trial, and most recently during their depositions.

Officers Malugani and Johnson asked Mr. Lowery what he did after he stopped at the house. Mr. Lowery told the officers he went to the front door. Even though Mr. Lowery stated he went through the front door, the officers wrote in their reports that Mr. Lowery went through the back door and that Mr. Lowery volunteered this information. Although the officers now take the position that Mr. Lowery entered through the front door, the officers repeated their original account of events in their communication with the prosecutor, during their testimony at the hearing and trial, and most recently during their depositions.

After responding to the suggestion that he had gone up to the door, Mr. Lowery stopped talking because he did not know any information about the crime. Officers Malugani and Johnson continued questioning him, [*13] promising to get him help if he told them how he got in the house. The officers asked Mr. Lowery, "How did you get in the house? Did you cut the screen door or bust it open and pull the screen back?" (Second Trial Tr. 259:8-10, Jan. 5-7, 1982.) [2] In response to the question, which included non-public facts, Mr. Lowery told the officers that he busted the screen door down with his hands. Mr. Lowery said this because "it sounded like the thing to say." (First Trial Tr. 28:14-15, Nov. 19-20. 1981.)

> 2   Testimony of Mr. Lowery at his second trial, Dkt. No. 67, Ex. C.

Mr. Lowery adds that he made the statement, so he could get the lawyer he already requested. Although Malugani and Johnson admit for the first time in this motion that Lowery requested a lawyer, Malugani and Johnson lied to the prosecutor before the hearings and trial, at the hearings and trial, and in their depositions in this case when they vehemently denied that Mr. Lowery ever requested a lawyer before he confessed.

Mr. Lowery then told the [*14] officers he busted the front door down and went inside the living room. Mr. Lowery told the officers he proceeded into the kitchen. Mr. Lowery stated he was rumbling around in the living room and the kitchen, which he now clarifies he could not have done since he was never inside the victim's home. Mr. Lowery based his statement about his entry into the house on the floor plan of his own trailer. Although Malugani and Johnson admit for the first time that Mr. Lowery told them he entered through the living room, they misrepresented this fact in their report, to the prosecutor, at hearings and trial and in their depositions, saying instead that he told them he entered through the kitchen.

The officers asked Mr. Lowery, "Were you going to burglarize the house or something?" (First Trial Tr. 49:13-17, Nov. 19-20, 1981.) Mr. Lowery replied, "Yeah." (First Trial Tr. 49:13-17, Nov. 19-20, 1981.)

The officers asked Mr. Lowery, "Did you hear a noise?" (Second Trial Tr. 260:20-21, Jan. 5-7, 1982.) Mr. Lowery replied, "Yeah, I heard a noise." (Second Trial Tr. 260:19-20, Jan. 5-7, 1982.) Again, Mr. Lowery clarifies that he could not have known about the noise without the officers' leading question. [*15] Although the officers now admit asking a leading question, Malugani and Johnson consistently represented at the pretrial hearings and at trial that Mr. Lowery volunteered - without any suggestion or leading on their part - that he heard a noise.

The officers asked Mr. Lowery, "Where did [the noise] come from?" (Second Trial Tr. 260:20-21, Jan. 5-7, 1982.) Mr. Lowery replied, "Down the hall." (Second Trial Tr. 260:21, Jan. 5-7, 1982.) Malugani asked Mr. Lowery what caught his attention down the hall, and Mr. Lowery told Malugani that he heard somebody down the hall inside the room.

Malugani asked Mr. Lowery if he went down the hall and Mr. Lowery said yes. Malugani asked Mr. Lowery, "Did you go into a room?" (Hearing Tr. 88:21, Nov. 12, 1981.) [3] Mr. Lowery said he went into a bedroom. Plaintiff notes that while the officers *now* admit asking leading questions, Officers Malugani and Johnson consistently testified at pretrial hearings and at trial that Mr. Lowery volunteered - without any suggestion or leading on their part - that he went down the hallway and entered a room.

> 3   Testimony of Mr. Lowery at his hearing on the Motion to Suppress Confession, Dkt. No. 67, Ex. A.

2006 U.S. Dist. LEXIS 66505, *

[*16] The officers asked Mr. Lowery, "Did you see anybody laying on the bed or anything?" "Did you jump on the bed or anything?" (Second Trial Tr. 261:8-10, Jan 5-7, 1982.) Mr. Lowery replied, "Well, I jumped on the bed." (Second Trial Tr. 261:10, Jan. 5-7, 1982.) Plaintiff notes that Malugani and Johnson now admit for the first time that Mr. Lowery was provided this information and simply repeated it back to the officers. Though they *now* admit asking leading questions, Malugani and Johnson consistently testified in their initial report, in their communications with the prosecutor, at pretrial and suppression hearings, at trial, and most recently during their depositions that Mr. Lowery volunteered - without any suggestion or leading on their part - that he had jumped on the bed.

Malugani asked Mr. Lowery, "Did you throw a pillow over her face or covers over her face?" (Second Trial Tr. 278:8-9, Jan. 5-7, 1982.) Mr. Lowery responded, "I threw covers over her face." (Second Trial Tr. 287:9-10, Jan. 5-7, 1982.) Again, Mr. Lowery claims he could not have volunteered this fact because he was never at the scene. Malugani and Johnson now admit for the first time that Mr. Lowery was provided [*17] this information and simply repeated it back to the officers. Though they *now* admit asking leading questions, Malugani and Johnson consistently stated in their initial report, in their communications with the prosecutor, at pretrial and suppression hearings, at trial, and most recently during their depositions that Mr. Lowery volunteered - without any suggestion or leading on their part - that he had thrown covers over the victim's face.

