UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH WYNIEMKO,                              CASE NO. 03-CV-74749-DT
                                               HON. LAWRENCE P. ZATKOFF

        Plaintiff,

vs.

THOMAS J. OSTIN, BART M. MARLATT,
ALEXANDER C. ERNST and TOWNSHIP
OF CLINTON,

        Defendants.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment.[1]  Plaintiff

has filed a response, to which Defendants have replied.  The Defendants have also filed a Motion

to Strike Declaration of Wayne Burkhardt and a Motion to Strike Declaration and Preclude the

Testimony of Glen McCormick, and Plaintiff has responded to both.  Defendants have filed a reply

brief with respect to the Motion to Strike Declaration and Preclude the Testimony of Glen

McCormick.   The Court finds that the facts and legal arguments pertinent to the Defendants'

Motions are adequately presented in the parties' papers, and the decisional process will not be aided

---

[1]Defendants also filed an Ex Parte Motion to Exceed Page Limit with respect to their
Motion for Summary Judgment.  The Court GRANTS Defendants' Motion to Exceed Page
Limit. The Court notes that, at the request of the parties, it allowed them to file over-length briefs
with respect to the Motion for Summary Judgment.  The parties took advantage, as evidenced by
Defendants' initial brief of 28 pages, Plaintiff's response brief of 39 pages and Defendants' reply
brief of eight pages (all of which were heavily footnoted).

by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the Motions be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, Defendants' Motion for Summary Judgment is DENIED in its entirety, Defendants' Motion to Strike Declaration of Wayne Burkhardt is DENIED AS MOOT and Defendants' Motion to Strike Declaration and Preclude the Testimony of Glen McCormick is DENIED.

## II. BACKGROUND

### A.   Synopsis

On November 9, 1994, Plaintiff was convicted by a jury in Macomb County Circuit Court of fifteen counts of criminal sexual conduct, one count of breaking and entering, and one count of armed robbery in connection with someone breaking and entering the home of Diane Klug, the repeated rape of Ms. Klug and the theft of $2,500 cash, all on April 30, 1994, hours after she returned home from a party at 2:00 a.m.

In 2003, after nine years in prison, Plaintiff was released after recently developed DNA testing performed on evidence preserved by the Clinton Township Police Department (the "Township" or "Department") established that Plaintiff's DNA did not match the DNA left by the rape perpetrator. On November 25, 2003, Plaintiff filed a twelve count Complaint in this Court alleging that Defendants violated his federal constitutional rights under the Fourth and Fourteenth Amendments and his civil rights under Michigan law. The Court retained jurisdiction over Counts I - V pursuant to 42 U.S.C. §1983 and dismissed Counts VI-XII without prejudice. In summary, those Counts allege that the Department and its members (i) inadequately investigated the case, including the actions taken or not taken by defendants Bart M. Marlatt ("Marlatt") and/or Thomas J. Ostin ("Ostin"), the failure to supervise by Alexander C. Ernst ("Ernst"), and the deficient customs and practices of the Department itself, (ii) conducted a procedurally improper line-up, (iii) arrested Plaintiff without probable cause, (iv) held improper meetings with two witnesses and manipulated their testimony, and (v) withheld exculpatory and impeaching information from Plaintiff.

2

After the close of the eight month discovery period requested by the parties, the Defendants filed their Motion for Summary Judgment on October 8, 2004, maintaining that Plaintiff's action against Marlatt and Ostin is barred by (a) collateral estoppel, (b) his failure to allege a deprivation of any constitutional rights, and (c) qualified immunity, and that Plaintiff's action against Ernst and the Township is barred for the foregoing reasons or, in the alternative, that no showing has been made that Ernst himself deprived Plaintiff of his constitutional rights or that the Department had a policy or custom that failed to adequately train or supervise its officers. Defendants subsequently filed the Motion to Strike Declaration of Wayne Burkhardt on October 29, 2004, and the Motion to Strike the Declaration and Preclude the Testimony of Glen McCormick on January 19, 2005.

**B.    Factual History of Investigation and Pre-trial and Trial Proceedings**

Plaintiff has set forth an extensive factual background of the events and happenings surrounding the investigation of the Klug attack, from April 30, 1994, through the end of the trial on November 9, 1994. Defendants generally do not dispute Plaintiff's recitation of the facts, with the exception of some significant events that are evident in the details set forth below.

On April 30, 1994, Ms. Klug reported to the Department that, beginning at around 5:00-5:30 a.m., she had been repeatedly raped in her home, including being vaginally and rectally penetrated. Ms. Klug reported that the masked assailant also stole $2,500 in cash before leaving. Ms. Klug's report to the Department regarding the attack indicated that her assailant had worn latex gloves and a nylon stocking over his face during the attack and described her assailant as being 6' to 6'2", 220 to 230 pounds, big, chubby, with a beer gut and a low raspy voice smelling of smoke on his breath and his clothing. She also said he was clean shaven, with no pubic hair or hair on his face, bottom, legs or thighs. She said that she had only briefly been able to glimpse at the assailant due to the nylon mask and his having covered her eyes with a pair of panties, but Ms. Klug helped the Department develop a composite of the assailant. The composite was, in Ms. Klug's words, "approximately 60 percent accurate" but she could not provide additional help to make it more accurate.

Ms. Klug went to the emergency room shortly after the attack and was examined by a physician. The physician found no evidence of lacerations, abrasion, bruises or bleeding on her body, genitalia or rectal area.

Defendants Marlatt, Ostin and Ernst, who were in 1994 (and today continue to be) employed by the Department, were the Department officers primarily responsible for the investigation of the crime. Ernst was the lieutenant in charge of criminal investigations for the Department at the time, and he was responsible for the assignment and supervision of detectives with respect to the Klug attack. Ernst assigned Marlatt to serve as the officer in charge of the Klug investigation on April 30, 1994. Marlatt served in that capacity until early July 1994, when he was replaced as officer in charge by Ostin.

As of April 30, 1994, Marlatt had worked for the Department for eight years, had attended detective school, had 673.35 hours of additional training and had worked in criminal investigations for the Department for seven months. At the time he took over the investigation, Ostin had worked in law enforcement for the Macomb County Sheriff's Department and the Department for seventeen years, had received an associate's degree in criminal justice, had received training at the police academy, detective school and other investigative courses, and had been working on criminal investigations for the Department for seven weeks. Neither of them had ever attended a rape scene or worked as an investigator in a rape case.

The Department did not typically require criminal division investigators to submit their reports to anyone for review in cases involving crimes committed by adults,[2] and such investigators typically conducted their own cases without supervision or reporting to a ranking officer. Sergeant Terry Waldoch, who was the senior ranking sergeant for the criminal investigations division responsible for adult crimes in 1994, did not oversee Marlatt or Ostin in the Klug investigation at all. Ernst also did not provide day-to-day supervision in the Klug case. The record reflects that

---

[2]Department detectives investigating crimes committed by youths were required to submit reports to their supervisor for a number of reasons, including the determination of whether investigations were being conducted properly.

Ernst conferred with Marlatt on no more than two occasions while Marlatt was the officer in charge. Ernst recalls that he must have spoken to Ostin because it was "a big case" but has no specific recollection of what was discussed or reviewed. According to Ostin, Ernst refused to provide Ostin with information regarding the case "unless it was crucial for a conviction."[3]

The Department conducted, but Marlatt did not personally conduct, a criminal investigation at the scene of the reported attack. Marlatt apparently did not conduct or cause others to conduct follow-up interviews with any of the neighbors who had provided information during canvassing. Neither Marlatt nor Ostin interviewed attendees at the party Ms. Klug attended the night of the attack, persons at the bowling alley where two nights earlier she had won $1,800 of the $2,500 cash stolen during the attack or persons at any of the bars she frequented in the week prior to the attack, a week in which her husband was out of town on business. A man matching the composite, who another Department officer saw walking on a street near Ms. Klug's home at around 5:00 a.m. on May 4, 1994, was not investigated, nor were numerous other men whom the Department had received tips on, including several who allegedly matched the composite or had noteworthy criminal sexual conduct histories.

As of July 6, 1994, no persons had been placed in a line-up with respect to this case. On July 6, 1994, Marlatt showed the composite to two different women, Catherine Whitcher and Karen Lewinski. Ms. Whitcher, a former girlfriend of Plaintiff, had filed a stalking complaint against Plaintiff with the Department on May 27, 1994 (which was investigated and closed by Marlatt on June 13, 1994), and she identified the man in the composite as Plaintiff, who was working as a bowling alley night manager at the time. Ms. Lewinski, who had called the Department on July 5, 1994 to discuss the possible involvement in the Klug case of a Myron Tisdel, told Marlatt that Mr. Tisdel matched the description on the composite, and Marlatt confirmed that her description of Mr. Tisdel did match the composite. The record also reflects that the Sterling Heights police had sent

---

[3]It is unclear when Ernst refused to provide this information, although it appears to have occurred at some point after Ostin took over the investigation. It is also unclear whose conviction would have been facilitated with the information that Ernst had.

information regarding Mr. Tisdel to Marlatt on May 13, 1994.

On July 6 or 7, 1994, Marlatt discussed the case and the identifications by Ms. Whitcher and Ms. Lewinski with Ostin, and Ostin then took over the investigation. At that time, no arrests had been made. Ostin conducted follow-up interviews with Ms. Whitcher and another ex-girlfriend of Plaintiff's, both of whom described sexual practices with Plaintiff that were similar to those that Ms. Klug described the perpetrator performing. Neither Marlatt nor Ostin engaged in any investigative activity with respect to Mr. Tisdel or any other suspect thereafter. On July 14, 1994, Plaintiff was picked up by the Department in connection with the stalking complaint filed by Ms. Whitcher and placed in a live line-up at the Macomb County jail. Ms. Klug initially did not identify Plaintiff or any other line-up participant as her perpetrator, became upset and left the identification room. Ms. Klug subsequently returned to view the line-up and identified Plaintiff as the perpetrator, at least in part based on voice identification according to the line-up attorney.

As a result of a search conducted at Plaintiff's home on July 14, 1994, Ostin obtained answering machine tapes on which Ms. Whitcher said in one message "Kenny, this is Cathy. Pick up. Hello? Kenny. If you don't ****ing leave me alone, I'm going to ****ing kill you myself. Leave me alone." In a second message, Ms. Whitcher said "Kenny, pick up the phone. I know you're there. Will you please stop calling my ex-husband, me, please, because I will have to kill you. I'm telling you, this is the honest truth." These tapes were placed in the case file related to Ms. Whitcher's complaint that Plaintiff was stalking her. The tapes were not included or referenced in Ostin's reports on the Klug case, may not have ever been produced for the prosecutor and were not produced for Plaintiff's attorney. Marlatt never listened to the tapes.

On July 15, 1994, Marlatt and Ostin sought from the Macomb County Prosecutor's Office, through then assistant prosecutor and now 41st District Judge Linda Davis, and state district court magistrate judge John Russi an arrest warrant on Plaintiff for the rape and robbery of Ms. Klug. In support of the request for arrest warrant, Marlatt stated, "While investigating, I received a tip on defendant. After investigating, victim positively i.d. the suspect in a line-up." At the probable cause

hearing, Marlatt stated, "After investigation on my part with the assistance with Sergeant Ostin we were able to develop a suspect through a tip. Through that tip we were able to gain some information on him through a couple of former girlfriends. We were able to get him arrested on an unrelated stalking and my victim came in and positively identified him in a physical line-up." During the request for arrest warrant and probable cause hearing process, Marlatt and Ostin did not reveal any evidence exculpatory to Plaintiff or that there were other leads that suggested there were other suspects,[4] nor did they reveal that their investigation focused entirely on Plaintiff after Ostin took over the case.

In arresting Plaintiff, Ostin told Plaintiff, "I haven't even started f***ing with you yet. By the time I'm done, you're going to be called the million dollar man."

