LEXSEE 2007 US DIST LEXIS 60079


Positive
As of: Dec 03, 2008

**BARRY LAUGHMAN, Plaintiff v. COMMONWEALTH OF PENNSYLVANIA, et al., Defendants**

**Civil Action No. 1:05-CV-1033**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

*2007 U.S. Dist. LEXIS 60079*

**August 16, 2007, Decided**
**August 16, 2007, Filed**

**PRIOR HISTORY:** *Laughman v. Pennsylvania, 2006 U.S. Dist. LEXIS 15841 (M.D. Pa., Mar. 17, 2006)*

**COUNSEL:** [*1] For Barry Laughman, Plaintiff: Leslie M. Fields, William C. Costopoulos, LEAD ATTORNEYS, COSTOPOULOS, FOSTER & FIELDS, Lemoyne, PA.

For Commonwealth of Pennsylvania, Defendant: Maryanne M. Lewis, LEAD ATTORNEY, Pennsylvania Office of Attorney General, Harrisburg, PA.

For John J. Holtz, a/k/a Jack, Janice Roadcap, Donald Blevins, Defendants: Gregory R. Neuhauser, LEAD ATTORNEY, Office of Attorney General, Harrisburg, PA; Maryanne M. Lewis, LEAD ATTORNEY, Pennsylvania Office of Attorney General, Harrisburg, PA; Timothy P. Keating, LEAD ATTORNEY, Office of Attorney General of Pennsylvania, Harrisburg, PA.

**JUDGES:** Yvette Kane, Chief Judge.

**OPINION BY:** Yvette Kane

**OPINION**

*MEMORANDUM*

On September 8, 1987, Plaintiff Barry Laughman was arrested and charged with the murder, burglary, and rape of his distant relative, Edna Laughman. After a death-qualified jury found him guilty, Laughman was sentenced to a term of life imprisonment. On November 21, 2003, after certain DNA tests ruled him out as the perpetrator, Laughman was released from state custody. Before his release, Laughman spent sixteen years in prison.

On May 20, 2005, Laughman brought this action pursuant to *42 U.S.C. § 1983* against the Commonwealth of Pennsylvania, [*2] Adams County, the Adams County District Attorney's Office, several former Pennsylvania State Police Commissioners, and individual defendants John Holtz, Donald Blevins, and Janice Roadcap. Laughman alleges that the defendants deprived him of rights guaranteed under the *Fourth* and *Fourteenth Amendments of the United States Constitution*, as well as rights protected under the Pennsylvania Constitution. On March 17, 2006, this Court granted motions to dismiss filed by the Commonwealth, Adams County, the Adams County District Attorney's Office, and the Pennsylvania State Police Commissioners, and dismissed them as parties to this action. Remaining individual defendants Holtz, Blevins, and Roadcap ("Defendants") filed a joint answer to the complaint (Doc. No. 27), and this action proceeded. On February 14, 2007, Defendants moved for summary judgment on the remaining claims. (Doc. No. 56.) After the parties submitted briefs, statements of material facts, and related exhibits (Doc. Nos. 56-72), the Court heard oral argument on July 25, 2007. Defendants' motion is ripe for disposition. For the reasons that follow, the motion will be denied.

Case 1:06-cv-10514-RGS   Document 173-5   Filed 12/03/08   Page 2 of 10

Page 2
2007 U.S. Dist. LEXIS 60079, *

## I. BACKGROUND

The circumstances giving rise to the instant [*3] suit began in the early evening of August 13, 1987, when Edna Laughman was found raped and murdered in her bedroom in Oxford Township, Adams County, Pennsylvania. Later that evening, Defendant Donald Blevins, an eighteen-year veteran of the Pennsylvania State Police in Gettysburg, Pennsylvania, arrived at the scene and assumed the role of lead investigator into Ms. Laughman's death. A few days later, Defendant John Holtz, a nineteen-year veteran of the Pennsylvania State Police in Harrisburg, Pennsylvania, joined the investigation of the case. As part of the investigation, various biological specimens were taken from the scene, including blood samples and fluid swabs, and an autopsy was conducted. Several of the biological samples were then forwarded to Defendant Janice Roadcap, a chemist for the Pennsylvania State Police, who determined that the perpetrator likely must have been an "A secretor," because no "B antigens" were present in the sample. The autopsy revealed that Edna Laughman's death was caused by suffocation due to upper-airway obstruction by medication pills.