Malugani then asked Mr. Lowery, "What did you do? Did you hit her with a vase or with the butt of a knife?" (Second Trial Tr. 262:2-3, Jan. 5-7, 1982.) Mr. Lowery responded, "I hit her with the butt of a knife." (Second Trial Tr. 262:2-3, Jan 5-7, 1982.) Malugani and Johnson now admit for the first time that Mr. Lowery was provided this information and simply repeated it back to the officers. Though they *now* admit asking leading questions, Malugani and Johnson consistently stated in their report, in their communications with the prosecutor, at pretrial and suppression hearings, at trial, and most recently during their depositions that Mr. Lowery volunteered - without any suggestion or leading on their part - that the victim had been hit with [*18] the butt of a knife.

Malugani asked Mr. Lowery, "Well, what was she wearing?" (Hearing Tr. 89:22, Nov. 12, 1981.) Mr. Lowery responded that the victim was wearing a nightgown. Malugani asked Mr. Lowery if the victim was wearing underwear or not. Mr. Lowery told Malugani that the victim was wearing underwear. Malugani and Johnson still deny asking Mr. Lowery leading questions suggesting non-public information

about the victim's nightgown, and that he simply repeated this information back to the officers. Defendants consistently stated in their report, in their communications with the prosecutor, at pretrial and suppression hearings, at trial, during their depositions, and again here, claiming that Mr. Lowery volunteered - without any suggestion or leading on their part - that the victim wore a nightgown.

Malugani asked Mr. Lowery, "Well, what happened after that?" (Second Trial Tr. 262:9, Jan. 5-7, 1982.) Mr. Lowery responded, "Well, I raped her." (Second Trial Tr. 262:9-10, Jan. 5-7, 1982.) Mr. Lowery next told the officers he left the house. When Mr. Lowery finished his confession, he asked the officers for and they gave him a fifteen-minute break and brought in a cup of coffee. [*19] The officers came back about fifteen minutes later and asked Mr. Lowery to write a statement out for them and advised him, "If you don't want to write a statement, would you say it into a recorder if that would be easier." (Second Trial Tr. 264:15-18, Jan. 5-7, 1982.) Mr. Lowery responded that he didn't want to say anything else and wanted to see a lawyer. After the questioning, the officers took Mr. Lowery back to his trailer in Ogden. Malugani and Johnson wanted to go back to the trailer to pick up the shirt Mr. Lowery was allegedly wearing at the time of the rape.

After the officers obtained the shirt, they took Mr. Lowery to Saint Mary's Hospital to draw blood from Mr. Lowery. Mr. Lowery isn't sure if Officer Malugani placed him under arrest after the statement or after they got back from Mr. Lowery's trailer. Mr. Lowery was taken to the jail about 4:20 and was actually booked at 4:37.

The entire chain of events from the time Mr. Lowery finished speaking with Officer Raynor until he was placed in jail lasted from about 12:45 p.m. to 4:37 p.m.

Mr. Lowery confessed to the rape "because he felt that he couldn't leave and if he did leave Investigator Malugani was just going to keep [*20] on getting all over him until he proved that Mr. Lowery was the one that did this." (Second Trial Tr. 263:23-264:4, Jan 5-7, 1982.) Mr. Lowery made up the whole story just so the officers would leave him alone and get off his back. Mr. Lowery constructed the details of his confession by using his own imagination. Again, plaintiff clarifies that he had been promised verbally and in writing that if he at any time wanted to speak to a lawyer, one would be provided him. Mr. Lowery states that Malugani and Johnson refused him an attorney. Although Malugani and Johnson admit for the first time in this motion that Lowery requested a lawyer, Malugani and Johnson lied to the prosecutor before the hearings and trial, at the hearings and trial, and in their depositions in this case

when they denied that Mr. Lowery ever requested a lawyer before he confessed.

At the time of the rape, Mr. Lowery was 22 years old and employed by the United States Army as an Sp-4. He was also married.

Prior to trial, the Riley County District Court denied Mr. Lowery's motion to suppress and found "the admissions given by this defendant were voluntarily made and were not a result of coercion, duress or unfairness [*21] on the part of the officers conducting the interrogation." (Hearing Tr. 116, Nov. 12, 1981). The Kansas Court of Appeals affirmed Mr. Lowery's conviction and held his confession was not involuntary. However, the District Court of Riley County, Kansas, Case No. 81 CR 575, exonerated Mr. Lowery and vacated his conviction on April 3, 2003, causing the prior findings of fact and rulings to lose all binding and preclusive effect.

## C. Officers' Report and Subsequent Testimony

After the interrogation and confession of Mr. Lowery, Johnson drafted an official report documenting the alleged confession. Although Johnson drafted the report, it would have been reviewed by both detectives and both detectives adopted it as their own. In the report, the detectives represented that Mr. Lowery had volunteered non-public information. Malugani and Johnson understood they had an obligation to complete this report accurately and honestly. It was the usual practice for officers to meet with the prosecutor before the hearings and trial. Patrick Caffey recalls meeting with both Malugani and Johnson and making clear that the officers did not feed Mr. Lowery any salient facts. Although Malugani and [*22] Johnson do not recall specifically meeting with the prosecutor, they believe they did so as it was the usual practice.