On July 18, 1994, Ostin learned from Prosecutor Davis[5] that Ms. Klug had been having an affair prior to and at least up to and including April 30, 1994, including a sexual encounter with her affair partner twelve hours prior to the attack. This information was passed on to the prosecutor and both Plaintiff's initial attorney and trial attorney. According to Ernst, this affair partner was one of Ms. Klug's co-workers.

In late July or early August 1994, attorney Barry Peppler was appointed to represent Plaintiff, and he served as Plaintiff's legal counsel until approximately a week before the trial, when Plaintiff requested a new attorney. Albert Markowski was appointed to represent Plaintiff at that time, and he served as Plaintiff's trial attorney. Plaintiff was represented at every stage of the criminal process, including all of those described herein.

On August 11, 1994, a preliminary examination was conducted to determine whether probable cause existed for Plaintiff to stand trial in the Klug attack. Two witnesses testified at the preliminary examination: Ms. Klug and Glen McCormick, who had shared a jail cell with Plaintiff

---

[4]This evidence is set forth in detail in Section V.A. below.

[5]Prosecutor Davis and the victim advocate learned of Ms. Klug's affair partner on July 14, 1994, following Ms. Klug's identification of Plaintiff in the line-up.

at the Macomb County jail in July 1994. Ms. Klug described the events of the rape attack on April 30, 1994, and identified Plaintiff as the assailant. Mr. McCormick first testified that his voluntary testimony was in exchange for the reduction of a pending charge against him. He testified that the pending charge of Armed Robbery and Obstructing a Police Officer (with a corresponding habitual offender charge that could have resulted in a sentence of up to life in prison) would be reduced to a charge of Attempt Unarmed Robbery (with the prosecutor's recommendation of a one-year cap in the Macomb County Jail and the dismissal of all other charges then pending). Mr. McCormick then testified, in part, as follows:

ON DIRECT BY PROSECUTOR DAVIS:

* * * * *

Q.   Okay, and did [Plaintiff] continue to discuss this case with you during the time that he was housed [in the Macomb County Jail]?

A.   Yes, he virtually all of the time. . . . I said and I asked, I came out and I asked him, I said did you do this and he said yes, but they ain't got shit against me.

Q.   He told you yes he did it but they didn't have shit against him?

A.   That's correct.

Q.   And did he elaborate on that?

A.   I came–yes, he did elaborate. I asked him, I said well how do you know they ain't got shit and he said that he had gotten rid of all the evidence.

Q.   Did he tell you any specific evidence that he had gotten rid of?

A.   Handcuffs that apparently that he used, gloves.

Q.   Did he say what kind of gloves?

A.   If I'm not mistaken I think he said latex gloves.

Q.   Okay, and what else did he tell you?

A.   I had asked him. I started, well at first I asked him if he was placed in a line-up and he said that he was. I asked him if he

8

was picked out of this line-up and he said he was. Now prior before me asking this he had told me that he had heard from an officer or something that the assailant was wearing a mask or a stocking. Well when he told me this I thought to myself well how did this person pick you out of a line up if you just got done telling me that this assailant was wearing a mask or a stocking over his face, it didn't corroborate to what he was telling me, something wasn't right. The things that he was saying just didn't match up. At one point he told me that he shaved himself to alter his appearance. He didn't get specific in any –

Q.  Did he indicate to what part of his body he shaved?

A.  He just said that he shaved himself. Like I said, he didn't get specific. He motioned with his hands, you know, just up and down.

> MS. DAVIS:  I would indicate that the witness is indicating the mid section of his body, your Honor, with his hand.

THE COURT  Yes.

* * * * *

Q.  He said he took the money?

A.  Yes.

Q.  Did he tell you the amount of money that he took?

A.  No, he didn't get specific on the amount.

* * * * *

Q.  Did you contact the police about what was told to you?

A.  No.

Q.  How is it that you're in this Courtroom today?

A.  I was contacted yesterday by Sergeant Tom Ostin of the Clinton Township Police Department at what time I'm not exactly sure, I don't know.

Q.  Prior to talking to Sergeant Ostin had you read any newspaper reports regarding this particular incident?

A.  No.

Q.  Or did Mr. Wyniemko show you any police reports regarding

9

this incident?

A.    No.

\* \* \* \* \*

ON CROSS EXAMINATION BY MR. PEPPLER:

\* \* \* \* \*

Q.    When you were housed with my client, Mr. Wyniemko did you have occasion to look at the police reports that were in his possession?

A.    He had nothing that I'm aware of in his possession.

\* \* \* \* \*

Q.    If you can tell me when did this supposed conversation take place? Was this all revealed to you during one conversation or over a period of time?

A.    Well we talked about the case virtually every day. When he told me was about on the third day is when he told me, you know, because I got sick and tired of hearing what he had to say.

\* \* \* \* \*

BY THE COURT:

Q.    Okay, just a minute, I had one. Did you–this direct question wasn't asked but you have no information with regard to this case other than what you got from the defendant, is that correct?

A.    That's correct.

Q.    You didn't read any newspapers? You haven't talked to anybody else at the County Jail?

A.    No.

Q.    The Officer, Detective Ostin didn't go over anything with you?

A.    No.

\* \* \* \* \*

Q.    So you never saw Detective Ostin outside the presence of Miss Davis, the Prosecutor?

A.    That's correct.

Q.    Okay, so were there any other officers there when you were interviewed?

A.    Yes, Detective –

Q.    Okay, anybody else?

A.    No, just those –

Q.    All right, and were you ever left alone in that room at any time?

A.    No, not at all.

Q.    You were never alone?

A.    Never alone.

Q.    And then–except in the lobby?

A.    Except in the lobby.

Q.    And in the lobby there weren't any papers or newspapers or –

A.    None.

Q.    Or files or anything that you looked at or that were left there that you know of?

A.    None at all.

Q.    Okay, so you simply went down there and then you were always in the presence of at least these two individuals?

A.    That's correct.

Q.    Okay, anything else?

By MR. PEPPLER:

Q.    What date did the interview take place?

A.    The interview took place, yesterday which would have been the 10th.

Based on the testimony of Ms. Klug and Mr. McCormick, Plaintiff's counsel (Mr. Peppler) conceded at the preliminary examination that there was probable cause to bind Plaintiff over for trial

on all charges, and District Court Judge William Cannon bound Plaintiff over for trial.

On October 6, 1994, Circuit Court Judge Michael Schwartz entered an Order for Discovery in the case, requiring production of a wide range of material, including all police reports, detective sheets, field notes, all evidence, all evidence in the possession of police or prosecutor that tended to exculpate Plaintiff or aid in the preparation of the defense or that was inconsistent with the prosecution's theories, all evidence tending to show the unreliability or untruthfulness of witnesses and all information indicating that prosecution witnesses may have committed perjury. At some point between the preliminary examination and the time he withdrew from the case, Mr. Peppler went to the Department to review the entire police file himself, on at least one occasion.

Between the preliminary examination and the trial, Mr. McCormick's girlfriend at the time called Ostin to express her concerns about Mr. McCormick, including that he had a drug problem, he was stealing her checks and property, he was using crack and alcohol, he had sold a bike for crack, he had filed a false stolen property report with the Department and she had packed up his stuff and put him out. About that time, Ostin told Mr. McCormick that "part of the deal was to remain squeeky [sic] clean" and that if Mr. McCormick was "charged with anything - no longer credible and deal is off." Ostin made notes regarding these conversations, but he did not give these notes to Prosecutor Davis, and neither Ostin nor Prosecutor Davis know whether these notes were ever given to Plaintiff's attorneys.

At a *Wade*[6] hearing on October 31, 1994, Plaintiff contested the procedures followed during the line-up conducted on July 14, 1994. At the *Wade* hearing, several witnesses testified: (1) Richard Reynolds, the line-up attorney on July 14, 1994, who testified that he did not remember anything improper as far as that line-up was concerned and that Ms. Klug kept her eyes on Plaintiff most of the time but positively identified Plaintiff as the perpetrator only after (i) taking a brief break, (ii) speaking during that break with the victim advocate present at the hearing, and (iii) listening to each of the six men in the lineup speak a sentence Ms. Klug requested; (2) John Berger,

---

[6]*United States v. Wade*, 388 U.S. 218 (1967).

the deputy in charge of the line-up, who testified that he conducted the line-up, spoke to Ms. Klug during the break to find out if she could identify anyone and wrote down the sentence Ms. Klug wanted the men in the line-up to say; and (3) Ms. Klug, who testified that (i) the victim advocate told her to take deep breaths, to relax and "take your time, you want to make a good decision if there is one. If not, don't worry about it," and (ii) when she left the identification room, she was "a hundred percent sure" that Plaintiff was the one who raped her. Circuit Court Judge Michael Schwartz, who heard testimony and allowed cross-examination regarding the line-up procedures at the *Wade* hearing, ruled that the line-up process was not improper and did not give rise to a likelihood of misidentification.

At the trial held from October 31 to November 7, 1994, Ostin sat at the counsel table for the prosecution. Ms. Klug and Mr. McCormick again testified at trial that Plaintiff had committed the crime. Mr. McCormick's testimony was substantively identical to that given at the preliminary examination. In addition, Ms. Whitcher testified about aspects of Plaintiff's consensual sex life that were similar to the perpetrator's conduct against Ms. Klug. Plaintiff took the stand, denied having raped and robbed Ms. Klug and testified that Ms. Whitcher had threatened to kill him in messages left on his answering machine. On cross-examination of Plaintiff, Prosecutor Davis asked Plaintiff if he had the answering machine tapes with her threats with him, and Plaintiff responded that Ostin had taken them during the July 14, 1994, search of Plaintiff's home. At the time, the tapes were still at the Department in the stalking complaint file related to Ms. Whitcher's complaint against Plaintiff, something apparently only Ostin knew. In her closing argument, Prosecutor Davis, with Ostin sitting at counsel table, emphasized the testimony of Mr. McCormick and Ms. Whitcher, stating that "you have no reason to disbelie[ve] Cathy Whitcher. She didn't make up some horrendous story. She told you about consensual sex acts." Prosecutor Davis also focused on Mr. McCormick's testimony that Plaintiff had revealed his involvement in the rape and robbery to Mr. McCormick. The jury found Plaintiff guilty and he was sentenced to 40 to 60 years in prison.

**C.     Post-trial Legal Process**

Plaintiff first appealed his conviction to the Michigan Court of Appeals, which affirmed the conviction on March 7, 1997, after finding no reversible error. Plaintiff's motion for rehearing before the Michigan Court of Appeals was denied on May 2, 1997. He then appealed the decision to the Michigan Supreme Court, which denied his application on April 27, 1998, because it was not persuaded that the issues should be reviewed.

Plaintiff then filed a petition for a writ of habeas corpus in the United States District Court, Eastern District of Michigan, wherein he asserted that his constitutional rights had been violated because (i) the Department lacked probable cause to arrest him, (ii) there was not a valid arrest warrant, and (iii) the line-up was conducted illegally and in a procedurally improper manner. Plaintiff also claimed he received ineffective assistance of counsel, was denied a fair trial because none of the physical evidence showed he could have committed the crime and because the Department and the prosecutor did not conduct forensic testing of the physical evidence at the scene. The petition was assigned to Judge Patrick Duggan, who concluded that no violation of Plaintiff's constitutional rights had occurred and denied Plaintiff's petition on May 18, 2000. Plaintiff then appealed Judge Duggan's decision to the Sixth Circuit Court of Appeals. In an unpublished order issued on March 2, 2001, the Sixth Circuit affirmed Judge Duggan's order denying Plaintiff's petition.

On June 17, 2003, all charges and convictions against Plaintiff stemming from the Klug attack were dismissed after DNA testing cleared him, and Plaintiff was released from prison.