Two weeks later, on August 27, Blevins and Holtz met with Plaintiff Barry Laughman ("Laughman"). At the time, Laughman [*4] was 24-years' old, and had an IQ of 69-71. On September 8, Blevins and Holtz again met with Laughman at the Gettysburg police station. At the conclusion of that meeting, Laughman was arrested and charged with the burglary, rape, and murder of Edna Laughman.

Although what happened after the meeting is well documented, what actually occurred during the meeting on September 8, 1987, is disputed to this day. Defendants assert that Laughman confessed and that Blevins reduced the confession to writing. Laughman insists that Blevins and Holtz fabricated a confession and that Laughman simply capitulated to Defendants' repeated inquisitions.

Blevins's handwritten transcription of Laughman's confession spans seven pages, consists of fifty-three questions and answers, and includes the initials of Laughman, Holtz, and Blevins at the bottom of each page. The confession described, at great length and in somewhat graphic detail, the manner in which Edna Laughman was murdered and raped, as well as Laughman's attempt to cover up his actions. For example, the confession depicted the way in which Edna died (suffocation by medication pills) and Laughman's disposal of certain items in a dumpster because "[he] [*5] knew the garbage man would come that day." It also includes Laughman's recollection of his "tr[ying] to make it look like an accident," and his robbing her "to cover up her death." It also contained Laughman's explanation that he raped Edna because he "could never ever get a girl."

Laughman maintains that the confession was falsely attributed to him and that the answers in the statement were not his own. He suggests that the confession was created by Holtz and Blevins and that he merely acquiesced in signing it. In support of his position, Laughman proffered an expert's report, which concluded that "[t]he statement attributed to Mr. Laughman contained facts, and some strikingly precise details about the crime scene and victim, that an innocent person could not have known or produced." (R. 35b.) Thus, Laughman argues, because he could not have known of certain details described in the September 8<th> confession, he simply could not have given such a confession.

On September 9, 1987, Blevins obtained a search warrant authorizing him to obtain a sample of Laughman's blood to compare it against the blood evidence recovered from the crime scene. After conducting tests on Laughman's sample, [*6] Roadcap discovered that her findings were inconsistent with her previous findings -- she discovered that Laughman was a "B secretor," not an "A secretor" as she previously determined the perpetrator must likely have been. Nevertheless, the case against Laughman continued.

Judicial proceedings against Laughman began on December 30, 1987, before President Judge Oscar Spicer in the Court of Common Pleas of Adams County. Prosecuting the charges against Laughman was the District Attorney of Adams County, Roy Keefer. Representing Laughman was the Chief Public Defender of Adams County, Jeff Cook. During the pretrial phase, Laughman moved to suppress his confession. Although the court held three separate hearings on Laughman's suppression motion, stretching from December 30, 1987, until September 28, 1988, the court did not resolve the issue of the admissibility of Laughman's confession until a few days before trial, when it was "discovered that the issue was still undecided." (R. 621a, Opinion on Post-Verdict Motions at 5.) At that point, the parties stipulated that factual findings underlying Judge Spicer's decision to allow the introduction of Laughman's confession would be waived until [*7] after the trial.

A death-qualified jury heard the evidence against Laughman during a four-day trial from December 12 to December 16, 1988. The jury found Laughman guilty of first-degree murder, rape, robbery, and burglary, and he was sentenced to a term of life imprisonment. Laughman thereafter filed a post-verdict motion in which he asserted, *inter alia,* that his confession was involuntary and that Roadcap's testimony scientifically excluded Laughman as a suspect. That motion was denied.

In the opinion denying Laughman's post-trial motion, Judge Spicer made a number of *post hoc* factual findings related to the voluntariness of Laughman's confession. First, Judge Spicer found that:

> [Holtz] told [Laughman] he thought he had been in the house and asked if he were [sic] ready to tell the truth. [Laughman] said he had something to say to the police if they would not tell his father. Upon assurances this would not occur, [Laughman] confessed.
>
> * * *
>
> [Laughman] is an unmarried, white male with a full range I.Q. of 70 or 71. He has been steadily employed and is a good worker. He has trouble reading but can understand concepts as difficult as those in the Miranda warnings, if they are explained carefully. [*8] Holtz explained [Laughman's] rights carefully and [Laughman] both understood them and expressly waived them.
>
> To summarize, [Laughman] while free of the influence of alcohol or drugs, while understanding the nature of the interrogation, its consequences, and his Miranda rights freely and voluntarily confessed. Guilt, and not police conduct, induced his confession.