Both Malugani and Johnson testified under oath that they did not suggest or feed any non-public details about the crime to Mr. Lowery while they were interrogating him, that Mr. Lowery knew non-public information about the crime and volunteered it, and that only the perpetrator could have known such information. Further, Malugani and Johnson claimed they did not ask Mr. Lowery any leading questions suggesting non-public facts other than the ones relating to the screen door. They repeated this testimony in their initial report, in their communications with the prosecutor, at pretrial and suppression hearings, at trial, and most recently during their depositions.

Mr. Lowery stated that Malugani and Johnson fed him facts through leading questions suggesting non-public facts and pressured him into repeating them throughout the interrogation.

Malugani and Johnson testified under oath that Mr. Lowery told them, without any prompting or suggestion, that he pulled up to a white house on the corner. They repeated this testimony at trial and most recently during their depositions. [*23] Malugani and Johnson both admit that only someone present or someone who was fed the facts could have known such details as the color or location of the house. At his first trial, Mr. Lowery stated he was fed the fact relating to pulling up to a house on the corner, and he merely repeated that detail back to the officers. At the second trial, Mr. Lowery stated he only learned of the color of the house during the trial.

Malugani and Johnson testified under oath that Mr. Lowery told them, without any prompting or suggestion, that he then went into the kitchen, saw a knife, and picked it up. Officer Johnson testified he represented in his initial report, in his communications with the prosecutor, at pretrial and suppression hearings, at trial, and most recently during his deposition that Mr. Lowery volunteered this information without any prompting. Malugani and Johnson both admit that only someone present or someone who was fed the facts could have known such details. At the suppression hearing, Mr. Lowery testified that Malugani suggested to him the detail about the knife with a leading question and he merely repeated that detail back to Malugani and Johnson.

Malugani and Johnson [*24] testified under oath that Mr. Lowery told them, without any prompting or suggestion, that after he had raped the victim, he threw the knife down inside the residence and fled the area. They repeated this testimony in their initial report, in their communications with the prosecutor, at pretrial and suppression hearings, at trial, and most recently during their depositions. Malugani and Johnson both admit that only someone present or someone who was fed the facts could have known such details.

Both Malugani and Johnson recognize that Mr. Lowery could not have known the aforementioned non-public details about the crime unless he was present or participating or he was fed those facts.

Johnson testified under oath that Mr. Lowery indicated he was giving his statement to Malugani and him, that he was ashamed and afraid his family would think poorly of him. Johnson repeated this testimony at trial, and most recently during his deposition. Mr. Lowery disputes the accuracy of Johnson's testimony and characterization of his behavior.

The prosecutor assigned to Mr. Lowery's case, Patrick Caffey, testified that Malugani and Johnson never told him that Mr. Lowery was fed facts relating to the [*25] crime and that Johnson's report indicated Mr.

Lowery volunteered all such details. Malugani and Johnson's recollection of their interactions with the prosecutor corroborate his testimony.

Malugani testified that neither he nor Johnson ever shouted at Mr. Lowery or attempted to intimidate him. Malugani denied telling Mr. Lowery he had ten years left on the force and would take all of that time to prove his guilt if necessary. Mr. Lowery repeatedly testified that Malugani told him he had ten years left on the force and would take all of that time to prove his guilt if necessary.

### D. Officers Malugani and Johnson

Malugani was known at the RCPD as "Dirty Harry," a nickname he got from his partner while he was a police officer in Santa Rosa, California, prior to moving to Kansas. The nickname was taken from the movie by the same name in which Clint Eastwood played the title character, a rogue cop willing to break the rules and use brutal and illegal methods to catch or kill culprits. Alvan Johnson, director of the RCPD at the time of the Lowery investigation, as well as Woodyard and French, both supervisors and friends of Malugani, acknowledged that they knew that nickname was [*26] used by his co-workers and colleagues. Johnson, too, had a nickname, "Mad Dog," which he testified was used by supervisors such as French and colleagues on and off the job. Johnson's supervisors at the time of the Lowery investigation remember his nickname, too.

Malugani and Johnson drank and socialized with their immediate supervisors, Larry Woodyard and Steven French. Indeed, Johnson considered these supervisors to be his friends, and French considered both Malugani and Johnson as his friends.

According to Alvan Johnson, the director of the Riley County Police Department at the time of the Lowery investigation, both Malugani and Johnson had domestic problems requiring his involvement at that time. Johnson had gone through a divorce and was experiencing domestic problems, while Malugani had gone through several divorces in addition to experiencing domestic problems with his spouse at the time, fellow officer Jennifer Shay. Malugani's problems were affecting his performance and required the involvement of his supervisors.

Although Johnson's supervisors had noticed problems with his work, in a letter to their superior, RCPD director Alvan Johnson, they noted increased activity on [*27] Johnson's part and commended him for singlehandedly improving the department's case clearance rates.

Alvan Johnson, the director of the Riley County Police Department at the time of the Lowery

investigation, testified that under department policy it was routine for the supervisors to sign off on the reports as they were submitted and reviewed. He recognized that ongoing supervision is intended in part to communicate to subordinates that their work is evaluated on a regular basis, thereby forestalling violations of internal rules and of the rights of suspects and others.

In relation to a Supplemental Report signed by Douglass Johnson (Dkt. No. 108, Ex. Q), Alvan Johnson states that it was normal procedure for the supervisor to sign the report or the cover sheet. Not leaving any signature would be inconsistent with department policy and procedure. Woodyard contends that the very idea of a supervisor having to sign off on a subordinate's report to indicate review of his work was "foreign" to him. Woodyard's contention in this respect is at odds with the above-referenced testimony of his then-superior, Alvan Johnson, and that of his peer, French, who routinely initialed subordinates' [*28] reports to indicate review and stated that other supervisors in the RCPD did that too, using the boxes provided in report forms to that end.