**D.   Post-Release Events**

In calendar year 2004, Plaintiff obtained separate signed Declarations from two persons, Wayne Burkhardt and Mr. McCormick, each of whom had been held in the Macomb County jail at the same time as Plaintiff in 1994. For the reasons set forth in Section III.A. below, Mr. Burkhardt's Declaration is not relevant in this action. Mr. McCormick's Declaration, dated October 5, 2004, on the other hand, requires more attention. As noted above, Mr. McCormick testified at Plaintiff's preliminary examination and trial that (i) Plaintiff had admitted committing the attack on Ms. Klug,

14

(ii) he never saw any police reports on the case, (iii) he was never left alone when talking to Ostin

or Prosecutor Davis the day before the preliminary examination, and (iv) he had not learned or been

given any information on the case from anyone but Plaintiff. In his Declaration, however, which

Mr. McCormick signed on October 5, 2004, while imprisoned on a parole violation, Mr. McCormick

stated:

* * * * *

     3.     Mr. Wyniemko never told me at any time that he had committed any crime. He never told me that he had any involvement in the rape and robbery of Diane Klug.

     4.     A few days after I was released from jail in July 1994, I received a telephone call from a woman who identified herself as Linda Davis. Ms. Davis said she was an assistant Macomb County Prosecutor. Ms. Davis said that she wanted to talk to me about Mr. Wyniemko.

     5.     Shortly after receiving the call from Ms. Davis, I received a telephone call from a Clinton Township police officer named Thomas Ostin. Mr. Ostin made arrangements for me to meet the next day with Ms. Davis and him at the Clinton Township Police Department.

     6.     On the next day, I met with Ms. Davis and Mr. Ostin at the Clinton Township Police Department. Ms. Davis and Mr. Ostin told me that if I could provide information helpful to them in their case against Mr. Wyniemko, they could help me avoid a possible life sentence as a habitual offender as a result of the charge that I had pending against me. They told me this before asking me whether I had any useful information against Mr. Wyniemko. They also told me that they had already three or four witnesses who were going to testify that Mr. Wyniemko had committed the crimes, but they would like my help as well. I was really concerned about the possibility of a life sentence if I did not help. I agreed to be a witness even though Mr. Wyniemko had not told me in any way that he had committed any crime.

     7.     After I indicated that I would be a witness, I was left alone in the room that we were meeting in. Before leaving the room, Mr. Ostin placed a police report regarding Mr. Wyniemko and the crimes against Ms. Klug directly in front of me on the table that we were sitting at. Mr. Ostin said he was going to leave me alone for a little while, or words similar to that. After Mr. Ostin put the police report in front of me and said he was going to leave me alone, I assumed that I was supposed to review the police report. By reading the police report, I learned details about the crime against Ms. Klug. I later used these details in the testimony I gave at the preliminary

examination and trial. I would not have been able to talk or testify about the crimes against Ms. Klug without the police report that I reviewed in the room.

8.      After I had been left alone in the room with the police report for awhile, Mr. Ostin and Ms. Davis returned to the room and asked me what Mr. Wyniemko had told me about the crime against Ms. Klug. I proceeded to tell them things that I had just read in the police report.

9.      During this meeting with Mr. Ostin and Ms. Davis, I received suggestions regarding statements I should make. One of the statements that was suggested to me was that I say Mr. Wyniemko had told me that "they ain't got shit against me" or words like that. It was also suggested to me that I say that Mr. Wyniemko had told me that he had gotten rid of the evidence. Mr. Wyniemko never told me these things.

10.     During this meeting with Mr. Ostin and Ms. Davis, they made a tape recording of an interview with me. During the interview, the tape was stopped on numerous occasions. When the tape was stopped, I received suggestions on the way I should say certain things.

* * * * *

14.     The statements made in this declaration are being made voluntarily and freely on my part without any threats or duress or offers of any kind.

15.     I am making these statements to get the weight off of my shoulders from my involvement in Mr. Wyniemko's preliminary examination and trial. I feel badly about what I said did [sic].

16.     Because I am making these disclosures, I am fearful for the safety of my family and myself. I do not want any harm to come to them or to me because I have come forward and made these disclosures.

17.     I declare under penalty of perjury that the foregoing is true and correct.

Executed in Kincheloe, Michigan on October 5th, 2004

/s/ Glen McCormick

In support of Mr. McCormick's statement at Paragraph 10 of his Declaration, Plaintiff has

attached the Declaration of Steve Cain, president of Forensic Tape Analysis, Inc. in Lake Geneva,

Wisconsin, and president of International Institute for Forensic Testing. Mr. Cain stated that he had

16

examined a cassette tape reading "Glen McCormick interview," as well as copy of a Department

continuation and supplementary report containing a transcription of that interview. The cassette tape

is a copy of the original Department recording of the August 10, 1994, interview of Mr. McCormick

by Ostin and Ms. Davis. Mr. Cain further stated that there were "at least four suspicious events, or

anomalies, on the tape copy. Specifically, these events or anomalies reflect occasions when the tape

recording was stopped and restarted and/or 'paused' or erase head signatures present during the

recording process and prior to the conclusion of the tape recording." Mr. Cain requested that he be

allowed to "review[] and test[] the original recording of the taped interview and, if possible,

inspect[] the tape recorder used to record the interview" in order to complete his "forensic tape

analysis regarding this tape recorded interview."

In October and November 2004, Mr. McCormick sent a number of letters to, and had

numerous phone conversations with, his friend, Michael Telfer, and Mr. Telfer's girlfriend, Pam

Teeple. Mr. McCormick stated in one such letter, dated October 23, 2004, that he

> tried to help [Plaintiff] back in 1992 [sic] because I know for certain
> he wasn't the one who did this. I didn't know this guy very well at
> the time, but I did know for a fact he didn't do this crime.  So
> needless to say, when he was released in June of 2003. [sic]  So now
> his lawyer filed a lawsuit against the Clinton Township Police
> Department.  He's now suing the police department for 15 Million
> Dollars!

> And guess what n****!!They need my testimony. Which means, I'm
> in the money!  I'm in the money!  I'm in the money!  I'm in the
> money!  I said this n**** is in the money!! . . . Did ya hear me
> n****!?! This n**** is in the money! Without me, they get nothing!

> His lawyer came up and visited with me a few days ago.  He
> told me he needed me to testify in court sometime in March of next
> year.  So I asked him if he could try and get me moved down state,
> somewhere like Adrian or Coldwater.  So he in turn wrote the
> Director in Lansing this letter.  I sent you a copy of it.  So, I'm
> hoping real soon I should be moved to either Coldwater or Adrian.
> They may even move me to Jackson, I don't know.  But I would
> really appreciate if you keep this to yourself bro, no one else needs
> to know.  I don't care if you tell Pam, but thats [sic] it.  And to be
> honest, theres [sic] no guarantee he is going to win this lawsuit.  But
> I do know one thing, he's got a very strong case against them.  You
> can trust me on this one bro.  The police department did some dirty
> shit to him, and I got the dirt on the police department.  Trust me bro.

17

> I know exactly what they did and I can <u>prove</u> it too (emphasis in the
> letter).

On November 7, 2004, Mr. McCormick's telephone conversation with Mr. Telfer and Ms. Teeple

included a substantively similar exchange, while other conversations included references to this case

and/or that Mr. McCormick could be coming into money.

In a letter dated November 1, 2004, sent to his former girlfriend, Michele Toney (she was

his girlfriend in July 1994), Mr. McCormick wrote, in part,

> I first want to apologize to you Michele about the situation
> with Mr. Howlett and about the whole deal thats [sic] going on with
> this pending civil case. But I do want you to know that regardless of
> what you may of [sic] heard, I <u>did not lie</u> about what I heard Kenneth
> Wyniemko told [sic] me in that jail cell. But there were some things
> I never mentioned either. I hope you can some how understand <u>why</u>
> I did what I did. As you well know, I was in a very "difficult
> situation" at the time and Linda Davis wasn't making things easier
> for me. But also know that Davis and officer Ostin did some real
> rotten shit too. (I'm not going to get into it, but believe me they did)

* * * * *

> But now Michele I'm going to <u>correct</u> a wrong that happen 10
> years ago. I never meant to hurt anyone, especially <u>you</u> Michele. So
> I hope you can find in your heart to forgive me and try to understand
> why I did what I did. I honestly & truly am sorry for everything that
> happen [sic] back then, but I do feel such a great relief has been lifted
> off my shoulders too. But nows [sic] the time to do the right thing
> and thats [sic] exactly what I'm going to do (emphasis in the letter).

On December 6, 2004, two persons employed by the Department, Lieutenant Craig Keith

and Captain Gary Franey, who claimed they were members of the Department's Internal Affairs

Section[7] interviewed Mr. McCormick at the Kinross Correctional Facility in Kincheloe, Michigan.

During this two and one-half hour interview, Mr. McCormick said, among many other things:

    1.    In questioning Plaintiff about the crime after Plaintiff had his cell mate for three
        days, McCormick said:

        A    I said, listen, ***hole, I said, did you do this shit or not? I

---

[7]At his deposition in July 2004, Ernst stated that the Department did not have an Internal
Affairs division and that any investigations of police misconduct are originated through him (as
police chief) or the executive captain (deputy chief).

18

mean – I mean, let's face it, you keep on talking about it. And I could have sworn I heard him say, yeah, but they ain't got shit. He could have said, nah, they ain't go shit.

Q       Okay. Okay.

A       Nay and yeah sound kind of familiar.

Q       Yeah. But let's go back ten years.

A       But he did say they ain't got shit.

2.      Ostin called McCormick to meet with Ostin and Ms. Davis. Ostin did not ask him if he had any information about Plaintiff. Ostin only asked if he could come down so they could ask him some questions regarding Plaintiff.

3.      Once in the interview on August 10, 1994, Ms. Davis immediately, before asking any questions, was very threatening, telling McCormick that he was between a rock and a hard place and she was the hard place.

4.      Ms. Davis asked if the interview could be recorded but she stopped the tape at least three times (but no more than eight times) when she had something "nice" to say to him, or to coach him on what to say. When McCormick said "nice", he said he was being sarcastic.

5.      Among things that Ms. Davis coached McCormick on was what Plaintiff had said when McCormick asked Plaintiff if he had committed the crime: "Remember when I said I don't know if I heard him . . . [Ms. Davis] wanted me to get on the stand and say 'yeah, make sure you say that yeah, he said "yes, they ain't got shit"' . . . when I would say I didn't really know if he said that." Lt. Keith then asked McCormick if those were the specific words she told McCormick to use and McCormick said "basically yeah" and that Ms. Davis continued to say "instead of saying you don't know, why don't you say you 'believe he said.'"

6.      Ms. Davis would give him tips on how to be "more accurate" with his statement and she would stop the tape at those times.

7.      McCormick also said, regarding the August 10, 1994, interview:

A       Yeah. And that's – wait. Can we go back to that interview, too?

Q       Yeah.

A       And there were some comments made by – by – now that I recall, I remember him saying – Ostin saying that – something about his girlfriend, ex-girlfriend.

Q       Something about his own ex-girlfriend.

A       Correct. Kenneth Wyniemko's girlfriend.

19

Q    Okay.

A    And Linda Davis even mentioned things like that, putting him down on his sexual preferences or whatever like that.

Q    Okay.

A    Kind of like -- you know, S and M type deal shit.

Q    Okay.

A    So I do remember them making comments of that during my -- the interview with me.

Q    During the interview with you.

A    Correct.

Q    Okay.

A    You know, and I -- I kind of had a dislike for -- I didn't really have a dislike for Ken.

Q    Uh-huh.

A    But I -- it's fair -- I would -- it's fair to say, and I -- for me to say that I kind of even disliked him more after the interview with -- with -- Davis and Ostin.

8.    Mr. McCormick also acknowledged his discussions with Ostin related to Michele Toney's concerns about Mr. McCormick's behavior.