(R. 622a.) Judge Spicer also rejected Laughman's position that his "mental acuity prevented him from understanding his rights or making a voluntary statement." (R. 623a.) In doing so, he found that "[a]side from [Laughman's] low I.Q., there is absolutely nothing in this case to justify exclusion of the confession. The police acted carefully and properly. Dr. Levy said that [Laughman] was susceptible to suggestion in tense situations and that all police interrogations involve this. Accepting this as reason to suppress would be tantamount to adopting a per se rule." (R. 625a.) Finally, Judge Spicer commented that he "observed [Laughman] on the stand during the hearing and during trial. He is a miserable reader but otherwise gives the appearance of competence. It was clear from his testimony at the suppression hearing that he couldn't [*9] read the Miranda form but had understood it." (R. 625a.)

Judge Spicer also rejected Laughman's contention that Roadcap's testimony exculpated him. In particular, Laughman argued that as a scientific matter Roadcap's testimony regarding the perpetrator's blood type cleared Laughman as a suspect. Judge Spicer disagreed:

> Janice Roadcap explained the lack [of B antigens] as possibly being due to drainage, contamination, breakdown or medicine ingestion. Her views were supported by Dr. Robert Wenk. She said her analysis could not exclude [Laughman].
>
> The expert called by [Laughman] cast some doubt on this testimony but fell far short of proving exclusion. Lawrence Koplinsky, Ph.D. said it was unlikely that A antigens would be present but not B antigens. He said no effort had been made to determine if contamination occurred.
>
> The problem is, from [Laughman's] standpoint, the analysis is a nonfactor. Commonwealth's evidence, excluding the analysis proved [Laughman's] guilt beyond a reasonable doubt. Even accepting Dr. Koplinsky's testimony, the serological examination proved nothing more than unlikelihood. The jury could still have accepted Ms. Roadcap's opinion while believing Dr. Koplinsky.

(R. [*10] 625a-26a.)

Following the denial of his post-verdict motion, Laughman filed an appeal with the Pennsylvania Superior Court. On July 12, 1991, the Superior Court affirmed his conviction and sentence. The Pennsylvania Supreme Court denied his petition for an allowance of appeal on March 26, 1992.

Over eleven years later, on June 18, 2003, Laughman filed a motion for post-conviction DNA testing pursuant to *42 Pa. Cons. Stat. § 9543.1*. The Court of Common Pleas of Adams County granted Laughman's motion, and certain DNA tests were conducted, which concluded that "Barry Laughman is excluded as a source of the DNA obtained from this sample."[1]

> 1 Laughman and Defendants have very different views as to the proper interpretation of the DNA tests. Laughman believes that it is irrefutable evidence that he is innocent of killing Edna Laughman. Defendants maintain that uncertainty remains. The Court cannot reconcile these views at summary judgment. It can only consider the

evidence in the light most favorable to the nonmoving party.

On November 12, 2003, Laughman sought release on bail through a petition for post- conviction relief pursuant to *42 Pa. Cons. Stat. § 9543.1*. On November 21, 2003, the Court [*11] of Common Pleas of Adams County ordered Laughman released on bail with conditions. On August 24, 2004, a new trial was granted to Laughman, and the District Attorney of Adams County dismissed the charges against him.

Based on the above-described events, Laughman filed this civil action in this Court on May 20, 2005. Now before the Court is Defendants' motion for summary judgment.

## II. STANDARD OF REVIEW

*Federal Rule of Civil Procedure 56(c)* provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When deciding a motion for summary judgment, the Court should "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 794 (3d Cir. 2007)*.

However, the nonmoving party may not simply sit back and rest on the allegations in the complaint, but must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions [*12] on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Id. at 322*.

## III. DISCUSSION

Defendants argue that the Court should grant their motion for summary judgment for three reasons. First, they argue that Laughman has failed to establish genuine issues of material fact with respect to essential elements of his federal constitutional claims. Second, they argue that they enjoy qualified immunity as government officials performing discretionary functions. Third, they argue that the doctrine of collateral estoppel bars Laughman from raising several of his claims. The Court will address each in turn.

### A. Laughman's federal-law claims

Because Defendants have asserted qualified immunity, the Court must engage in the two- step analysis set forth in *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*. First, the Court must decide, based on the relevant set of facts and drawing all inferences [*13] in favor of the plaintiff, whether "the facts alleged show the officer's conduct violated a constitutional right." *Scott v. Harris, 550 U.S. , 127 S. Ct. 1769, 1774, 167 L. Ed. 2d 686 (2007)*. After the Court has concluded that a constitutional violation has occurred, the Court must then decide whether the official "is entitled to qualified immunity despite that violation." *Groh v. Ramirez, 540 U.S. 551, 563, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004)*. This second step requires a court to answer "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier, 533 U.S. at 202*). In conducting an analysis of Laughman's federal constitutional claims, it is imperative for the Court to first identify what rights, if any, are at issue and determine whether any genuine issues of material fact exist as to whether such rights were violated. Then the Court must consider whether Defendants would be entitled to qualified immunity at this stage in the litigation. Thus, the Court will turn to the task of identifying what federal claims are at issue.