The testimony cited is unclear as to whether there was a supervisor signature on the Supplemental Report. French's testimony states there was no signature indicating supervisor review. However, Woodyard testified that there was some notation at the top indicating that there may have been supervisor review, but Woodyard was unsure who was the supervisor.

## IV. ANALYSIS

### A. Qualified Immunity

Generally, the *Eleventh Amendment* shields from suit state officials acting in their official capacity. *Wares v. VanBebber, 231 F. Supp. 2d 1120, 1124 (D. Kan. 2002)*. In enacting *42 U.S.C. § 1983*, Congress did not intend to abrogate state immunity. *Neal v. Lewis, 325 F. Supp. 2d 1231, 1235 (D. Kan. 2004)*. Thus, when state officials act in their official capacities, they are entitled to absolute immunity. Id. These officials are not considered "persons" within the meaning of *42 U.S.C. § 1983*. Id. citing *Will v. Mich. Dep't of State Police, 491 U.S. 58, 66- 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)*. [*29]

Even when state officials act in their personal capacity, they may still receive qualified immunity to shield them from personal liability unless their conduct violates clearly established constitutional rights. *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)*. The Tenth Circuit places a presumption in favor of immunity for public officials acting in their individual capacities. *Hidahl v. Gilpin County DSS, 938 F. 2d 1150, 1155 (1991); Schalk v.*

*Gallemore, 906 F.2d 491, 499 (10th Cir. 1990); Melton v. City of Oklahoma City, 879 F.2d 706, 728-29 (10th Cir. 1989),* reh'g granted on other grounds, *888 F.2d 724 (1989).* The Supreme Court notes that "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).*

To determine whether qualified immunity serves as a defense to a *Section 1983* action, the court undertakes a two-step analysis. *PeTA, People for the Ethical Treatment of Animals v. Rasmussen, 298 F.3d 1198, 1207 (10th Cir. 2002)* [*30] (citing *Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).* First, the court must determine whether the facts alleged state the violation of a constitutional right. *Id.* And if so, the court must determine whether the constitutional right was clearly established at the time of injury. *Id.* If the answer to either of these questions is "no," then the defendant is entitled to qualified immunity. Id. Once a defendant asserts a qualified immunity defense, the plaintiff carries the burden of showing qualified immunity is not proper under the circumstances. *Despain v. Uphoff, 264 F.3d 965, 971 (10th Cir. 2001).*

### 1. Miranda and *Section 1983* Actions

Defendants argue that plaintiff cannot state a violation of his *Fifth Amendment* right to counsel because such a claim does not give rise to a claim for damages under *Section 1983.* Plaintiff argues that defendants misconstrue his claim. Plaintiff concedes that no *Fifth Amendment* right to counsel claim can arise out of *Section 1983.* However, plaintiff claims that his action seeks recovery for a coerced confession used to convict Mr. Lowery at trial, which creates a *Fourteenth Amendment* [*31] violation falling within the scope of *Section 1983.* Defendants respond that plaintiff's argument is fatally flawed, noting that one cannot convert a Miranda violation into a coercion claim. Specifically, if Mr. Lowery was not under arrest, he cannot claim coercion.

As both parties acknowledge, no cause of action exists for money damages under *Section 1983* where an officer allegedly violated a suspect's Miranda rights. *Bennett v. Passic, 545 F.2d 1260, 1263 (10th Cir. 1976)* ("No rational argument can be made in support of the notion that the failure to give Miranda warnings subjects a police officer to liability under the Civil Rights Act."). See also *Chavez v. Martinez, 538 U.S. 760, 772, 123 S. Ct. 1994, 2004, 155 L. Ed. 2d 984 (2003)* (citations omitted) (noting that failure to read Miranda warnings did not violate the defendant's constitutional rights and cannot be grounds for a *Section 1983* action). Plaintiff's attempts to reframe a Miranda violation into a coerced

confession claim is of no avail. To the extent that plaintiff presents a Miranda violation under *Section 1983,* the court dismisses plaintiff's claim. Mr. Lowery's allegations of a coerced [*32] confession will be addressed in the next section.

### 2. Whether Mr. Lowery's Confession Was Voluntary

Whether plaintiff made a voluntary confession is the central issue in determining whether defendants are entitled to qualified immunity. Defendants initially argue that a reasonable officer could believe Mr. Lowery's confession was voluntary and that this confession provided probable cause. Defendants note that they have satisfied the factors considered in *United States v. Erving, L., 147 F.3d 1240, 1249 (10th Cir. 1998).* Plaintiff responds that defendants have violated Mr. Lowery's right against compelled self incrimination by fabricating evidence, providing perjured testimony, questioning Mr. Lowery over two days and coercing a confession. In their reply, defendants add that the timing and events related to Mr. Lowery's accident provided probable cause to question Mr. Lowery.