The Court also notes that in late November 2004, pursuant to a request from the Macomb County Prosecutor's Office and a referral from the Michigan Attorney General, the St. Clair County Prosecutor's Office was appointed to investigate the conduct of Ostin and Ms. Davis, as described by Plaintiff in this lawsuit. On February 10, 2005, the St. Clair County Prosecutor's Office concluded that neither Ostin or Ms. Davis had engaged in any conduct which would subject them to criminal charges.

### III.  ANALYSIS OF NON-DISPOSITIVE MOTIONS

#### A.  Motion to Strike the Declaration of Mr. Burkhardt

Defendants ask the Court to prohibit Plaintiff's use of Mr. Burkhardt's Declaration as evidence at trial, at a hearing or in response to the Defendants' Motion for Summary Judgment.

Plaintiff did not rely on Mr. Burkhardt's Declaration in its opposition to Defendants' Motion for Summary Judgment and acknowledges that Mr. Burkhardt's Declaration could not be admitted as evidence at trial.  Accordingly, the Court has not considered the substance of Mr. Burkhardt's Declaration in considering any of the Defendants' Motions and DENIES AS MOOT Defendants' Motion to Strike the Declaration of Mr. Burkhardt; provided, that if Plaintiff seeks to use the Declaration in the future, Defendants may renew their Motion to Strike Mr. Burkhardt's Declaration.

**B.      Motion to Strike the Declaration and Preclude the Testimony of Glen McCormick**

Defendants maintain that Mr. McCormick's testimony is (i) "inherently incredible because it materially conflicts with numerous prior and contemporaneous statements he has made regarding [Plaintiff's] admissions while they shared a jail cell in 1994," and (ii) "incredible and fundamentally untrustworthy because newly-acquired evidence[8] suggests that McCormick anticipates that he will receive a substantial amount of money in exchange for his assistance in this case."  In addition, Defendants note that the Declaration was filed three weeks after discovery closed and was produced to Defendants on the eve of the dispositive motion cut-off date, notwithstanding that Plaintiff had been aware of at least the substance of Mr. McCormick's Declaration since the "summer of 2004." For those reasons, Defendants argue that Plaintiff should not be permitted to rely on Mr. McCormick's Declaration or testimony at a trial or hearing, or in response to Defendants' Motion for Summary Judgment.

Plaintiff responds that the Defendants' motion is "rife with irony and hypocrisy in light of Defendants' heavy *reliance* on Mr. McCormick's words during the wrongful investigation and conviction of [Plaintiff] in 1994." Plaintiff argues that Defendants' concerns about credibility and reliability were also present in 1994, but at that time the Defendants failed to disclose the source of such concerns to Plaintiff, even though Defendants were obligated to disclose such exculpatory evidence.  Finally, Plaintiff argues that Defendants are not prejudiced by the Declaration or the

---

[8] The Court presumes this newly-acquired evidence consists of Plaintiff's post-Declaration letters and phone conversations from Fall 2004 and the December 6, 2004, videotaped interview.

substance of it, as Defendants are aware of everything that is set forth in the Declaration because they were privy to the actions and inactions set forth by Mr. McCormick in his Declaration. Plaintiff also notes that he indicated throughout the discovery process that he intended to rely on Mr. McCormick's testimony at trial, including listing him as a witness and setting forth the substance of Mr. McCormick's Declaration in several of their discovery responses.

Defendants acknowledge that issues of credibility should normally be assessed by a jury, *Wayne v. Village of Sebring*, 36 F.3d 517, 530 (6th Cir. 1994), but argues that "[e]vidence that is too incredible to be accepted by reasonable minds does not raise an issue of credibility to defeat a motion for summary judgment." *Allstate Inc. Co. v. Cannon*, 644 F.Supp. 31, 33 (E.D. Mich. 1986). Defendants maintain that because statements in the Declaration contradict those made by Mr. McCormick under oath in 1994 and some of his statements in the December 6, 2004, videotaped interview, Mr. McCormick's Declaration is untrustworthy, inherently unbelievable and should be excluded from consideration in this case.

The Court declines to adopt Defendants argument. Without question, Mr. McCormick has made some inconsistent statements with respect to this case over the last 11 years. There are several statements set forth in the Declaration that contradict the testimony Mr. McCormick gave under oath in 1994. Contrary to Defendants' assertions, however, the answers supplied by Mr. McCormick in the December 6, 2004, interview hardly could be viewed as a reiteration of his 1994 testimony under oath. The December 6, 2004, interview is replete with instances where Mr. McCormick's statements on key issues appear to be consistent with the statements made in his Declaration and not his testimony under oath in 1994. Likewise, Mr. McCormick's November 1, 2004, letter to his former girlfriend, Michele Toney, says much more than the limited language set forth in Defendants' brief that "I [Glen McCormick] did not lie about what I heard Kenneth Wyniemko told [sic] me in that jail cell." As noted above, the next few lines of that letter (which were omitted from the Defendants' brief) provide:

> But there were some things I never mentioned either. I hope you can
> some how understand <u>why</u> I did what I did. As you well know, I was

22

> in a very "difficult situation" at the time and Linda Davis wasn't
> making things easier for me. But also know that Davis and officer
> Ostin did some real rotten shit too. (I'm not going to get into it, but
> believe me they did)

* * * * *

> I honestly & truly am sorry for everything that happen [sic] back
> then, but I do feel such a great relief has been lifted off my shoulders
> too. But nows [sic] the time to do the right thing and thats [sic]
> exactly what I'm going to do (emphasis in the letter).

Those inconsistent statements create an issue of credibility for the fact finder, not this Court, to

resolve. *See Newcome v. McCabe, et al.*, 319 F.3d 301, 304 (7th Cir. 2003) (ruling that the district

court did not err in allowing witness in a §1983 action to testify that 20 years earlier an officer

manipulated the witness and two others to identify a person as a killer, even though all three persons

had testified under oath in the criminal proceeding that such person was the killer), wherein the court

stated,

> This jury heard Rounds. It knew that he was contradicting testimony
> given at Newsome's criminal trial; it knew that Rounds is not the
> most savory character. But just as many a criminal defendant goes
> to prison on the testimony of former partners in crime who say that
> they have at last gone straight, so a jury could believe these witnesses
> when they decided to sing in a new key. And Rounds' testimony
> about the warning, taken in the light most favorable to the verdict,
> permitted the jury to find that McCabe and McNally not only
> manipulated the identifications (something that would not by itself
> support an award of damages, as our opinion denying rehearing in
> 2001 explained) but also obstructed the ability of the prosecutors and
> defense counsel to get at the truth in the criminal trial - - which *does*
> support the jury's verdict.

Defendants next argue that Mr. McCormick's apparent belief that he might be financially

rewarded for testifying in a manner consistent with the Declaration is a basis for precluding his

Declaration and testimony as fundamentally untrustworthy. The Court is not persuaded, however,

that Mr. McCormick's apparent belief[9] that he might receive some kind of award if Plaintiff prevails

in this action could be any more of a motivating factor than the opportunity to have a potential

---

[9]There is no evidence on the record that there has been an offer of remuneration in
exchange for Mr. McCormick's testimony.

23

lifetime sentence reduced to a cap of one year in exchange for providing testimony was in 1994, nor does the Court find that any such belief would make Mr. McCormick any more "fundamentally untrustworthy" today than he was in 1994. This issue, like all issues pertaining to Mr. McCormick's statements, involves a matter of credibility for a finder of fact to resolve. Accordingly, which version of Mr. McCormick's statements is credible, if any, is a question of fact for the jury, not for the Court.

Defendants contend that Plaintiff produced the Declaration in an untimely manner and argue that a self-serving declaration that contradicts prior sworn testimony cannot be used to generate a genuine issue of material fact to avoid summary judgment. *Citing U.S. v. Midwest Suspension and Brake*, 796 F.Supp. 260, 263 (E.D. Mich. 1992) (citations omitted). The Court notes that what this Court actually said in *Midwest Suspension and Brake* was:

> It is well established that a party cannot create a genuine issue of material fact by submitting an affidavit <u>containing conclusory allegations</u> that contradict prior admissions, deposition testimony, or otherwise sworn testimony.

*Midwest Suspension and Brake*, 796 F.Supp. at 263 (emphasis added). In the present case, Mr. McCormick's statements in the Declaration, his conversations and correspondence from Fall 2004, and the December 6, 2004, interview are not conclusory allegations. His statements, in particular those in the Declaration, are detailed. In addition, Plaintiff points out, and the record reflects, that Plaintiff clearly and repeatedly provided Defendants with notice that Plaintiff would rely on Mr. McCormick to provide testimony of substantially the nature of the statements Mr. McCormick made in his Declaration. *See e.g.,* Plaintiff's Complaint (¶¶ 69-75), Plaintiff's Witness List, Plaintiff's Objections and Answers to Second Interrogatories to Plaintiff (page 18). While Mr. McCormick's Declaration presumably could have and should have been produced sooner, the Court does not find that Defendants were prejudiced by the timeliness of its submission, as evidenced by (i) their ability to obtain telephone records and letters involving Mr. McCormick throughout Fall 2004, (ii) the fact that Defendants themselves included Mr. McCormick on their witness list, and (iii) the subsequent two and one-half hour interview with Mr. McCormick conducted by members of the Department

24

on December 6, 2004.

Accordingly, for the reasons set forth above, Defendants' Motion to Strike the Declaration and Preclude the Testimony of Glen McCormick is DENIED. In order to be clear, that determination means that the substance of Mr. McCormick's Declaration is a part of the record available for Court's consideration in deciding the Defendants' Motion for Summary Judgment and will be available, should Mr. McCormick testify to that effect, at trial. The Declaration itself will not be admissible at trial.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings, combined with any affidavits in support show that no genuine issue as to any material fact remains and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)(citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the

25

motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## V.  ANALYSIS OF DEFENDANTS' SUMMARY JUDGMENT MOTION

Defendants have asserted numerous grounds on which this case should be dismissed in its entirety. Plaintiff argues that Defendants' Motion for Summary Judgment must be denied due to genuine issues of material fact regarding (i) the circumstances leading to the detectives' request for authorization to arrest Plaintiff, and (ii) the withholding of exculpatory and material information from Plaintiff thereafter. The parties have formulated their briefs and therefore the Court addresses the Summary Judgment Motion in two facets, the first involving the arrest of Plaintiff and the second involving the prosecution of the criminal case against Plaintiff thereafter.

## A.    Collateral Estoppel

Defendants argue that where issues are necessarily resolved against a party in a prior criminal action, and in both prior state and federal appeals, he may not collaterally attack them in a subsequent civil case. *Citing Ditmore v. Michalik*, 244 Mich.App. 569 (2001). Defendants also maintain that Plaintiff's claims are barred by the *Rooker-Feldman* doctrine, which provides that a federal district court may not review matters actually decided by a state court, or provide relief that is "inextricably intertwined" with the state court decision. *Rooker v. Fidelity Trust Co.*, 460 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). Defendants argue that Plaintiff had an opportunity to, and availed himself in some instances of the opportunity to, litigate any and all issues previously, including during the trial court proceedings, on appeal and/or in his habeas corpus petition.

Plaintiff argues that the doctrine of collateral estoppel applies only in limited circumstances and that it does not apply in this case. Plaintiff argues that the two issues giving rise to §1983 liability in this action were not actually litigated (or, in Plaintiff's view, even considered) in the prior criminal proceeding. Those two issues stem from Plaintiff's belief that Defendants (i) sought

26

authorization of the arrest warrant on July 15, 1994, when they had exculpatory leads that they ignored or had not investigated but they did not disclose this information to the prosecutor or the magistrate, and (ii) Defendants suppressed exculpatory, impeaching and material information regarding two key prosecution witnesses, Ms. Whitcher and Mr. McCormick.