Laughman's federal claims, brought pursuant to *42 U.S.C. § 1983*, stem from the same general set of allegations -- that he was arrested, [*14] tried, and convicted on a doctored confession and altered scientific evidence. [2] Laughman argues that the Defendants' conduct gave rise to three distinct constitutional claims: a claim for false arrest under the *Fourth Amendment*; a claim for malicious prosecution under the *Fourth Amendment*; and a claim for deprivation of substantive due process under the *Fourteenth Amendment*.

> 2  At oral argument, counsel for Plaintiff clarified that Laughman is not pursuing claims against the defendants for their in-court testimony, or any claims stemming from his post-conviction incarceration. As Plaintiff's counsel stated it: "Our position is [that] Barry Laughman was framed, that this case was fabricated long before the jury was picked."

### 1. False arrest

Laughman's first claim is a false-arrest claim brought under the *Fourth Amendment*. [3] It is beyond dispute that a civil action lies under the *Fourth Amendment* for false arrest where a police officer arrests a citizen without probable cause. *Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995)*. However, a

false-arrest claim "covers damages only for the time of detention until the issuance of process or arraignment, and not more." *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007). [*15] Defendants advance two reasons for granting summary judgment in their favor with respect to Laughman's false-arrest claim: (1) that probable cause existed at the time of Laughman's arrest; and (2) that Laughman's claim is time-barred. Both arguments, however, fail.

> 3   The *Fourth Amendment* provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

Generally, in a *§ 1983* action, whether probable cause existed to effectuate a warrantless arrest is an issue of fact to be resolved by a jury. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788-89 (3d Cir. 2000). An arresting officer has probable cause "whenever reasonably trustworthy information or circumstances within [the] officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested." *United States v. Laville*, 480 F.3d 187, 194, 48 V.I. 1012 (3d Cir. 2007). Probable [*16] cause depends on the "totality of the circumstances," *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), and must be evaluated "with reference to the facts and circumstances within the officer's knowledge at the time of the investigative stop or arrest." *Laville*, 480 F.3d at 194. Although probable cause "requires more than mere suspicion . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti*, 71 F.3d at 482-83. Thus, in considering whether probable cause exists, the Court will "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) (internal quotation marks omitted).

Defendants assert that they had probable cause to arrest Laughman because he "told [Defendants] Holtz and Blevins that he was walking past [Edna Laughman's] residence, lifted her window, went inside, struck [her] on the head, took her to the bedroom and committed the offenses with which he was charged." (Defs' Br. 14.) In other words, Defendants believe that Laughman's confession provided [*17] them with sufficient information to believe that Laughman raped and murdered Edna Laughman. Implicit in Defendants' argument, however, is the adoption of critical facts that Laughman asserts represents facts in dispute. Central to Laughman's claim is his representation that his "confession" was not his own. Indeed, at every point during Mr. Laughman's twenty-year odyssey, Laughman has insisted that he did not tell Defendants that he killed Edna Laughman.[4]

> 4   For example, during cross-examination at trial, Mr. Laughman was asked the following series of questions:
>
> > Q: You did tell Trooper Holtz and Trooper Blevins that you killed Edna Laughman, didn't you?
> >
> > A: No, I didn't.
> >
> > Q: You never told them?
> >
> > A: I never did.
> >
> > Q: You never told these two men that you killed Edna Laughman?
> >
> > A: No. They say I did and they were going through it all and that there. They said we know you did and that there.

(R. 597a-598a.)

The facts surrounding Laughman's attributed confession are very much in dispute to this day. Laughman testified at his trial that he did not confess and he has proffered expert reports calling into doubt the legitimacy of the confession, in light of his innocence. Furthermore, while Defendants insist [*18] that Laughman's innocence should not bear on the fact of his confession, the Court finds that a reasonable juror could find from the facts in dispute that Defendants knew that no confession occurred and thus arrested Laughman without probable cause. The ultimate question of probable cause cannot be answered until the underlying historical facts surrounding Laughman's purported confession can be resolved. Thus, genuine issues of material fact remain in dispute and summary judgment must be denied on this ground.