In determining whether a confession is voluntary, the Tenth Circuit evaluates "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *United States v. Erving, L., 147 F.3d 1240, 1248 (10th Cir. 1998)* [*33] (citing *Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)).* The court considers: 1) the age, intelligence, and education of the defendant; 2) the length of any detention; 3) the length and nature of the questioning; 4) whether the defendant was advised of his or her constitutional rights; and 5) whether the defendant was subjected to physical punishment. *Id. at 1249* (citation omitted). The Supreme Court has elaborated on this standard noting that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the *Due Process Clause of the Fourteenth Amendment."* Id. (citing *Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L. Ed. 2d 473 (1986).* The crucial element is police overreaching, and after *Connelly* a confession is only involuntary under the *Fourteenth Amendment* if the police use coercive activity to undermine the suspect's ability to exercise his free will. *Id.* (citing *Connelly, 479 U.S. at 163, 107 S.Ct. 515).*

For claims of coerced confessions, the court looks to whether a reasonable officer in defendants' position could have believed [*34] the confession was voluntary. See *Storck v. City of Coral Springs, 354 F.3d 1307, 1315 (11th Cir. 2004)* (noting that arguable probable cause for arrest exists based in light of the information the officer possessed). The distinction is crucial and goes to the

heart of the qualified immunity doctrine. *Jones v. Cannon, 174 F.3d 1271, 1283 n. 3* (finding in the context of a warrantless arrest "arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry."). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).* "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991).* Only when officers' conduct falls outside the bounds of what a reasonable officer would consider constitutional do they forfeit their entitlement to immunity. See *Roy v. Inhabitants of Lewiston, 42 F.3d 691, 695 (1st Cir. 1995)* [*35] (one of the cardinal purposes of immunity is to offer the police "a fairly wide zone of protection in close cases.").

Although defendants ask the court to focus on plaintiff's age, education, the length of the detention and the fact plaintiff had been advised of his constitutional rights, this is merely examining form rather than function. It is evident that Mr. Lowery had a high school education and was 22 years of age at the time of his confession. However, he underwent two days of questioning where he claims he evoked his right to counsel, which the officers ignored.

Several factors counsel in favor of finding Mr. Lowery's confession was involuntary. First, the findings of fact indicate that there is significant factual disparity between the officers' recollection of events at the time of prosecution and now. Mr. Lowery indicates that he invoked his right to counsel, though the officers initially denied this fact and now appear to admit this. Second, there are several versions of the nature of the questioning. The tenor of the conversation is unclear as defendants' account of the conversation has varied in the suppression hearing, the first trial, the second trial, and the deposition. [*36] Third, the findings of fact indicate that many of the questions were leading and included non-public facts. Given the number of specific facts that had to be fed to Mr. Lowery about the rape, no reasonable officer could believe that Mr. Lowery's confession was voluntary. This is not an instance of reasonable mistake or arguable probable cause, but rather an instance where law enforcement misled Mr. Lowery, the prosecution and the courts. Such action is not entitled to immunity. No number of Miranda waivers should shield an officer from illegal and unethical conduct.

### 3. Complaining Witness & Immunity

The issue of immunity is further complicated by the stage of the proceedings and the status of the defendant. In general, "the common law provided absolute immunity from subsequent damages liability for all persons-governmental or otherwise-who were integral parts of the judicial process." *Briscoe v. LaHue, 460 U.S. 325, 335, 103 S.Ct. 1108, 1115- 1116, 75 L. Ed. 2d 96 (1983).* Although a party may bring a civil rights claim, *Section 1983* "does not authorize a damages claim against private witnesses on the one hand, or against judges or prosecutors in the performance of their [*37] respective duties on the other." *Id. at 335.* On the specific issue of police officer witnesses, the Court observed:

> When a police officer appears as a witness, he may reasonably be viewed as acting like any other witness sworn to tell the truth-in which event he can make a strong claim to witness immunity; alternatively, he may be regarded as an official performing a critical role in the judicial process, in which event he may seek the benefit afforded to other governmental participants in the same proceeding. Nothing in the language of the statute suggests that such a witness belongs in a narrow, special category lacking protection against damages suits.

*Id. at 335-36.* Ultimately, the Supreme Court held in Briscoe that a state defendant cannot assert a *Section 1983* action against a police officer for giving perjured testimony at the defendant's criminal trial. *Id. at 326.* The Court also declined to carve out an exception to the general rule of immunity in cases of alleged perjury by police officer witnesses. Id. The Court affirmed the Circuit's holding that all witnesses, police officers as well as lay witnesses, [*38] are absolutely immune from civil liability based on their testimony in judicial proceedings. *Id. at 328.* See also *Hunt v. Bennett, 17 F.3d 1263 (1994), 1267-68 (10th Cir. 1994)* (noting that all witnesses enjoy absolute immunity from civil liability under *Section 1983* for their testimony in a prior trial and dismissing the claim against defendant for actions in his capacity as a witness at the preliminary hearing and trial). Therefore, defendants Malugani's and Johnson's trial statements are entitled to absolute immunity.

Although plaintiff tacitly accepts Briscoe's application to the officers' trial testimony, plaintiff distinguishes Malugani's and Johnson's pretrial statements as that of complaining witnesses. Plaintiff cites *Malley v. Briggs, 475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)* and *Anthony v. Baker, 955 F.2d*

2006 U.S. Dist. LEXIS 66505, *

*1395 (10th Cir. 1992)* for the proposition that complaining witnesses should not receive absolute immunity. In Malley, the Supreme Court addressed the issue of what degree of immunity should be afforded a police officer alleged to have unconstitutionally arrested plaintiffs by presenting a complaint and affidavit that [*39] failed to establish probable cause. *Id. at 337*. Again, the Supreme Court examined the degree of immunity afforded at common law and determined that complaining witnesses were not entitled to absolute immunity. *Id. at 340-41*. Rather, the Malley court remanded the issue of whether the officer was entitled to qualified immunity. *Id. at 344-46*. The Court directed that the same standard of objective reasonableness applied in the context of suppression hearings defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest. *Id. at 345*. In the context of warrant applications, the Court noted that the shield of immunity will be lost only for an application so lacking an indicia of probable cause as to render official belief unreasonable.