Plaintiff claims that these issues were not and could not have been adjudicated at the preliminary examination or trial because evidence of these actions only surfaced in the course of this civil case. For that reason, Plaintiff believes collateral estoppel does not apply to bar his claims. *Citing Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (a state-court's determination of probable cause at the preliminary hearing does not preclude a plaintiff in a subsequent civil action from litigating the issue of whether the officers made materially false statements to establish probable cause); *Buttino v. City of Hamtramck*, 87 Fed.Appx. 499, 503-04 (6th Cir. 2004) (unpublished opinion) (where the state court had determined there was probable cause to arrest, collateral estoppel does not operate to bar plaintiff's claims that police officer had supplied the magistrate judge with a false and incomplete version of the facts to establish probable cause). Plaintiff further argues that even if these issues were litigated, Plaintiff never had a full and fair opportunity to litigate the issues, particularly in light of what Plaintiff alleges to be tainted testimony of Mr. McCormick.

In their reply, Defendants argue that all of the allegations or claims of Plaintiff in this action could have been investigated and litigated by his criminal defense attorneys.

1.    *Doctrine of Collateral Estoppel*

In order for the doctrine of collateral estoppel to apply, the following elements must be satisfied:

    (1)    the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;

    (2)    determination of the issue must have necessary to the outcome of the prior proceeding;

    (3)    the prior proceeding must have resulted in a final judgment on the merits; and

    (4)    the party against whom estoppel is sought must have had a <u>full and fair opportunity to litigate the issue in the prior proceeding.</u>

27

*N.A.A.C.P., Detroit Branch v. Detroit Police Officers Assoc.*, 821 F.2d 328, 330 (6th Cir. 1987) (footnotes omitted)(emphasis added). *See also Allen v. McCurry*, 449 U.S. 90, 102 (1980) (issues decided in a state-court criminal proceeding may preclude relitigation of the same issues in a subsequent §1983 action in federal court); *Donovan v. Thames*, 105 F.3d 291, 293-94 (6th Cir. 1997); *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 682-84 (2004)(collateral estoppel applies if (i) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (ii) the same parties must have had a full and fair opportunity to litigate the issue; and (iii) there must be mutuality of estoppel, except where the doctrine is being asserted defensively against a party who has already had a full and fair opportunity to litigate the issue). The doctrine of collateral estoppel bars relitigation of an issue in federal court if such issue was resolved in federal or state court. *Migra v. Warren City School Dist. Bd. Of Educ.*, 465 U.S. 75, 81-83 (1984)(state-court judgments have issue preclusive effect in §1983 suits)(*citing Allen*, 449 U.S. at 96).[10]

   2.   *Probable Cause for Arrest Warrant*

   Defendant argues that where the issue of probable cause was fully litigated during a preliminary examination, a party is barred by collateral estoppel from contesting probable cause. In the instant case, the record reflects that Plaintiff litigated the issue of probable cause at the preliminary examination, and his attorney cross-examined both Ms. Klug and Mr. McCormick at that hearing. The Court notes that Plaintiff also challenged probable cause for his arrest (or the primary basis for establishing probable cause, i.e., the line-up identification by Ms. Klug) at the *Wade* hearing, on appeal and in his habeas corpus petition. Therefore, the Court concludes that

------

   [10]Just as significantly, the *Migra* court held that state-court judgments also create a claim preclusive bar in §1983 suits. *Migra*, 465 U.S. at 83-85. Claim preclusion or res judicata, as it is commonly known, exists to put an end to litigation and does so by foreclosing litigation of a matter that should have been advanced in a prior suit. *See Wilkins v. Jakeway*, 183 F.3d 528, 532 (6th Cir. 1999) (*citing Migra*, 465 U.S. at 77 n.1), wherein the Sixth Circuit stated that a claim would be barred under the doctrine of res judicata if there exists: "(1) a final decision on the merits; (2) a subsequent action between the same parties or their privies; (3) an issue in a subsequent action which should have been litigated in the prior action; and (4) an identity of the causes of action."

Plaintiff had the opportunity to and in fact did litigate the issue of probable cause.

Plaintiff at no time alleges that the Klug investigation file was void of any of the potentially exculpatory evidence that existed prior to the probable cause hearing and the issuance of the arrest warrant. There is nothing on the record to suggest that the file was not available for review by Plaintiff's criminal attorneys. In fact, Mr. Peppler, Plaintiff's initial attorney, claims to have gone to the Department to review the file (apparently after the preliminary examination but prior to the *Wade* hearing), which would have included all of the evidence, tips, etc. that Plaintiff now relies on as potentially exculpatory items (e.g., Ms. Lewinski's claim that Mr. Tisdel matched the composite, the 5:00 a.m. visitor to Ms. Klug's neighborhood only 4 days after the attack). The Court therefore finds that Plaintiff was aware of (or had the ability to be aware of), at all appropriate times, the evidence, tips, etc. in the Department's possession when the arrest warrant was obtained. The Court also finds that Defendants did not deprive Plaintiff of the ability to fully and fairly contest probable cause in the criminal proceeding, on appeal and in his habeas corpus petition. Accordingly, the Court concludes that Plaintiff had a <u>full and fair</u> opportunity to challenge probable cause. For the reasons set forth above, the Court concludes that the doctrine of collateral estoppel would bar the relitigation of Plaintiff's of probable cause for Plaintiff's arrest.

As the Sixth Circuit has made clear in *Darrah* and *Buttino*, however, Plaintiff is not collaterally estopped from bringing a civil case that challenges the integrity of the evidence because the police investigation was conducted in bad faith. *Darrah*, 235 F.3d at 311; *Buttino*, 87 Fed.Appx. at 503-04. *See also Josey v. Salisbury*, 1993 WL 476974 (6th Cir. 1993); *Madiwale v. Savaiko*, 117 F.3d 1321 (11th Cir. 1997); *DeLoach v. Bevers*, 992 F.2d 618 (10th Cir. 1990) *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). Plaintiff has alleged, and the record contains evidence (set forth in detail in Section V.B.1 below), that the Defendants omitted material exculpatory evidence in preparing the affidavit in support of probable cause and in testifying at the probable cause hearing. Accordingly, the Court concludes that the finding of probable cause in the state-court criminal proceeding does not collaterally estop Plaintiff from litigating his claim that the Defendants

conduct in obtaining the arrest warrant violated his constitutional rights.

      *3.    Prosecution of Plaintiff*

      The record reflects that Plaintiff had (and in some instances availed himself of) the opportunity to address the key issues in this case on appeal and in his habeas corpus petition in relation to the criminal proceeding. As Defendants have noted, Plaintiff did not actually challenge the failure of Defendants to disclose exculpatory information with respect to Mr. McCormick on appeal or in his habeas corpus petition. As such, the issues were not litigated previously and collateral estoppel would not operate to bar Plaintiff's claim of the same in this case. The Court assumes that the Defendants intend to rely on the doctrine of res judicata (which prohibits a party from litigating issues which should have been raised previously) to preclude Plaintiff's claim of malicious prosecution in this action, and will decide their motion with respect to malicious prosecution on this basis. As set forth in footnote 10 above, the Supreme Court has recognized claim preclusion in a §1983 proceeding subsequent to a state-court criminal proceeding. Still, claim preclusion would not operate to bar a subsequent proceeding if there was not a full and fair opportunity to litigate the issue previously.

      In the instant case, the Court finds that Plaintiff did not have a full and fair opportunity to litigate the issues regarding his continued prosecution in the criminal proceeding. As set forth in Section V.B.2. below, there are several instances on the record where the Defendants failed to provide Plaintiff with impeaching or exculpatory evidence. The Court finds that evidence was material, and without that evidence, Plaintiff's ability to put on a defense at his trial was significantly impaired and Plaintiff was handcuffed in his ability to appeal on the basis of such evidence. This is particularly true with respect to the failure of the Defendants to provide Plaintiff with exculpatory evidence after the preliminary examination, in direct contravention of the discovery order issued by Circuit Court Judge Michael Schwartz. As such, the Court concludes that Plaintiff did not have a <u>full and fair</u> opportunity to litigate these issues at trial, on appeal or in his habeas corpus petition. For the reasons stated, the Court finds that neither collateral estoppel nor res

judicata operates to bar Plaintiff's claims that Defendants' maliciously prosecuted Plaintiff following his arrest.

**B.      Alleged Constitutional Rights Violations and Qualified Immunity**

Defendants argue that even if collateral estoppel does not bar Plaintiff's claims, Plaintiff has not asserted a viable claim pursuant to 42 U.S.C. §1983. To survive a motion of summary judgment in a §1983 action, a plaintiff must demonstrate that (i) a defendant acting under color of state law (ii) took action that amounts to a constitutional deprivation (iii) such that the defendant is not entitled to dismissal pursuant to the doctrine of qualified immunity. *Summers v. Leis*, 368 F.3d 881, 887-88 (6th Cir. 2004); *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). "Qualified immunity shields government officials acting within the scope of their official duties from civil liability insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Vakilian*, 335 F.3d 509, 516 (6th Cir. 2003)(*citing Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)).

The Sixth Circuit has identified a three-prong test for evaluating a claim of qualified immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)(*quoting Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999)(*en banc*). The parties' burdens with respect to qualified immunity have been clearly delineated by the Sixth Circuit:

> The defendant bears the initial burden of coming forward with facts to suggest that he or she acted within the scope of his or her discretionary authority during the incident in question. The burden then shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position

31

would have clearly understood that he or she was under an affirmative duty to refrain from such conduct. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

*Flint ex rel. Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 347 (6th Cir. 2001).

The Court finds that the Defendants have met their initial burden for purposes of qualified immunity with respect to Plaintiff's constitutional claims related to probable cause and the malicious prosecution of Plaintiff. The Department, through the efforts of Marlatt, Ostin and Ernst, was engaged in an investigation of the attack on Ms. Klug, pursuant to which Plaintiff was arrested, tried and convicted. All Defendants were clearly acting within the scope of their discretionary authority in undertaking such an investigation and have provided the Court with sufficient facts to meet their burden, including, without limitation, following some leads and tips provided to the Department, submitting some crime scene evidence to the Michigan State Police, conducting a line-up, filling out an affidavit in support of the arrest warrant, interviewing witnesses with and without the prosecutor, testifying at trial and sitting at counsel table for the prosecution throughout the trial.

The burden therefore shifts to Plaintiff to establish that the Defendants, in conducting the Klug investigation, violated constitutional rights of Plaintiff that were clearly established in 1994.

1.    *Probable Cause for Arrest Warrant*

Plaintiff states that Defendants cannot legitimately contend that the rights implicated by Plaintiff's ordeal were not clearly established in 1994. Specifically, Plaintiff argues that it has been long established that police officers are not entitled to qualified immunity if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that an arrest warrant should issue. Plaintiff argues that Ostin and Marlatt had reasons to believe that the identification by Ms. Klug might be mistaken (pointing out that Ostin and Marlatt knew that Plaintiff was not a smoker and was older, shorter and lighter than the man described by Ms. Klug) and ignored the exculpatory evidence in their possession (such as the tips regarding other potential suspects) when evaluating probable cause and preparing the affidavit in support of the arrest warrant. Plaintiff

32

argues further that the facts of this case are unlike those in *Ahlers,* where the identity of the suspect was not disputed, the issue was the veracity of the victim's claim and where the focus was on whether the officer's failure to obtain exculpatory evidence violated the suspect's constitutional rights. Here, Plaintiff contends that the issue is who the perpetrator was and whether the officers ignored all of the exculpatory evidence that existed.