Defendants' second argument, that Laughman's false-arrest claim is time-barred, is unavailing because Defendants have waived such a defense. *Federal Rule of Civil Procedure 8(c)* provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively" a statute-of-limitations defense. *Fed. R. Civ. P. 8(c)*. It is black-letter law that "[a] defending party who fails to

Case 1:06-cv-10514-RGS   Document 173-5   Filed 12/03/08   Page 6 of 10

Page 6
2007 U.S. Dist. LEXIS 60079, *

raise an affirmative defense by presenting it in the initial responsive pleading sometimes is deemed to have waived the defense. The effect of waiver is that evidence relating solely to the defense may not be admitted at trial, at a summary judgment hearing, or at any similar proceeding." 2 *Moore's Federal Practice § 8.07* [*19] (Matthew Bender 3d ed.). In this case, Defendants have pleaded eighteen defenses in their answer to Laughman's complaint (Doc. No. 27), none of which pertain to the timeliness of Laughman's false-arrest claim. [5] By failing to raise a statute-of-limitations affirmative defense in their answer, the Court finds that Defendants have waived it. Not only did Defendants fail to assert a statute-of-limitations defense in their answer, but they made no reference to such a defense in either their motion for summary judgment or supporting brief. Indeed, it was not until their reply brief that Defendants raised for the first time the argument that a two-year statute of limitations bars Laughman's claim. [6] The failure to raise and assert the defense timely constitutes a waiver of such a defense. Accordingly, Defendants are deemed to have waived the defense, and summary judgment will be denied.

 5   Defendants asserted neither statute-of-limitations nor laches defenses.

 6   In their reply brief, Defendants suggest that *Wallace v. Kato*, U.S. , 127 S. Ct. 1091, 1097, 166 L. Ed. 2d 973 (Feb. 21, 2007), which was decided after their opening brief was filed, compels the conclusion that Laughman's claims are untimely. In [*20] *Wallace*, the Supreme Court held that "the statute of limitations upon a *§ 1983* claim seeking damages for a false arrest in violation of the *Fourth Amendment*, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." *127 S. Ct. at 1100*. In, Pennsylvania, the statute of limitations applicable to Laughman's *§ 1983* claims is two years. *Garvin v. City of Philadelphia, 354 F.3d 215, 220 (3d Cir. 2003)*. Defendants therefore argue that because Laughman did not file his complaint within two years after legal processes were initiated against him, his claims are barred.

The Court notes that while *Wallace* resolved the issue of when a false-arrest claim accrues for statute-of-limitations purposes, the issue of whether Laughman's claim might be subject to tolling is dependent on Pennsylvania state law. *Wallace, 127 S. Ct. at 1098* ("We have generally referred to state law for tolling rules, just as we have for the length of statutes of limitation"). Given that discovery has already concluded in this case (and that briefing has already closed), Laughman's ability to now assert that tolling should apply would obviously be [*21] impaired in this case. Therefore, Defendants waived their statute-of-limitations defense, and *Wallace* should not be understood as giving any new vitality to such a defense.

### 2. Malicious Prosecution

Laughman's next claim is that Defendants maliciously pursued the prosecution against Laughman in violation of the *Fourth Amendment*. To state a claim for *Fourth Amendment* malicious prosecution in a *§ 1983* action, a claimant must show that "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the claimant's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the [claimant] suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson, 477 F.3d at 81-82*.

At this stage in the proceedings, Defendants only argument with respect to Laughman's malicious-prosecution claim is that Laughman has failed to create a genuine issue of material fact with respect to the third element -- the absence of probable cause. The Court finds that genuine issues of material fact exist as to whether [*22] the officers had probable cause to initiate and prosecute the criminal proceedings against Laughman. Although Defendants argue that the confession supports probable cause, whether the confession could be fairly attributable to Defendants is at the heart of this dispute. Laughman argues that Defendants relied on a confession they knew to be fabricated and hence had no probable cause. Beyond the confession, the issue of probable cause is further complicated by Roadcap's exculpatory test results ruling Laughman out as a suspect. However, the Court need not, and cannot, resolve this issue at this stage of the litigation because the critical historical facts surrounding the existence of probable cause remain in dispute.