Thus, the court must inquire whether the officers' pretrial statements are entitled to qualified immunity using the objective reasonableness standard. Evident from the findings of fact is that the officers' testimony at various stages of the proceedings is inconsistent with what they admit today. This is troubling to the court as it undercuts fundamental principles of the judicial [*40] system, where witnesses are under oath and sworn to tell the truth. The officers now admit in several instances that they asked leading questions, even though they denied doing so in their report and at the suppression hearing. Such conduct is not objectively reasonable and condemnable behavior.

### 4. Fabrication of Evidence

Plaintiff provides an alternative framework for this case, defining it as Mr. Lowery's right not to be deprived of liberty on the basis of fabricated evidence. Plaintiff cites to several cases that have recognized this right. *Clanton v. Cooper, 129 F.3d 1147, 1152 (10th Cir. 1997); Castellano v. Fragozo, 311 F.3d 689, 704-705 (5th Cir. 2002); Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001)* (en banc); *Stemler v. City of Florence, 126 F.3d 856, 872 (6th Cir. 1997)*. One example in this Circuit is *Pierce v. Gilchrist, 359 F.3d 1279, 1298*. In Pierce, the Tenth Circuit affirmed the district court's denial of qualified immunity to a forensic chemist alleged to have fabricated evidence that led to plaintiff's conviction and fifteen years in Oklahoma state prison. [*41] *Id. at 1297-98*. In recognizing a right to be free from fabricated evidence, the Circuit noted "'[O]fficials can still be on notice that their conduct violates established law even in novel factual

circumstances . . . [T]he salient question . . . is whether the state of the law [at the time of the conduct] gave respondents fair warning that their alleged treatment of [plaintiff] was unconstitutional.'" *Pierce, 359 F.3d at 1298* (citing *Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)*). "[A] defendant's due process rights are implicated when the state knowingly uses false testimony to obtain a conviction, *Pyle v. Kansas, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942)*, or withholds exculpatory evidence from the defense, *Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)*." *Id. at 1299*. See also *Spurlock v. Satterfield, 167 F.3d 995, 1005-06 (6th Cir. 1999)* (rejecting qualified immunity where officers allegedly fabricated evidence and manufactured probable cause; holding that on the basis of Brady and Pyle "[the [*42] defendant] cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights."); *Newsome v. McCabe, 256 F.3d 747, 752-53 (7th Cir. 2001)* (finding Brady clearly established that officers could not withhold information that plaintiff's fingerprints did not match those found at the crime scene or that officers influenced witnesses to pick plaintiff out of police lineup).

Defendants cite *Taylor v. Meacham, 82 F.3d 1556 (10th Cir. 1996)* in response to plaintiff's argument. In Taylor, the plaintiff had been arrested and charged with murder and rape and jailed for seven weeks. DNA tests led authorities to drop charges, and plaintiff was released from custody. Taylor thereafter filed a *Section 1983* claim against the sheriff alleging there was no probable cause to arrest. On appeal, the Tenth Circuit found there was no evidence which suggests the sheriff included false statements, or omitted any facts knowingly or with reckless disregard for the truth. *Id. at 1563*.

However, the Tenth Circuit in Pierce [*43] distinguished Taylor and recognized that a party may be able to proceed with a *Section 1983* action despite the existence of probable cause. "In the case of a *Fourth Amendment* claim of falsified evidence, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit." *Pierce v. Gilchrist, 359 F.3d 1279, 1293 (10th Cir. 2004)* (citations omitted).

Since defendants do not dispute that the right to be free from fabricated evidence was clearly established, the court proceeds directly to the factual issues. Based on the findings of fact, the court finds that plaintiff's claim survives summary judgment. The officers' statements at the pretrial hearing bolstered the case for finding the confession to be voluntary. The combination of the officers asking leading questions and disclosing non-

public facts to Mr. Lowery led to the creation of a credible confession. Had the court known of the inconsistencies in Mr. Lowery's testimony and the fact that he received non-public facts, the result of the suppression hearing would have been different. Defendants distorted their conversation with Mr. Lowery [*44] and misstated the context of some of his statements. Since knowledge of the specific facts in the crime led to Mr. Lowery's hearing, trial and conviction, the court permits Mr. Lowery's claim to proceed. Since there are material factual disputes, the court denies summary judgment on Mr. Lowery's fabrication of evidence claim.

### 5. Failure to Investigate Without a Reasonable Basis for Probable Cause Determination

Defendants seek qualified immunity on Officers Malugani, Johnson and Raynor's failure to adequately investigate the crime to seek out the true perpetrator. Count 1(C) of the complaint alleges the officers should have continued an investigation.