Plaintiff argues that under the totality of the circumstances as they existed on July 15, 1994, there are questions of fact as to whether it was objectively reasonable to seek an arrest of Plaintiff, taking into consideration all facts and circumstances within the officers' knowledge at the time of arrest. *Gardenhire v. Schubert,* 205 F.3d 303, 315 (6th Cir. 2000). *See also* U.S. Const. amend IV; *Malley v. Briggs,* 475 U.S. 335, 344-46 (1986). Plaintiff relies on the following language in *Gardenhire,* 205 F.3d at 318 (citations omitted):

> This Court recognizes that an officer does not have to investigate independently every claim of innocence. *See Baker v. McCollan,* 443 U.S. [137], 145-56 [(1979)]. But his axiom does not suggest that an officer has *no* duty to investigate an alleged crime before making an arrest. A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime. *See Beck* [*v. Ohio*], 379 U.S. [89], 91 [(1964)]. And, in obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest (emphasis in original).

*See also Ahlers,* 188 F.3d at 372 ("officers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward exculpatory evidence known to them in an effort to pin a crime on someone"); *Kuehl v. Burris,* 173 F.3d 646 (8th Cir. 1999) (evidence that tends to negate the possibility that a suspect has committed the crime is relevant to whether the officer had probable cause to seek an arrest).

As stated by Plaintiff, probable cause exists when "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that" the suspect had committed the offense. *Donovan,* 105 F.3d at 298. Plaintiff also claims that unless but one reasonable determination is possible, probable

33

cause in a §1983 action presents a jury question, particularly when there are "fluid, fact-specific elements at the heart" of the probable cause inquiry. *Gardenhire*, 205 F.3d at 315, 318.

Plaintiff also relies on two additional cases for the proposition that the omission of material exculpatory information in the possession of police at the time that a warrant is sought violates a subject's constitutional rights. *See Madiwale*, 117 F.3d at 1326-27 (stating that a warrant is invalidated by the Fourth Amendment where it contains omissions "made intentionally or with a reckless disregard for the accuracy of the affidavit."); *Deloach*, 922 F.2d at 622-23 (10th Cir. 1990) (holding detective liable for arrest where detective omitted all mention of exculpatory medical information contradicting theory against suspect in report to prosecutor and stating "in the case of omitted evidence, it is not enough to ask simply whether the truthful statements included in the affidavit are by themselves sufficient to support a probable cause finding; the court must also ask if inclusion of the omitted material would negate probable cause").

Defendants contend that there was no violation of Plaintiff's rights because there was probable cause for the arrest warrant, as evidenced by the fact that the arrest warrant was sought by Prosecutor Davis and issued by the magistrate. Defendants argue that "[p]robable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Darrah*, 255 F.3d at 312 (citations omitted). Moreover, Defendants state, "[i]n a civil rights case, investigators are entitled to rely on a judicially-secured arrest warrant as satisfactory evidence of probable cause." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). *See also Ahlers*, 188 F.3d at 373, wherein the Sixth Circuit Court of Appeals held:

> [A] police officer can only be held liable for requesting a warrant which allegedly led to a false arrest if he "stated a deliberate falsehood or acted with a reckless disregard for the truth. Proof of negligence or innocent mistake is insufficient." *Lippay v. Christos*, 996 F.2d 1490, 1501 (3d Cir. 1993). See also *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986) ("Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost.")(internal citation omitted).

34

Defendants argue that officers have no duty to disclose exculpatory information in obtaining an arrest warrant. *See e.g., Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998), wherein the Sixth Circuit stated:

> To interweave the *Brady* due process rationale into warrant application proceedings and to require that all potentially exculpatory evidence be included in an affidavit, places an extraordinary burden on law enforcement officers, compelling them to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded. Under such a scenario, every search would result in a swearing contest with participants arguing after the fact over whether exculpatory evidence even existed.

Defendants assert that a plaintiff must make, and that Plaintiff in this case did not make, a "substantial preliminary showing that a false statement knowingly or intentionally or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks v. Delaware*, 438 U.S. 154, 156 (1978).

Defendants argue that an eyewitness identification generally establishes adequate probable cause. *Ahlers*, 188 F.3d at 370 (since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reality and veracity). Defendants also argue that even if one were to consider the totality of the evidence within the knowledge of Ostin and Marlatt at the time of Plaintiff's arrest, including inculpatory and exculpatory evidence, objectively reasonable probable cause was clearly established. *Citing People v. Nunez*, 242 Mich.App. 610, 612 (2000).[11] Defendants note, and the record reflects, that in addition to the eyewitness identification by Ms. Klug, the record reflects that even before the identification by Ms. Klug, the Department received an anonymous tip that Plaintiff matched the composite, Ms. Whitcher agreed that Plaintiff matched the composite, and two ex-girlfriends stated that Plaintiff had previously engaged in sexual practices similar to those performed during the attack. Moreover, Plaintiff admitted during questioning that he knew Ms. Klug, and he lacked a corroborated alibi for

---

[11]The Court did not see where the *Nunez* court said this, but the Sixth Circuit has said as much on numerous occasions. *See e.g., Gardenhire, supra.*

the relevant time frame.          Finally, in their reply brief, Defendants contend that Plaintiff

has not argued, let alone demonstrated, that had the prosecutor and magistrate known about other

tips or theories of the Department during the investigation, the prosecutor would not have sought

and the magistrate would not have issued, the warrant for Plaintiff's arrest. *Vakilian*, 335 F.3d at

517. Defendants assert that Plaintiff also has not shown that the evidence was material such that the

result of the probable cause proceeding would have been different. *United States v. Bagley*, 473 U.S.

667, 678-83 (1985).

          The Court's analysis begins with the prevailing law in the Sixth Circuit that the

determination of probable cause in a §1983 action is a matter of law to be decided by the court if the

parties do not disagree on any material facts with respect to the pre-arrest process. *Hale v. Kart*, ___

F.3d ___, 2005 WL 119593, Slip Op. at 6 (6th Cir. 2005) (but probable cause is to be determined by

the fact finder if the underlying facts are in dispute). In evaluating whether probable cause existed,

the Court is to consider only those facts known to the Defendants at the time the arrest warrant was

sought. *Id.* at 3. In the instant case, the record does not reflect any disagreement among the parties

regarding the facts known to the Defendants prior to obtaining the arrest warrant; therefore, the

Court is to determine whether probable cause existed.

          Although the parties approached the rule differently, the Court agrees with them that

probable cause to make an arrest exists if the facts and circumstances within the officers' knowledge

at the time were sufficient to warrant a prudent man in believing that the Plaintiff had committed the

crime. *Darrah*, 255 F.3d at 312. That said, the Court finds that Defendants' reliance on *Mays,

Darrah, Vakilian* and *Ahlers* is too narrowly focused. Although those cases did include the language

cited by the Defendants above, the Sixth Circuit in each case recognized that there were

circumstances under which the rules cited by Defendants were not applicable.[12] The Sixth Circuit

_____

[12]For example, contrary to Defendants' interpretation, *Mays* does not say that officers
have no duty to disclose exculpatory evidence in obtaining a search warrant; (b) the *Darrah*
court said that materially false statements by officers to establish probable cause can subject an
officer to liability even though probable cause was found in the criminal proceeding; ©) the
*Vakilian* court said that "an officer [or investigator] cannot rely on a judicial determination of

has clearly recognized that officers cannot omit with impunity exculpatory evidence in obtaining

an arrest warrant. *See Gardenhire*, 205 F.3d at 318; *Ahlers*, 188 F.3d at 372. *See also DeLoach*, 922

F.2d at 622 (the 10th Circuit has recognized that it is a jury question in a civil rights suit whether an

officer had probable cause to arrest), wherein that court stated:

> Not all errors and omissions will negate probable cause, of course,
> and not all evidence known to an officer need be included in every
> affidavit used to secure an arrest warrant. But in the case of omitted
> evidence it is not enough to ask simply whether the truthful
> statements included in the affidavit are by themselves sufficient to
> support a probable cause finding; the court also must ask if inclusion
> of the omitted material would negate probable cause.

> With respect to §1983 liability for the omission of exculpatory evidence from an

affidavit in support of an arrest warrant, the Sixth Circuit recently instructed district courts that:

> plaintiffs must make a strong preliminary showing "that the affiant
> *with an intention to mislead* excluded critical information from the
> affidavit, and the omission is critical to the finding of probable
> cause." *Mays*, 134 F.3d at 816 (italics in original). Only if the
> plaintiff makes this "strong preliminary showing" may the court
> "consider the affidavit including the omitted portions and determine
> whether probable cause still exists." [*United States v.*] *Atkin*, 107
> F.3d [1213,] 1217 [(6th Cir. 1997)]. Absent this first preliminary
> showing, the district court may not engage in the second inquiry
> related to probable cause (italics in original).

*Hale*, 2005 WL 119593, Slip Op. at 5. The *Hale* court then addressed what "an intention to mislead"

might mean when such intent is to be established by omissions alone:

> The mere existence of omissions alone is ordinarily not enough to
> make this strong preliminary showing.  We do not foreclose the
> possibility that strongly material omissions could provide evidence
> of an intention to mislead; however, there is no evidence that the
> omissions of which plaintiff complains were material to the grant of
> the search warrant. Put another way, plaintiff cannot (and on appeal
> does not) argue that the search warrant would not have been granted
> had the omissions been included.  Plaintiff merely argues that
> defendant should have engaged in further investigation before
> seeking a warrant. Such a claim is not enough, in this circumstance,
> to meet plaintiff's burden under the first prong of the *Mays* test

---

probable cause if that officer knowingly makes false statements or omissions to the judge such
that but for these falsities the judge would not have issued the warrant." *Id.* at 517 (citations
omitted); and (d) the *Ahlers* court said that officers cannot turn a blind eye toward exculpatory
evidence known to them.

> because it does not speak to defendant Kart's intent to mislead, it
> only speaks to the thoroughness of his investigation (emphasis
> added).

*Hale*, 2005 WL 119597, Slip Op. At 5-6. Whether phrased in the manner of the *Hale* court (i.e., that strongly material omissions could provide evidence of an intent to mislead) or the *Ahlers* court (i.e., that there must be a reckless disregard for the truth), the Court concludes that Plaintiff must demonstrate more than negligence or innocent mistake of the officers was involved in omitting or not disclosing exculpatory evidence and that such omissions are not insignificant or immaterial.[13]

For the reasons set forth below, the Court finds that (a) the volume, strength and materiality of omissions in this case provide evidence of a reckless disregard for the truth and an intent to mislead the prosecutor and magistrate into believing that the case against Plaintiff was much stronger than it was, (b) the omitted material would negate probable cause for Plaintiff's arrest if taken into consideration, and (c) that without such omissions, an arrest warrant would not have been issued.

First, there is the issue of the identification of Plaintiff as the perpetrator, which unquestionably was the primary basis for the pursuit and issuance of the arrest warrant against Plaintiff. At the time they sought the arrest warrant, Ostin and Marlatt[14] were aware that Ms. Klug had picked Plaintiff out of a line-up, and Ms. Klug had said she was "a hundred percent sure" Plaintiff was the perpetrator. As Defendants indicate, identification by the victim in itself generally is sufficient to establish probable cause, *see e.g., Ahlers*, 188 F.3d at 370. But, as Plaintiff correctly point out, the *Ahlers* court also stated that eyewitness identification is not sufficient to establish probable cause if "at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion

---

[13]The Court further notes that if the evidence only supported a finding that the Defendants conducted a negligent investigation, Plaintiff could not survive summary judgment on this issue. *See Ritchie v. Wickstrom*, 938 F.2d 689, 692 (6th Cir. 1991), citing *Daniels v. Williams*, 474 U.S. 327 (1986). *See also Ahlers*, 188 F.3d at 373-74.

[14]In a light most favorable to Plaintiff, Ernst would have had or would be deemed to have had this knowledge as the supervising officer on the Klug investigation.

mistaken regarding his recollection of the confrontation." *Id.* (internal citation omitted).