### 3. Substantive Due Process

Laughman's third federal claim is grounded in the *Fourteenth Amendment's due process clause*, which provides that no state "shall deprive any person of life, liberty, or property, without due process of law." *U.S. Const. amend. XIV*. Laughman asserts that Defendants, acting individually and jointly, violated his substantive due process rights by doctoring evidence, which led to his incarceration. The Third Circuit has never recognized a free-standing [*23] right under the *Fourteenth Amendment* to be "free from being framed by police." (Pl's Br. in Opp'n 20 n.9.) [7] Other circuit courts of

appeals that have considered the issue have held that the intentional fabrication of inculpatory evidence to secure a conviction violates due process. [8] This Court has previously recognized that the "right to be free from falsifying documents, fabricating evidence, giving misleading or perjured testimony, and malicious prosecution" is actionable. *Crawford v. Commonwealth, No. 03-693, 2005 U.S. Dist. LEXIS 43100, 2005 WL 2465863, at *940 (M.D. Pa. Oct. 6, 2005), vacated in part on other grounds, 2006 U.S. Dist. LEXIS 3725, 2006 WL 148881 (M.D. Pa. Jan. 19, 2006).*

7 On at least three occasions, the Third Circuit has declined to address the issue. In *Kulwicki v. Dawson, 969 F.2d 1454, 1467 (3d Cir. 1992)*, the Third Circuit passed on the issue where the appeal was limited to the availability of an immunity defense, which the defendant failed to raise. In *Hector v. Watt,* the Third Circuit stated, in the context of proximate-causation analysis in *§ 1983* actions, that "[w]e have no reason to use this case as a vehicle for effectively deciding, for example, that a *§ 1983* plaintiff who was the victim of [*24] fabricated evidence can never sue for damages incurred after a prosecutor's decision to indict. We leave such matters for another day."). Most recently, in *Yarris v. County of Delaware, 465 F.3d 129, 138-139 (3d Cir. 2006)*, the plaintiff alleged that several assistant district attorneys fabricated a confession against him. The defendants moved to dismiss on the grounds that, as prosecutors, they enjoyed absolute immunity from suit under *§ 1983*. The district court denied the motion to dismiss, and the prosecutors appealed to Third Circuit. On appeal, the Third Circuit framed the issue as "whether the [assistant district attorneys] were functioning as the state's advocates when they engaged in the conduct that gave rise to the evidence-fabrication allegations." *Id.* The court remanded, however, because the plaintiff's allegations were unclear as to when the fabrication occurred.

8 *See, e.g., Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004); Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000); Washington v. Wilmore, 407 F.3d 274 (4th Cir. 2005); Castellano v. Fragozo, 352 F.3d 939, 955 (5th Cir. 2003); Gregory v. City of Louisville, 444 F.3d 725, 737 (6th Cir. 2006); Moran v. Clarke, 296 F.3d 638, 646-647 (8th Cir. 2002);* [*25] *Devereaux v. Abbey, 263 F.3d 1070, 1074-1075 (9th Cir. 2001); Pierce v. Gilchrist, 359 F.3d 1279 (10th Cir. 2004); Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1281 (11th Cir. 2002).*

The Court need not, at this stage, define the limits of the substantive due process right at issue. Of course, as the Second Circuit in *Zahrey* recognized, "[t]he manufacture of false evidence, 'in and of itself' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right." *221 F.3d at 348.* But where, as here, Laughman has claimed an actual deprivation of his liberty *vis a vis* his sixteen-year incarceration, the allegations that Roadcap altered her findings to match a confession fabricated by Blevins and Holtz are sufficient to state a claim. zTAdditionally, the Court finds that Laughman has met his burden to identify evidence sufficient to create a genuine issue of material fact as to whether Defendants fabricated a confession and the lab results. Defendants repeatedly argue that Laughman's innocence should not be enough to cast doubt on his confession or on the quality of Roadcap's testing. But the Court does not find that Laughman's only evidence is his claimed [*26] innocence. Laughman has also shown, for example, that if he *is* innocent the confession contains descriptions and language that could lead a reasonable juror to conclude that Laughman did not actually confess or that it would have been entirely unreasonable for the officers to believe that Laughman's affirmations and inculpatory statements were worthy of evidence. Furthermore, Laughman has proffered expert-witness reports suggesting that Roadcap knowingly misrepresented her scientific findings (*see* Shaler Report, R. 5b), and calling into doubt Laughman's ability to understand certain concepts that were contained within the confession.

As such, the Court finds that genuine issues of material fact remain as to Laughman's *Fourteenth Amendment* substantive due process claim. Summary judgment will therefore be denied.