In support of a claim of qualified immunity, defendants cite *Romero v. Fay, 45 F.3d at 1472.* In Romero, the plaintiff was arrested for murder. *Id. at 1474.* When he was in custody, plaintiff informed the arresting officer he was innocent and had a complete alibi. Id. The defendant, Officer Fay, refused plaintiffs' offer of names of alibi witnesses and stated they were of little significance because they would lie to protect plaintiff. Id. Defendant neither interviewed plaintiff's [*45] alibi witnesses, nor did he interview the individuals present in plaintiff's apartment. Although plaintiff was imprisoned for at least three months, he was ultimately released from jail. Plaintiff then filed a *Section 1983* action and alleged his constitutional rights had been violated. Id. On appeal, plaintiff argued that the officer did not have probable cause, even though he had two witness statements, because the officer did not investigate defendant's alleged alibi defense, which would have negated the probable cause. *Id. at 1476-77.* The Tenth Circuit rejected this argument and found the officer's actions were reasonable under the circumstances, and the officer was not under an obligation to investigate defendant's alleged alibi witnesses. Id. The court affirmed the grant of qualified immunity to Officer Fay. *Id. at 1478.* Defendants also cite *Baker v. McCollan, 443 U.S. 137, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979),* in support of their argument that the failure to investigate is not a constitutional violation. However, the case is framed slightly differently from the way in which defendants attempt to employ it. In Baker, the Court found that since the [*46] respondent was arrested under a facially valid warrant, respondent could not bring a claim of deprivation of liberty. *Id. at 145-46.*

In response, plaintiffs argue that to establish a *Fourteenth Amendment constitutional* violation, a government official must injure an individual's life, liberty, or property interest with deliberate or reckless intent rather than simple negligent conduct. *Webber v. Mefford, 43 F.3d 1340, 1343 (10th Cir. 1994)* (emphasis added). Therefore, "only reckless or intentional failure to investigate other leads offends a defendant's due process rights." *Wilson v. Lawrence County. 260 F.3d 946, 955 (8th Cir. 2001). Id. at 957* (noting that a failure to investigate other leads could easily be described as reckless or intentional). See *Sanders v. English, 950 F.2d 1152, 1162 (5th Cir.1992)* (denying qualified immunity where evidence could support a finding that defendant had deliberately ignored exonerating information indicating he had arrested the wrong person); *Whitley v. Seibel, 613 F.2d 682, 686 (7th Cir.1980)* (noting that while negligent acts in an investigation [*47] do not violate due process, intentional acts do). Generally, the failure to investigate is not a constitutional violation as long as the officer in question reasonably established probable cause. *Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)* ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.") (citations omitted). See also *Whitley, 613 F.2d at 686* (noting that "[i]f the officer undertakes to make decisions which are not his to make and then intentionally misleads those who do have the ultimate authority to authorize the arrest, that officer may be found to have deprived the arrestee of his liberty without due process of law.").

Again, since defendants do not contest that the right was clearly established, the court proceeds directly to the factual issues. The court agrees that defendants' authorities are not helpful in our present case as there is a fundamental question as to whether there was probable cause. Before the confession, defendants did not have probable cause to arrest Mr. Lowery. The only evidence of his presence at the scene was the fact that he was near [*48] the scene at the time and had been seen at a local convenience store. After Mr. Lowery's confession, the officers argue that the voluntary confession provides a basis for probable cause. This argument is essentially bootstrapping. In essence, if the officers feed information and mislead others, they argue that they should be immune because they received the information that would establish probable cause. Based on the circumstances under which plaintiff's confession was procured, defendants had an obligation to investigate other suspects. In essence, defendants acted intentionally and recklessly.

### 6. Failure to Disclose Exculpatory and Impeachment Evidence to the Prosecution

Defendants also seek qualified immunity for the their alleged failure to disclose exculpatory and impeachment evidence to the prosecution. Count I(B) of the complaint alleges that the officers are liable for failing "to document or disclose to the prosecutors material exculpatory and impeachment information." The "exculpatory and impeachment information" reference in the claim is Lowery's allegation that his confession was not voluntary and the product of coercion.

Defendants essentially raise two arguments [*49] in support of their claim. First, the *Due Process Clause* prohibits the state from withholding exculpatory evidence from the defense in a criminal prosecution. See *Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*. The duty imposed by the *Due Process Clause* under Brady is owed to the criminal defendant, not to the prosecution. See *Jean v. Collins, 221 F.3d 656, 660-61 (4th Cir. 2000)* (en banc). Next, Mr. Lowery was fully aware of the circumstances of his confession. Thus, there was no information to withhold from the defense. Mr. Lowery responds that officers withheld exculpatory and/or impeachment evidence in violation of defendant's rights. Further, Mr. Lowery contends that the officers violated a right to a fair trial by withholding from prosecutors the fact they either fabricated evidence or coerced a confession.

"In a case involving the withholding of exculpatory evidence, the existence of probable cause is determined by examining the evidence as if the omitted information had been included and inquiring whether probable cause existed in light of all the evidence, including the omitted information." *Pierce v. Gilchrist, 359 F.3d 1279, 1293 (10th Cir. 2004)*. [*50] For purposes of Brady, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)*. Information is exculpatory if it is "favorable to [the] accused," either because it would "tend to exculpate" him, or because it undermines the credibility of a material witness. *Brady, 373 U.S. at 87; Giglio, 405 U.S. at 154-55*. The disclosure duty under Brady applies to all members of the investigative or prosecutorial team.

The court proceeds to the factual issues, since defendant does not deny that this right was clearly established at the time of Mr. Lowery's arrest and prosecution. The findings of fact indicate that the officers withheld crucial information from the prosecutor as to the content and nature of the interrogation. This undermines the prosecutor's ability to determine whether a case should proceed. Without the confession,

defendants would have no basis for arresting Mr. [*51] Lowery. Thus, the court finds that the exculpatory evidence had more than a reasonable probability to undermine confidence in the outcome. Accordingly, the court finds that defendants are not entitled to qualified immunity.