The record includes substantial evidence (of which Defendants were aware when seeking the arrest warrant) that Defendants had reason to believe that Ms. Klug was mistaken in her identification of Plaintiff at the line-up. The composite developed with Ms. Klug's assistance was, in her words, only 60% accurate. There were numerous discrepancies between Ms. Klug's description of the perpetrator and the features or characteristics of Plaintiff. Unlike the perpetrator, Plaintiff was not a smoker. Plaintiff also was older, shorter and lighter than the man described by Ms. Klug. In addition, at the line-up, she was not able to identify Plaintiff prior to taking a break. Finally, there is evidence that Ostin wasn't even sure that Ms. Klug was telling the truth about the rape incident itself. Based on his review of the emergency room's physician's report indicating a lack of lacerations, abrasions, bruises or bleeding when Ms. Klug presented to the emergency room, Ostin acknowledged that he had concerns as to whether a rape had occurred at all.[15]

Plaintiff's brief and the record are littered with examples where Ostin and Marlatt did not disclose (or follow up on) evidence that would have been exculpatory to Plaintiff. For example, on the same day Ms. Whitcher suggested that Plaintiff matched the composite, there was a claim by Ms. Lewinski that Mr. Tisdel matched the composite. Yet, the Defendants did not follow up on that tip at all, even though the Sterling Heights police had forwarded information about Mr. Tisdel previously. There was also the man with a long criminal history that fit the description of the composite, who was seen by a Department officer walking in Ms. Klug's neighborhood at 5:00 a.m., only four days after the attack. That man was never investigated despite the officer supplying age, description and where a recent mug shot could be obtained. No follow up investigation was conducted on the information garnered during canvassing the day the attack occurred. No investigation was conducted with respect to 15 possible suspects supplied by the Michigan State Police department's violent crime unit, a Garden City man who matched the composite or other tips

---

[15]Ostin maintains that his doubt was alleviated and no follow up investigation was necessary because doctors are sloppy in rape cases so that they will not be called as witnesses.

regarding men with relevant criminal sexual histories supplied by other police departments.

There is also evidence that during the two and one-half month investigation of the attack prior to the arrest of Plaintiff, the members of the Department detective bureau discussed the possibility that a law-enforcement official might be the assailant due to the thoroughness of the crime, but that angle apparently was not followed up on by Ostin or Marlatt.[16]  Neighborhood canvassing by officers of the Department immediately following the report of the attack offered some support for that theory as neighbors had described a man fitting the composite, who they thought to be a police officer, driving in a police-type car and standing or walking in the neighborhood.  In fact, on the evening of April 30, 1994 (12-16 hours after the attack was reported by Ms. Klug), Ostin mentioned to Mr. Peppler (who had not yet been appointed) that he was working on a "very unusual rape case" in which the perpetrator might be in law enforcement he "had taken great pains not to leave behind any physical evidence."

None of the information in the two preceding paragraphs was disclosed in obtaining the arrest warrant.  Ostin's comment to Plaintiff upon arresting him, that "I haven't even started f***ing with you yet.  By the time I'm done, you're going to be called the million dollar man" is also relevant in evaluating his conduct and approach in seeking the arrest warrant against Plaintiff.

Therefore, for the reasons set forth above, the Court finds that Defendants are not entitled to qualified immunity with respect to their conduct in seeking an arrest warrant against Plaintiff.

2.    *Prosecution after Arrest*

With respect to Plaintiff's claim that his Fourteenth Amendment rights to due process and fair trial were violated, Plaintiff argues that the law is clear that the government must disclose exculpatory and material information, including evidence that would affect the credibility of

---

[16]Plaintiff notes that a Clinton Township officer at that time, Jerry Cornett, is now in prison for the rape of a Township resident in August 1999, but nothing on the record supports a finding that the Department had any reason to suspect, prior to Plaintiff's conviction, Mr. Cornett was the perpetrator in the Klug attack.

prosecution witnesses when the reliability of those witnesses may be determinative of guilt or innocence. *See* U.S. Const. amend. XIV; *Bagley*, 473 U.S. at 674-77, 682 (a person's right to due process and fair trial have been violated where, had there not been a suppression of exculpatory or impeaching evidence, there is a reasonable probability that the result of the criminal proceeding would have been different; "reasonable probability" means "a probability sufficient to undermine confidence in the outcome"); *Brady v. Maryland*, 373 U.S. 83 (1963). Plaintiff argues that Defendants withheld exculpatory and material information regarding prosecution witnesses that could be expected to affect the outcome of the trial, and that withholding such information violated Plaintiff's right to due process and a fair trial. *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997).

Plaintiff notes that there have been numerous federal cases where courts have held that police officers may face §1983 liability for violating a person's due process and fair trial rights when they fail to disclose exculpatory information in their possession when a criminal defendant goes to trial. *See e.g., Manning v. Miller*, 355 F.3d 1028 (4th Cir. 2004) (officer who induced a jailhouse snitch to testify to false story creates liability); *Newsome v. McCabe*, 319 F.2d 301 (7th Cir. 2003)(withholding information about officers' coaching of witnesses violates defendants' rights); *Ienco v. City of Chicago*, 286 F.3d 994 (7th Cir. 2002); *Jones*, 856 F.2d at 995 (in a §1983 case arising in part from police department's use of "street files" that were maintained separately from a case's official file, the court stated that attempts to circumvent *Brady* and the obligation to produce exculpatory information by retaining records in clandestine files violates the right to a fair trial); *Patterson v. Burge*, 328 F.Supp.2d 878 (N.D. Ill. 2004); *Taylor v. Hansen*, 731 F.Supp. 72 (N.D. N.Y. 1990).

Defendants argue that once probable cause was established, the police officers had no duty to investigate any exculpatory information, including the man with whom Ms. Klug was having the affair. *Citing Ahlers*, 188 F.3d at 371, wherein the Sixth Circuit said:

> Once probable cause is established, an officer is under no duty to
> investigate further or to look for additional evidence which may

41

exculpate the accused. [citations omitted] In fact, law enforcement "is under no obligation to give any credence to a suspect's story [or alibi] nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Criss [v. City of Kent]*, 867 F.2d [259], 263 (6th Cir. 1988)]. The facts as initially discovered, i.e., Stilner's eyewitness statement, provided Defendants with ample probable cause.

The Court rejects the Defendants' reliance on the rule that once the prosecutor and magistrate have issued an arrest warrant, such warrant alleviates any liability for the Department's actions. The fact that probable cause to arrest Plaintiff may have existed on July 15, 1994, does not mean that the Defendants could bury their heads in the sand when significant events occurred that would call that probable cause into question. Defendants erroneously argue that the Sixth Circuit has ruled that officers have no duty to look at exculpatory evidence. The Sixth Circuit has been very clear on an officers' duty with respect to exculpatory evidence, as set forth in *Sutkiewicz*, 110 F.3d 352, 358 (6th Cir. 1997),

Additionally, even though an officer is not obligated to actively search for exculpatory evidence, when an officer is aware of exculpatory facts and circumstances, he has a duty to disclose those facts and circumstances to the prosecutor. *Sanders v. English*, 950 F.2d 1152, 1161 (5th Cir. 1992); *Knudsen v. United States*, 966 F.2d 733, 737 (2d Cir. 1992); *Geter v. Fortenberry*, 882 F.2d 167, 170 (5th Cir. 1989).

*See also Haupt v. Dillard*, 17 F.3d 285, 290 & n.5 (9th Cir. 1994) (stating that "[p]robable cause to continue a prosecution may disappear with the discovery of new exculpatory evidence").

Further, as noted by Plaintiff, "[i]f police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him." *Jones*, 856 F.2d at 994. *See also Mayor of City of Lansing v. Knights of the Ku Klux Klan*, 222 Mich.App. 637, 649-50 (1996)(where an officer's misconduct "taints the legal process, a decision bearing that taint cannot insulate the officer from liability"); *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1989)(rejecting argument that officers cannot be liable since "the prosecutor is the one who decides

42

whether or not to prosecute the case" and holding that investigating officers can face liability when they "made material omissions or gave false information to the prosecutor"). Unlike the cases cited by the Defendants (where there is no evidence of new exculpatory or impeaching evidence being obtained by the police after the suspect's arrest), the Department received new exculpatory evidence with regularity between the time of Plaintiff's arrest and trial. For example, once there were additional reasons to question the credibility of Ms. Klug (as there should have been once she revealed that their was an affair partner with whom she had sexual intercourse only twelve hours prior to the attack)[17] or the new issues of credibility arose with respect to Mr. McCormick, any of the potentially exculpatory evidence the Department had received prior to Plaintiff's arrest became extremely relevant to whether the continued prosecution of Plaintiff was prudent. The fact that the Defendants did not follow up on any of those tips, identifications or inconsistencies could be found by a fact finder to be things that suggests the Defendants were focused solely on a conviction of Plaintiff, irrespective of whether he was the perpetrator. In other words, a fact finder could determine that Defendants were engaged in a malicious prosecution of Plaintiff.

Defendants argue that, even if there was a failure to turn over exculpatory evidence that could potentially be used for impeachment, Plaintiff must show that the evidence was material, i.e., had the evidence been disclosed, there would have been a reasonable probability that the result of the proceeding would have been different. *Bagley*, 473 U.S. at 678, 682 (the "suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial").

Defendants also argue that in order to maintain a claim of malicious prosecution, at the very least a plaintiff must show that there was no probable cause to justify his prosecution. *Darrah*, 255 F.3d at 312. The Court finds that Plaintiff has adequately established on the record evidence upon which a finder of fact could determine that the Defendants' actions, at a minimum, deprived Plaintiff of material exculpatory evidence and, at worst, involved wholly inappropriate

---

[17] After learning of Ms. Klug's affair shortly after Plaintiff's arrest, Ostin and other detectives suspected her affair partner was involved in law enforcement.

conduct that the prosecution heavily relied on at the preliminary examination and trial in securing a conviction of Plaintiff. For example, there is evidence that (i) Ostin knew that Mr. McCormick was provided information regarding the attack on Ms. Klug by a person or persons other than Plaintiff and/or himself provided Mr. McCormick with that information, (ii) Ostin failed to provide exculpatory evidence of his conversations with Michele Toney and Mr. McCormick after the preliminary examination but prior to trial, (iii) Ostin failed to provide the taped messages from Plaintiff's answering machine to the Prosecutor Davis or Plaintiff, (iv) Ostin never investigated or followed up on the affair partner upon learning after the arrest that there was such a person, and (v) Ostin did not disclose Ernst's refusal to tell Ostin the information Ernst had that would "secure a conviction." In addition, there is Ostin's statement to Plaintiff at the time of his arrest that he hadn't even begun messing with him yet and that, by the time he got done, Plaintiff would be the million dollar man. Finally, the record reflects that the forensic scientist at the Michigan State Police who was assigned to the Klug case did not find any evidence linking Plaintiff to the crime or even any evidence that indicated that a rape had occurred.[18]

Defendants also claim that "[t]he *Brady* rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue," *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001), "even if the government does not disclose the evidence itself." *Spirko v. Mitchell*, 368 F.3d 603, 616 (6th Cir. 2004)(*quoting United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990)).[19] Specifically, Defendants argue that Plaintiff's assertion that the answering machine tapes demonstrate Ms. Whitcher's ill will toward him is lacking because that ill will was indisputably known to Plaintiff. *Coleman*, 268 F.3d at 438. Defendants also argue that if McCormick was lying on the stand, Plaintiff knew about such false statements as he was in

---

[18]It is unclear whether this exculpatory evidence was disclosed to Prosecutor Davis, Plaintiff or Plaintiff's attorneys prior to Plaintiff's trial in 1994.