### B. Qualified immunity

At the second step of the qualified-immunity defense, Defendants' arguments similarly fail with respect to Laughman's *Fourth Amendment* claims. [9] As the Third Circuit explained in *Orsatti v. New Jersey State Police,* the "typical" dispositive issue in qualified-immunity cases is whether "whether the right at issue was 'clearly established' at the time the official [*27] acted." *71 F.3d 480, 483 (3d Cir. 1995).* The court went on to recognize that "there is no question that the right at issue, namely, the right to be free from arrest except on probable cause" is clearly established. *Id.* That did not end the inquiry, however. Instead, the court proceeded to acknowledge that where the qualified-immunity defense relates to the conduct of law-enforcement officers engaged in investigative activities, the appropriate qualified-immunity inquiry focuses on whether it was "objectively unreasonable" for the officers to believe that

their actions were lawful, because "it is inevitable that law enforcement officers will in some cases reasonably but mistakenly conclude that probable cause to make an arrest is present." *Id.*

> 9 Defendants, for the purposes of summary judgment, appear not to assert a qualified-immunity defense with respect to Laughman's *Fourteenth Amendment* Due Process claim. *See* (Defs' Reply Br. 2) ("Even assuming *arguendo* that individual defendants could be deprived of qualified immunity for such a fabrication claim, a claim which is argued by plaintiff to be 'unrelated' to the defendants' testimony (for which they undoubtedly are immune) and which [*28] is based on actions taken in 1987--- a proposition not as clear as plaintiff would suggest by the recently decided cases he cites --- the fact remains that plaintiff has adduced no colorable proof that his confession, or defendants' testimony at trial, was fabricated.")

Defendants claim that qualified immunity should be available because "[f]aced with [Laughman's] admission that he participated in the rape and killing of Edna Laughman, it cannot be 'objectively unreasonable' for the officers to have arrested [him] and present the Commonwealth's case to a trial court. The troopers made a judgment that [Laughman] knew what he was doing when he confessed to the crimes." As before, Laughman's position is that the confession never took place and that the officers knew that to be the case. Without the confession, Defendants appear to agree that no reasonable person could believe that probable cause existed to arrest and prosecute Barry Laughman. (*See* Holtz Dep. 57, R. 208b) ("Q: Now, right off the top of your head, would you at least acknowledge that those things, without the confession, would never have been enough to convict Barry Laughman? A: Oh, it wouldn't have been enough to arrest [*29] him.") In other words, whether Defendants' decision to arrest Laughman was reasonable (and thus entitled to qualified immunity) depends on a factual question that is yet to be determined, *i.e.,* whether the officers could reasonably have understood Laughman's purported confession to be legitimate.

## C. Collateral Estoppel

Defendants further argue that the doctrine of collateral estoppel should bar Laughman from claiming that his confession was involuntary or that Janice Roadcap's testimony was somehow improper. Collateral estoppel, which precludes parties from litigating an issue previously resolved in a prior judicial proceeding, "serves the twin purposes of protecting litigants from assuming the burden of re-litigating the same issue with the same party, and promoting judicial economy through preventing needless litigation." *McNeil v. Owens-Corning Fiberglas Corp., 545 Pa. 209, 680 A.2d 1145, 1148 (Pa. 1996); see Peloro v. United States, 488 F.3d 163, 174-75 (3d Cir. 2007).* As a general rule, collateral estoppel applies "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." *AMTRAK v. Pa. PUC, 288 F.3d 519, 525 (3d Cir. 2002).* [*30] After the issue has been resolved by a court, that court's "determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Id.*

Under *28 U.S.C. § 1738,* a federal court is required to give state-court judgments "the same full faith and credit . . . as they have by law or usage in the courts of such State . . . from which they are taken." *See also Allen v. McCurry, 449 U.S. 90, 106, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980)* (collateral estoppel applicable in *§ 1983* suits). A district court must therefore "treat a state court judgment with the same respect that it would receive in the courts of the rendering state." *Matsushita Elec. Indus. Co., Ltd. v. Epstein, 516 U.S. 367, 373, 116 S. Ct. 873, 134 L. Ed. 2d 6 (1996); see also Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 380, 105 S. Ct. 1327, 84 L. Ed. 2d 274 (1985).* Accordingly, this Court must look to

Pennsylvania state law with regard to collateral estoppel. Pennsylvania generally follows the Restatement (Second) of Judgments with respect to collateral estoppel. *McGill v. Southwark Realty Co., 828 A.2d 430, 434 (Pa. Commw. 2003); see Pennsylvania State Univ. v. County of Centre, 532 Pa. 142, 615 A.2d 303, 306-07 (Pa. 1992).* Accordingly, its courts apply the doctrine of collateral [*31] estoppel when the following criteria are met: (1) "the issue decided in the prior adjudication was identical with the one presented in the later action"; (2) "there was a final judgment on the merits"; (3) "the party against whom [collateral estoppel] is asserted was a party or in privity with a party to the prior adjudication"; and (4) "the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action." *Shaffer v. Smith, 543 Pa. 526, 673 A.2d 872, 874 (Pa. 1996); accord Restatement (Second) of Judgments § 27 (1982).* If those four elements are satisfied, the court should also consider whether exceptions to the general rule are applicable. See *Restatement (Second) of Judgments § 28* (enumerating exceptions); *Clark v. Troutman, 509 Pa. 336, 502 A.2d 137, 139-41 (1985).* Only if all the requirements for collateral estoppel are satisfied should a court preclude a party from raising an issue anew.