### 7. Fourteen Amendment Substantive Due Process Claim

Plaintiff states that he will not be proceeding with his *Fourteenth Amendment* substantive due process claim. Plaintiff also states that he will not be pursuing a claim against Officer Raynor. Thus, these claims are dismissed from plaintiff's action.

### 8. *Fourteenth Amendment* Malicious Prosecution Claim

Defendants do not separately address the malicious prosecution claim under the *Fourteenth Amendment*. The only discussion of the malicious prosecution claim is in the summary judgment motion for state law claims. Mr. Lowery, however, did provide some discussion in support of the malicious prosecution claim.

In support of his argument, Mr. Lowery argues that in the § 1983 malicious prosecution context, that constitutional right is the *Fourth Amendment's* right to be free from unreasonable searches. *Taylor v. Meacham, 82 F.3d 1556, 1561 (10th Cir. 1996); Pierce v. Gilchrist, 359 F.3d at 1289*. [*52] In Kansas, "[t]o maintain successfully an action for malicious prosecution, the plaintiff must prove that the defendant initiated the . . . proceeding of which complaint is made, that the defendant in so doing acted without probable cause and with malice, and that the proceeding terminated in favor of the plaintiff." *Vanover v. Cook, 260 F.3d 1182, 1189 (10th Cir. 2001)* (citations omitted). *Gilchrist* makes clear that initial probable cause is not a defense to subsequent police misconduct.

The court finds that the officers' actions in initiating proceedings forms the root of Mr. Lowery's present complaint. There is also allegation of deliberate misconduct that, if proven, would indeed amount to malice. Finally, that the proceeding terminated in favor of the plaintiff cannot be disputed in light of the aforementioned order vacating Mr. Lowery's conviction. See *Heck v. Humphrey, 512 U.S. 477, 487, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994)* (holding that § 1983 malicious prosecution claimant can prove termination of prior criminal proceeding in his favor by showing that "the conviction or sentence has been . . . declared invalid by a state tribunal authorized to make such determination").

[*53]  Accordingly, the court finds that plaintiff should be permitted to proceed with his constitutional malicious prosecution claim.

### 9. Conspiracy Claim and Supervisory Liability

Defendants argue that plaintiff's conspiracy and supervisory liability claims should fail because plaintiff cannot demonstrate a violation of a constitutional right. The court denied immunity to the officers immunity on several claims. Accordingly, plaintiff should be allowed to proceed with his claims.

### 10. Pendant Loss of Association

The court addressed the issue of pendant loss of association in its prior motion to dismiss and will not revisit the issue here.

### B. State Law Claims

Defendants also move for summary judgment on Mr. Lowery's state law claims. Since the court has not granted immunity on all federal claims, the court will have to address defendants' motion on whether Mr. Lowery's state law claims survive summary judgment. In reaching a conclusion, the court relies heavily on the conclusions of law outlined in the discussion of qualified immunity.

At the outset, the court notes that the findings of fact for the state law claims are largely the same as those for qualified [*54]  immunity. Defendants added only two additional uncontroverted facts in their motion for summary judgment on the state law claims. These two facts were that Mr. Lowery had served in the United States Army since April 1979 and that Mr. Lowery suffered no immediate physical injury following his confession. In his response, Mr. Lowery redacted some objections and offered fewer additional facts. Since the facts and objections are substantially the same, the court will apply the facts as set forth in Section III.

Defendants raise several arguments in support of their claim for summary judgment. Defendants first argue that Officers Malugani, Johnson and Raynor had probable cause to initiate a prosecution against Mr. Lowery because plaintiff's confession was voluntary. Defendants also note that any claim against Officer Raynor fails because the essential elements of a claim cannot be made against Officer Raynor. The court disagrees with defendants. Although the court has already found plaintiff's confession to be voluntary, plaintiff's state law claim of malicious prosecution may proceed against the officers because it is based on the fabrication of evidence and misrepresentations made by [*55]  the officers. The parties already agreed to the dismissal of Officer Raynor, and thus no action can be maintained against him.

Defendants also argue that: 1) Officers Malugani, Johnson and Raynor are immune from liability for false arrest under *Kan. Stat. Ann. § 75-6104(e)*; 2) Mr. Lowery fails to establish the elements of an abuse of process claim; 3) Mr. Lowery's claim of negligent infliction of emotional distress is barred because of the absence of immediate physical injury; 4) defendants cannot be liable for negligent training, supervision and adoption of policies because of the absence of an underlying tort. Plaintiff's counsel did not respond to these arguments because the' parties already stipulated to dismissal of these counts in the "Stipulation for Partial Dismissal without Prejudice" entered in the court records on December 20, 2004. As a result, defendants' arguments are moot.

Accordingly, the court denies summary judgment to defendants on the state law claims.

The court discourages the parties from filing a motion to reconsider. If, however, the parties believe one is necessary, such motion should comply with the standards set forth by the [*56]  Tenth Circuit and shall not exceed ten double-spaced pages. The response shall not exceed ten double-spaced pages. No reply shall be permitted.

IT IS ACCORDINGLY ORDERED this 15th day of September 2006, that the court grants in part and denies in part defendants' Motion for Qualified Immunity (Dkt. No. 56).

IT IS FURTHER ORDERED that the court denies defendants' Motion for Summary Judgment on State Law Claims (Dkt. No. 62), which defendant Riley County Law Enforcement Agency joined (Dkt. No. 77).

s/ J. Thomas Marten, JUDGE