[19] The Defendants also assert that *Brady* rule also does not benefit a defendant when the evidence would not have been admissible, *see Hutchison v. Bell*, 303 F.3d720, 743 (6th Cir. 2002), but it is unclear what evidence that has a bearing on this case the Defendants believe is inadmissible.

the cell with him, yet failed to dispute those statements during his own testimony or raise that issue on appeal.[20]

The Court finds that in each of these situations where Plaintiff "knew" about the exculpatory or impeaching evidence, such "knowledge" in itself may have been rendered useless and its value was compromised by the failure of Defendants to disclose the exculpatory evidence. In particular, Plaintiff's ability to impeach Ms. Whitcher without the tapes was minimal, especially when Prosecutor Davis challenged him to produce the tapes being held by the man sitting next to her at counsel table (Ostin). As to the Defendants' contention that if Plaintiff knew Mr. McCormick was lying, Defendants did not disclose (and Plaintiff therefore would have no way of knowing) that McCormick had received a police report from Ostin and/or Ms. Davis, if that in fact happened.[21]

For the reasons set forth above, the Court finds that there is sufficient evidence on the record for a fact finder to decide that Defendants did not provide exculpatory and/or impeaching evidence to Prosecutor Davis and, more significantly and more frequently, to Plaintiff, even though Circuit Court Judge Michael Schwartz had ordered that such information be disclosed. In the light most favorable to Plaintiff, there is also evidence that demonstrates Ostin engaged in some misconduct, or was aware that Ms. Davis engaged in misconduct (of which misconduct Marlatt was aware), which enabled Mr. McCormick to put together a believable story that Plaintiff had confessed to Mr. McCormick that Plaintiff had committed the crime. For the reasons set forth above, the Court finds that, for purposes of summary judgment, there is sufficient evidence on the record that the

---

[20] Defendants also argue that Plaintiff waived any claim with regard to Mr. McCormick's testimony by failing to appeal it and because Mr. McCormick's credibility and criminal history were addressed at length during Plaintiff's criminal trial and his girlfriend's assertions against him were not material in the sense that Plaintiff would have been acquitted. The Court finds this argument irrelevant to the instant action. Plaintiff is not challenging his conviction or seeking to have it overturned.

[21] As set forth above in Section III.B., Mr. McCormick's statements in Declaration and in the December 6, 2004 video can be used for purposes of deciding this summary judgment motion. His statements in those documents create a genuine issue of material fact as to what occurred at the interview on August 10, 1994, as well as whether Plaintiff ever admitted to Mr. McCormick that Plaintiff committed the attack on Ms. Klug.

(mis)conduct of Defendants was instrumental to the continued confinement, prosecution and conviction of Plaintiff and that such conduct tainted the legal process such that Plaintiff was denied a fair trial. The Court also finds that the failure to disclose exculpatory and impeaching evidence was material and there is a reasonable probability that the result of the proceeding would have been different had such evidence been produced. Accordingly, the Defendants are not entitled to qualified immunity with respect to Plaintiff's post-arrest malicious prosecution claims.

3.      *Conspiracy Claims*

Defendants argue that Plaintiff has offered no evidence of a concert of action, a shared conspiratorial objective or that any overt act was committed in furtherance of the conspiracy that caused injury to Plaintiff and therefore has not set forth a conspiracy claim upon which he can recover. *Citing Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987). Defendants argue that "[i]t is well settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under §1983." *Spadafore*, 330 F.3d at 854 (citation omitted).

The Court finds that the evidence on the record creates a genuine issue of material fact as to whether the Defendants acted in concert in the arrest and prosecution of Plaintiff in a manner that violated his constitutional rights and deprived him of due process and a fair trial. For example, the record includes evidence that Marlatt and Ostin discussed the case on many occasions, including the discussion after two separate calls were received regarding suspects who matched the composite on July 6 or 7, 1994. There is evidence that both officers were intimately involved in obtaining the arrest warrant against Plaintiff, and the two of them continued to work on the case together until at least up to the preliminary examination. The record also includes evidence from which a fact finder could determine that Ostin was conspiring with Prosecutor Davis or Mr. McCormick. The record contains evidence that Ostin either provided Mr. McCormick with a police

file on the case and/or was aware that such a file was provided to Mr. McCormick by Prosecutor Davis and that Marlatt was present during at least parts of the interview with Mr. McCormick where that occurred.

Ernst had a duty to supervise the officers involved in the case and to be sure that exculpatory information was being provided and there is evidence that he discussed the case with Ostin and Marlatt.   Alternatively, there is evidence on the record that he failed to provide supervision and that he told Ostin that he had evidence related to the Klug investigation but would not share it unless it was necessary for a conviction (again, whose the information would have helped secure a conviction is not known).   In either event, a fact finder could determine that Ernst conspired with Ostin and Marlatt to deprive Plaintiff of his constitutional rights.

For these reasons, in a light most favorable to Plaintiff, the Court concludes that there is evidence that each of Marlatt, Ostin and Ernst did conspire with one or more other persons to engage in the continued prosecution of Plaintiff.

**D.    Ernst**

As to Ernst, Defendants first argue that as Marlatt and Ostin did not violate Plaintiff's constitutional rights, Ernst cannot be held liable as a supervisor. "At a minimum, a plaintiff must show that the official implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending officers. . . . Supervisory liability under §1983 cannot be based upon a mere failure to act but must be based upon active unconstitutional behavior." *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002)(citations omitted).   The Defendants also argue that Ernst's failure to disclose the affair partner was one of her co-workers was neither exculpatory to Plaintiff's arrest and conviction nor material to any claims in this case.

Plaintiff acknowledges that Ernst is not liable under §1983 for failure to supervise, control or train Ostin and/or Marlatt absent a showing that he "either encouraged or in some way directly participated in" their constitutional violations, but argues that such encouragement may be implicit rather than direct. *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir. 1982). Plaintiff states that Ernst was

47

well aware that there were numerous leads that pointed to suspects other than Plaintiff, and that such leads were being ignored prior to Ostin's focus on Plaintiff in early July 1994. Plaintiff also claims that Ernst must have learned what the police file in general and Marlatt's and Ostin's case notes in particular showed, namely that there were leads that were simply not being investigated. Plaintiff maintains that Ernst's knowledge of alternative suspects and leads, together with Ernst's own withholding of evidence from Ostin and his overall lack of supervision of Ostin and Marlatt with respect to the Klug investigation, enable a jury to conclude that he at least implicitly authorized or knowingly acquiesced to the manner the case was being handled and Plaintiff was being pursued.

The Court agrees with Plaintiff. First, as set forth above, the Court has concluded that there is evidence upon which a fact finder could conclude that Ostin and Marlatt did violate Plaintiff's rights. Second, for the reasons cited by Plaintiff, there is sufficient evidence on the record from which a fact finder could conclude that Ernst's actions or inactions supported the arrest, continued investigation and prosecution of Plaintiff, including the withholding of exculpatory evidence. Accordingly, the Court concludes that Ernst is not entitled to summary judgment in this action.

**E.      Township**

Defendants argue that the Township is not liable under a theory of *respondeat superior* or the theory that it failed to adequately train or supervise its officers pursuant to a policy and practice that authorized officers to make arrests without probable cause and to withhold exculpatory and impeaching information from prosecutors and defendants.   Defendants further argue that Plaintiff cannot establish that he suffered a constitutional injury at the hands of Ostin, Marlatt or Ernst, so he can not recover against the Township, *Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000), as there is no evidence that Township policies were deliberately indifferent to Plaintiff's constitutional rights. *Shamaeizadeh v. Cunigan, 338 F.3d 535, 557 (6th Cir. 2003).*

Plaintiff claims that at all relevant times, the adult crime section of the Department had a practice of allowing detectives to investigate crimes, make arrests, prepare reports and handle evidence without supervision, and that as a result, Plaintiff was arrested and convicted in violation

48

of his constitutional rights.

The Supreme Court has clearly held that a municipal or governmental entity defendant can be found liable for the violation of a constitutionally protected right only if the plaintiff can establish that an officially executed policy, or the toleration of a custom of such municipality or governmental entity leads to, or causes, or results in the deprivation of such rights. *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690-91 (1978). Even if the officers violated Plaintiff's constitutional rights, *respondeat superior* is not available as a theory of recovery in a §1983 action. *Monell,* 436 U.S. at 690-91. In order to have a viable action against the Township, Plaintiff would have to demonstrate that Township itself is the wrongdoer. *Collins v. City of Harker Heights,* 503 U.S. 115, 122 (1992). Therefore, in order to recover, Plaintiff must "identify the policy, connect the policy to the [Township] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dept.,* 8 F.3d 358, 363-64 (6th Cir. 1993).

As to a claim premised upon inadequate training, "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under §1983." *Shamaeizadeh,* 338 F.3d at 557 (*quoting City of Canton v. Harris,* 489 U.S. 378, 389 (1989)). To recover, a party may either show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably said to have been deliberately indifferent to the need" by not providing that training, or that so many violations have occurred that the need for additional training was "plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *City of Canton,* 489 U.S. at 389-91 (citations omitted).

The Court finds there is sufficient evidence on the record to create a genuine issue of material fact as to the Township's liability. First, the Court has already determined that Marlatt, Ostin and Ernst are not entitled to summary judgment. Second, while Ostin and Marlatt clearly had been officers for many years prior to being appointed officers in charge of the Klug investigation,

49

there is evidence that neither of them had never attended a rape scene or been in charge of a rape investigation. Despite (i) the fact that they were novices to such an investigation, and (ii) the fact that they would have been supervised in such an investigation if the crime was committed by a youth (even if they were seasoned veterans), there is evidence that no one in the Department supervised either of them with the investigation. Further, Sergeant Waldoch stated that such a lack of supervision was the policy and custom of the Department. In a light most favorable to the Plaintiff, the Court concludes that such a policy and custom could be found by a fact finder to be "deliberately indifferent" to the rights of the Township inhabitants. Accordingly, the Court finds that the Township is not entitled to summary judgment in this action.

## VI. CASE MANAGEMENT

Pursuant to the parties' request at the scheduling conference, the Court gave the parties eight months to conduct discovery. The Court, having read the extensive briefs and numerous eleventh hour filings by the parties (including a "Motion to Compel . . ." recently filed by Plaintiff for which all responses and replies are not yet even due), recognizes that there are many unresolved issues between the parties, including an alarming lack of agreement regarding discoverable evidence at this stage of the proceeding. In fact, the ability of the Court to issue a decision on the Defendants' Motion for Summary Judgment was delayed in order to take all appropriate information and motions into account before rendering its Opinion.

As a result, this case is rapidly hurtling toward a Final Pre-Trial Conference on March 15, 2005, with a trial date as soon as early April 2005. The parties should be aware that the Court will hold the Final Pre-Trial Conference on March 15, 2005, and expects the parties to produce the requisite items due at that time. The Court recommends that the parties promptly and professionally resolve the ongoing disputes about discovery and depositions. To the extent the Court must address discovery issues this late in the proceeding and determines that any discovery is appropriate, the parties will have an extremely limited time in which to conduct it. A trial in this matter will not be put on hold because of the parties' posturing. In resolving any outstanding disputes, the parties

50

would do well to keep in mind that, barring settlement, this case will be in the hands of and decided by a jury and that jury will be availed of all relevant evidence.  To that end, the Court hereby ORDERS Defendants to produce for review by Mr. Steve Cain, within ten (10) business days from the date of this Opinion, the original "Glen McCormick interview" cassette tape from the August 10, 1994, interview of Mr. McCormick by Prosecutor Davis and Ostin.

## VII.  CONCLUSION

Accordingly, and for the reasons set forth above, Defendants' Motion for Summary Judgment is DENIED in its entirety, Defendants' Motion to Strike Declaration of Wayne Burkhardt is DENIED AS MOOT and Defendants' Motion to Strike Declaration and Preclude the Testimony of Glen McCormick is DENIED.

IT IS SO ORDERED.

_s/Lawrence P. Zatkoff_____
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Date: _s/March 3, 2005_____

S:\Zatkoff\Marie ECF\wyniemko.022805.wpd

51