In this case, Defendants argue that the voluntariness of Laughman's confession and the propriety of Janice Roadcap's testimony has already been considered by the Court of Common Pleas for Adams County and the Pennsylvania Superior Court, and therefore that collateral [*32] estoppel should bar Laughman's claims. The Court disagrees.

### 1. Voluntariness of the confession

Defendants argue in their brief that "it is apparent that the issues decided in *Commonwealth v. Laughman* regarding the voluntariness of [Laughman's] confession . . . are the same issues [Laughman] presents in this case." (Defs' Br. 6.) Laughman, in his brief and at oral argument, counters that the voluntariness of his confession is not at issue in this suit. Indeed, as discussed above, Laughman's position is that he did not confess at all. (Pl's Br. 10) ("Here, the question for this Court is . . . [whether Laughman's confession] was falsely created by the Defendants in order to obtain his unconstitutional arrest, prosecution and conviction."). Defendants do not dispute that the issue of fabrication in this case, as stated by Laughman, was not litigated before Judge Spicer or the Superior Court. Accordingly, because the issues are not identical, collateral estoppel does not apply as to Laughman's confession.

### 2. Roadcap's test results

Defendants also argue that collateral estoppel bars Laughman from challenging the "the appropriateness of the lab testing on his blood samples" that Roadcap conducted. [*33] This argument also fails. During the state proceedings, the courts did not address the propriety of her testimony or her lab results, but rather focused on whether Janice Roadcap's testimony exculpated Laughman. In other words, the issue presented in state court spoke narrowly to sufficiency of the evidence. By contrast, the issue now presented is whether Roadcap knowingly altered her scientific conclusions to secure a conviction. These issues are plainly distinct. The first necessarily assumes that Roadcap's testimony was valid. The second challenges the truth of such testimony. Accordingly, these issues are not identical.

Defendants nevertheless contend that Laughman cannot challenge the content of Roadcap's testimony, because her testimony was supported at trial by Dr. Robert Wenk. Specifically, Defendants state that Laughman should be precluded from challenging Roadcap's conclusions because Dr. Wenk previously testified in open court he could "verify [that] her testimony to the best of my knowledge is in fact correct." (R. 295a.) Based on the testimony of Roadcap and Dr. Wenk, Defendants assert that "[t]he trial court determined that the value of the blood testing evidence was a [*34] 'classic sufficiency of the evidence' question and this decision was upheld on appeal." (Defs' Reply Br. 13.) Despite Defendants' assertion, the state courts never evaluated the validity of Roadcap's testimony. Indeed, Judge Spicer's opinion specifically stated that: "The expert [Dr. Koplinsky] called by [Laughman] cast some doubt on [Ms. Roadcap's] testimony but fell far short of proving exclusion. . . . Even accepting Dr. Koplinsky's testimony, the serological examination proved nothing more than unlikelihood. The jury could still have accepted Ms. Roadcap's opinion while believing Dr. Koplinsky." (R. 625a-26a.) As such, the Court finds that collateral estoppel does not bar Laughman from challenging the "propriety" of Roadcap's testimony. Summary judgment will therefore be denied.[10]

---

10   Defendants finally argue that sovereign immunity bars Laughman's state-law claims. *Section 2310* of Title I of the Pennsylvania Consolidated Statutes provides that "the [*35] Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." *1 Pa. Cons. Stat. § 2310*. Laughman appears to concede that Defendants are entitled to sovereign immunity. (*See* Pl's Br. 30) (Plaintiff acknowledges, however, that the courts have held that sovereign immunity protects State Police employees even when they engage in criminal acts or acts of willful misconduct."). Furthermore, this Court has already dismissed the state-law claims in this action brought against the Commonwealth of Pennsylvania on the grounds of sovereign immunity. (Doc. No. 42.) Accordingly, the Court finds that Laughman's state-law claims are barred by the doctrine of sovereign immunity.

### IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Doc. No. 56) will be denied. An appropriate order follows.

### *ORDER*

**AND NOW**, on this 16th day of August, 2007, for the reasons set forth in the accompanying memorandum, Defendants' motion for summary judgment (Doc. No. 56) is **DENIED**.

S/ Yvette Kane, Chief Judge

United [*36] States District Court

Middle District of Pennsylvania