UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS MAHER,             )<br>                  Plaintiff,   )<br>         v.                )<br>                         )<br>TOWN OF AYER, THE AYER POLICE    )<br>DEPARTMENT, NANCY TAYLOR-HARRIS a/k/a )<br>NANCY TAYLOR, in her individual capacity, and   )<br>JOHN and JANE DOES NOS. 1-15, in their individual )<br>capacities, CITY OF LOWELL, EDWARD F. DAVIS   )<br>III, in his individual capacity, GARRETT SHEEHAN, in )<br>his individual capacity, and JOHN AND JANE DOES )<br>NOS. 16-30,                   )<br>                         )<br>               Defendants.   )<br>                         )<br>                         ) | Civil Action No. 06-10514 (RGS) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT TOWN OF AYER AND THE AYER POLICE DEPARTMENT'S RENEWED MOTION FOR SUMMARY JUDGMENT**

Plaintiff Dennis Maher ("Maher") hereby submits his opposition to the Defendants Town of Ayer, Ayer Police Department, and John and Jane Does Nos. 1-15's Renewed Motion for Summary Judgment.[1]

## I.   INTRODUCTION

On April 19, 1984, Dennis Maher was wrongfully convicted of a rape in Ayer, Massachusetts. After Maher spent more than nineteen years in prison, DNA testing conclusively proved Maher's innocence and he was released on April 3, 2003. Defendant Nancy Taylor-Harris ("Taylor") conducted an incompetent investigation in which she recklessly and intentionally violated Maher's constitutional rights, resulting in his wrongful conviction. Defendant Town of Ayer (the "Town") is liable for these constitutional violations because of its

---

[1] Maher does not oppose the renewed motion for summary judgment as it applies to the Doe defendants.

policy of assigning an unqualified clerk/dispatcher to rape investigations, the pervasive patterns

of misconduct that the Town tolerated and acquiesced in, and its failure to provide adequate

training, supervision, and policies for its officers, all of which created an environment in which

violations of suspects' constitutional rights were likely to occur, and did occur on a regular basis.

## II.    BACKGROUND[2]

### A.    Nancy Taylor Harris

In 1977, Nancy Taylor was hired by the Ayer Police Department ("APD" or the

"Department") as a full-time clerk-dispatcher and a part-time "special officer."  CSF ¶ 73.  Her

responsibilities included answering the Department's phone calls, dispatch, and record-keeping.

*Id.* ¶ 72.  In addition, although Taylor did not attend the police academy until the fall of 1983, the

Department routinely assigned her to lead rape investigations.  *Id.* ¶ 75.  Taylor was paid at a

higher rate for investigating rape cases. *Id.* ¶ 72.  A former Ayer police sergeant described

Taylor's various roles during his deposition testimony:  "She's the secretary.  So she was in

charge of like, scheduling road jobs, details that came up.  And she handled the rapes."  *Id.*  The

only formal training relevant to rape investigations that Taylor received prior to attending the

police academy consisted of a four-day rape investigation class and a class on interviews and

interrogations.  *Id.*  Despite this lack of formal training, Taylor was considered to be the lead

investigator on rape cases, and conducted much of these investigations without supervision.  *Id.*

¶ 75.

On August 18, 1983, Taylor was assigned to investigate the sexual assault of Marilyn

Goss, which occurred at the Caza Manor Motel.  *Id.* ¶ 1.  Taylor's initial investigation was

---

[2]  As the Court is familiar with the basic background of the case, Maher here focuses on the core facts requiring denial of Town's motion, and respectfully refers the Court to the accompanying Response to the Ayer Defendants' Statement of Undisputed Facts ("RSF") and Counterstatement of Additional Material Facts as to Which There is a Genuine Dispute ("CSF") for the complete factual record.

superficial, consisting primarily of visits to Goss' home, the hospital, and the crime scene.  *Id.*

¶¶ 10-16.  Taylor did not interview witnesses, canvass the area, or collect potentially exculpatory

evidence from the crime scene.  *Id.*  Little to no further investigation was conducted from August

to December 1983.  *Id.* ¶ 16.  In December 1983, a police officer from a neighboring city gave

Taylor a photograph of Maher, who had been arrested for two recent sexual assaults.  RSF ¶¶ 39-

41.  The facts relating to Taylor's conduct from that point forward, through Maher's trial and

conviction, are set forth in detail in Plaintiff's Opposition to Defendant Nancy Taylor-Harris'

Renewed Motion for Summary Judgment ("Opposition to Taylor Motion").  *See* Opp. to Taylor

Mot. at pp. 2-7.

### B.    Ayer Police Department: A Culture of Misconduct

Taylor's conduct in the Maher investigation was not an aberration in the Department.  In

the early 1980s, the APD operated with few rules and little guidance for its officers.  CSF ¶¶ 79-

81.  The Department did not have any written policies or procedures governing disclosure of

exculpatory evidence, evidence collection and testing, or identification procedures.  *Id.*  Rather

than following clear policies and procedures, Taylor and other Ayer officers instead followed the

examples of their fellow officers, and "oral" or "verbal" policies rather than written policies.  *Id.*

¶¶ 78, 82.

#### 1.    The 1980 Ties Construction Scandal

In 1980, the Ties Construction Company cancelled a lucrative work detail with the APD.

*Id.* ¶ 65.  In apparent retaliation, a number of Ayer police officers vandalized the site.  *Id.*  The

incident went uninvestigated for over a year and the officers involved, including the son of then-

Police Chief William Adamson, continued to work at the Department.  *Id.*

When the Department finally launched an investigation, the inquiry revealed other types

of misconduct at the APD.  *Id.* ¶ 66.  Philip Connors, who replaced Adamson as Chief of Police,

learned that Ayer police officers had falsified police reports. *Id.* ¶¶ 65, 66. Connors also learned that numerous Ayer police officers were involved in a practice of stealing drugs from suspects who had been arrested for possession — the officers would take a portion of the drugs found in the suspect's possession for their own personal use. *Id.* ¶ 66.

There is no evidence in the record that this misconduct was investigated, that the officers involved were disciplined, that the Town or the Department put in place any policies or safeguards to prevent similar misconduct from happening in the future. In fact, one of the officers involved in the drug thefts, Dennis MacDonald, was Nancy Taylor's supervisor during the Goss investigation. *Id.*

## 2.    Stanley Randall

Stanley Randall, an Ayer police officer at the time of the Ties incident, responded to the Ties site after the vandalism was reported. *Id.* ¶ 67. Soon after, Chief Adamson, whose son was involved in the Ties vandalism, brought disciplinary charges against Randall. *Id.* Randall believed that these charges were intended to undermine his credibility and disqualify him as a witness in the Ties investigation. *Id.* All charges were ultimately dropped. *Id.*

In October 1981, a woman named Lisa Frawley alleged that Randall had raped her two months earlier. *Id.* ¶ 68. Taylor was the investigating officer. *Id.* Randall maintained his innocence, and the charges were dropped soon after his arraignment. *Id.* Randall believes that the charges were fabricated in retaliation for his investigation of the Ties incident, and that Taylor "had put Miss Frawley up to it," because of Taylor's relationship with the officers who were involved. *Id.* After the charges were dropped, Randall sued Taylor, Adamson, the Town of Ayer, and the Ayer Selectmen, for their involvement in bringing the disciplinary charges and the Frawley charges against him. *Id.* ¶ 68. Randall's suit was settled. *Id.* Despite the town's

involvement in the lawsuit, there is no evidence in the record that they did anything to investigate or discipline the officers involved in either of these incidents.

### 3. <u>Ernest Downing</u>

Allegations that Ayer police officers threatened a witness into making false accusations were also brought to the attention of the Board of Selectmen.  In 1979, Ayer officers began an investigation into a teenage boy's allegations of sexual abuse against Ernest Downing, then an officer in the Department.  *Id.* ¶ 69.  Downing was tried on those charges in 1981.  *Id.*  At trial, two letters written by the alleged victim were introduced into evidence.  *Id.*  In one letter, the alleged victim recanted his accusations, stating that Ayer police officers had picked him up when he was on drugs and had threatened him:

> The true story is I got picked up by the Ayer cops and they scared me with questions and said if I didn't answer them, they would put me away….they brought me to another police station and used a tape recorder and threats and promises….They promised me I wouldn't go to jail and it was only Downing they were after.

*Id.*  The alleged victim also stated that the officers told him that "they wanted Ernest Downing off the police force no matter what it took."  *Id.*  The alleged victim then stated, "Please tell Mr. Downing that I am truly sorry for lieing [sic] about him."  *Id.*

Despite media reports and these allegations being brought to the attention of the Town's Board of Selectmen (*id.* ¶ 70), there is no evidence in the record that Ayer officers were ever disciplined in connection with this incident, or that the Town or Department instituted any policies or additional supervision to guard against such coercion or fabrication of allegations.

### C. <u>The Waters Investigation</u>

Prior to her investigation of the Goss rape, Taylor investigated another case which also resulted in the conviction of a man who was eventually exonerated.  On May 21, 1980, Katharina Brow was murdered in her home.  CSF ¶ 56.  Taylor was assigned to investigate the homicide,

and identified Kenneth Waters as a suspect.  *Id.* ¶¶ 56-58.  During the investigation, Taylor

pressured a witness, Brenda Marsh, to give false testimony against Waters.  *Id.* ¶ 62.  As part of

her investigation into the Brow homicide, Taylor sent fingerprints of suspects – including

Kenneth Waters – to state police officer John Baliunas, asking him to compare those fingerprints

to the prints found at the scene.  *Id.* ¶ 57.  After receiving Baliunas' results for Waters, Taylor

wrote a note stating:  "Check Waters prints against partial print on faucet & 3 from kitchen table.

*All negative.*"  *Id.* ¶ 58 (emphasis added).  This note, and the information that Kenneth Waters'

prints did not match any of the prints found at the scene, were never disclosed to the prosecutor

or to Waters or his attorney.  *Id.* ¶ 59.

In fact, Taylor testified under oath before the grand jury that there were no usable prints.

*Id.* ¶ 60.  She responded to a question from a grand juror that all the prints found at the scene

were smeared.  *Id.*  When the prosecutor asked if the state police were unable to match or lift any

prints for use in the investigation, Taylor replied: "That's correct."  *Id.*  Waters was convicted in

1983.  *Id.* ¶ 64.  He was released in 2001 after he was exonerated by DNA testing.  *Id.*

## III.  <u>ARGUMENT</u>

The summary judgment analysis "contemplates an abecedarian, almost one dimensional,

exercise geared to determining whether the nonmovant's most favorable evidence and most

flattering inferences which can reasonably be drawn therefrom are sufficient to create any

authentic question of material fact."  *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835

F.2d 932, 936 (1st Cir. 1987).  The nonmoving party is entitled "to have the credibility of his

evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal

conflicts in [the evidence] resolved favorably to him."  *Foster-Miller, Inc. v. Babcock & Wilcox*

*Canada*, 975 F. Supp. 30, 37 (D. Mass. 1997).

A.      **Ayer is Liable For Violations of Maher's Constitutional Rights.** [3]

A local government may be liable under 42 U.S.C. §1983 for constitutional violations committed by its officers where those violations are caused by the municipality's policy or custom.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  "A municipality may be held liable for acts taken pursuant to a 'policy' by at least two methods:  when the deprivation resulted: (1) 'from the decisions of its duly constituted legislative body,' or (2) from the decisions 'of those officials whose acts may fairly be said to be those of the municipality.'" *Silva v. Worden*, 130 F.3d 26, 31 (1st Cir. 1997) (*quoting Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403-404 (1997)); *see also Putnam v. Town of Saugus*, 365 F. Supp. 2d 151, 178-79 (D. Mass. 2005) ("[M]unicipal liability can inhere from the single act of a municipal official.").

A municipality may also be held liable on the basis of a custom or practice, which is attributable to a municipality when it is "so well[]settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."  *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989) (affirming verdict for plaintiff where jury could have found existence of a custom of breaking down doors without a warrant, as there was evidence that this practice had occurred in the past).

---

[3]  As a preliminary matter, Maher addresses Ayer's pleading argument although it should have been raised at an earlier stage of this litigation. In a transparent attempt to avoid addressing the substance of Maher's *Monell* claim, the Town tries to escape liability by claiming that Maher did not plead "the proper level of culpability" in his Complaint. (Town's Mot. at 6.)  This argument is based on an erroneous understanding of pleading requirements in civil rights cases.  It is well-established that notice pleading, under Fed. R. Civ. P. 8(a), applies to cases brought under 42 U.S.C. § 1983. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) (rejecting heightened pleading standard for a *Monell* claim); *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006) (plaintiff was not required to plead specific theory underlying *Monell* claim).  Here, the Complaint clearly states in Count VIII that the claim against the Town is based on *Monell* and alleges that the Town's policies and customs were the moving force behind Maher's injuries. (Compl. ¶¶ 185-88.)  Thus, the Complaint gave the Town fair notice of Maher's claims.  *See McGrath v. MacDonald*, 853 F. Supp. 1, 5-6 (D. Mass. 1994) (complaint alleging that violation "was caused by or was in conformity with an official policy of the City" was sufficiently pled).

A municipality's failure to train its police officers is grounds for § 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  If the need for training was obvious, and violations of constitutional rights were likely to result because of the inadequacy of training, the municipality "can reasonably be said to have been deliberately indifferent," and "[i]n that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."  *Id.* at 390.  In addition, *Monell* liability can be based on a municipality's failure to provide policies, *see A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 583-85 (3d Cir. 2004) (reversing summary judgment for defendants where a reasonable jury could conclude that defendant failed to establish a policy in disregard of the obvious consequences of its action), or its failure to provide adequate supervision or discipline, *see Bordanaro*, 871 F.2d at 1159 (liability can arise from municipality's failure to "provide minimally acceptable standards of…supervision or discipline of its police force").

As is explained more fully in the Opposition to Taylor Motion, there is sufficient evidence in the record for a reasonable jury to find that Maher suffered constitutional violations. As is set forth in detail below, the Town is liable for violations of Maher's constitutional rights as a result of its policy of allowing unqualified "special officers" to lead felony investigations, its custom and practice of allowing officers to fabricate evidence, its lack of policies or training to instruct officers on the requirements of disclosing exculpatory evidence to the prosecutor, its lack of policies or training on crime scene investigation and evidence testing or collection, the

absence of policies on identification procedures, and its failure to supervise and discipline officers.[4]

Because there is sufficient evidence from which a reasonable jury could find that Maher suffered injuries that were caused by the Town's policies or customs, the Town is not entitled to summary judgment on Maher's *Monell* claim.[5]

### 1.    The Town's Policy of Allowing An Unqualified "Special Officer" To Lead Felony Investigations Led To Maher's Constitutional Injuries.

In August 1983, Taylor had not yet attended the police academy.  Rather, she worked at the APD as a clerk and dispatcher.  The only formal investigative training Taylor had received was a four-day rape investigation course she took prior to joining the APD.  CSF ¶ 72.  Despite her lack of formal training, Taylor was assigned as the lead investigator of the Goss assault as a special officer.  Her lack of qualifications, experience, and training to conduct this type of investigation led Steve Rothlein, Maher's police practices expert, to conclude that the decision to permit Taylor to lead the Goss rape investigation contributed to the many deficiencies in the investigation.  *Id.* ¶ 77; *see A.M.*, 372 F.3d at 581 (expert opinion that inadequate supervision contributed to violation of rights "provides a causal link" between the municipality's policies and the plaintiff's injuries).  This policy posed a substantial risk of harm to individuals who were subject to investigation by Taylor, as is shown by the wrongful convictions of Maher and

---

[4]  The Town's attempt to narrowly frame Maher's *Monell* claim as one based solely on the Town's failure to discipline ignores the other bases for Maher's *Monell* claim, which are clearly set forth in the Complaint.  *See* Compl. ¶¶ 185-88; *see also Gregory*, 444 F.3d at 750-751 (plaintiff need not plead specific theory of *Monell* liability where allegations underlying theory are set out in complaint).

[5]  Taylor has argued that even if she violated Maher's constitutional rights, she is entitled to qualified immunity.  As explained in the Opposition to Taylor Motion, there is no basis for granting qualified immunity to Taylor.  For purposes of the Town's Motion, whether Taylor is entitled to qualified immunity is irrelevant because a municipality is liable for constitutional violations caused by its policies or customs, regardless of whether the individual officer is held liable for those constitutional violations.  *See, e.g.*, *Wilson v. Town of Mendon*, 294 F.3d 1, 7 (1st Cir. 2002) ("There is, however, nothing to prevent a plaintiff from foregoing the naming of an individual officer as a defendant and proceeding directly to trial against the municipality."); *Bordanaro v. McLeod*, 871 F.2d 1151, 1158 (1st Cir. 1989) (affirming judgment against city on *Monell* liability, where individual officers were either defaulted or found not liable).

Waters.  CSF ¶¶ 53-64.  *Cf. Burrell v. Hampshire County*, 307 F.3d 1, 10 (plaintiff could not

show that policy of not segregating inmates posed a substantial risk of harm, as there was no

evidence of harm to other inmates).

A policy of hiring special officers, by itself, would not necessarily lead to *Monell*

liability for a special officer's violation of an individual's constitutional rights.  A typical special

officer would be assigned non-investigative work.  CSF ¶ 74.  As former Ayer Police Chief

Connors explained, "[s]ome might be appointed just as a special officer for school crossings, that

sort of thing."  *Id.*  Not only were special officers limited in the type of work details they would

be assigned, they were typically subject to close supervision.  For example, when Ayer

Lieutenant Boisseau was a special officer, he was assigned to ensure the security of a building

damaged by a fire.  *Id.*  He explained that the full time officers would frequently check on the

special officers – "once or twice or three times" in an eight hour shift.  *Id.*  When Boisseau was

asked if he would ever assign a special officer to investigate a serious felony, he simply

answered "No."[6]  *Id.*

Not only did the Town have a policy of allowing a "special officer" to lead felony rape

investigations without adequate training, and with little or no supervision; it also gave Taylor a

financial incentive to fill that role, by paying her at a higher rate for such work than she would

have earned performing her usual clerical functions.[7]  The Town's policy of appointing an

inadequately trained and unqualified officer to lead rape investigations is sufficient to establish

---

[6]  Although Boisseau testified that he would not have assigned a special officer to investigate a rape or other serious felony, he later testified that in the "particular instance" of Taylor, she would be assigned to lead a rape case.

[7]  In this case, the Board of Selectmen is responsible for establishing Town policy (CSF ¶ 73; Town's Mem. at 4-5), and the Town is responsible for the Board's actions.  Thus, the Board of Selectmen's decision to allow and to provide financial incentives for an untrained clerk/dispatcher to investigate rape cases was an act for which the Town is liable.  CSF ¶ 72-76; *see also Bordanaro*, 871 F.2d at 1157 (police chief was final policymaker, and ultimately deemed liable for custom of breaking down doors without a warrant, where he oversaw department operations and utilized an extensive review process).

the Town's liability under *Monell* if that policy caused the violation of Maher's constitutional rights.[8]  Here, a reasonable jury could conclude that the Town's policy caused Maher's injuries.[9] *See A.M. v. Luzerne County Juvenile Det. Ctr*, 372 F.3d 572, 581 (3d Cir. 2004) (where juvenile detention center hired unqualified workers and failed to ensure that there were sufficient workers on duty, there was an issue of fact as to whether a policy of deficient hiring or staffing caused plaintiff's injury).

### 2. <u>Taylor's Fabrication of Evidence Conformed To The Widespread Custom Or Usage Of The Ayer Police Department.</u>

One of the key pieces of evidence against Maher at his trial was the testimony of Richard Nichols, a witness who claimed to have seen Maher in the area of the Caza Manor Motel numerous times in August 1983.  As is more fully described in the Opposition to Taylor's Motion, Nichols' trial testimony was entirely fabricated, and Taylor caused that fabrication. This is evident from the nature and content of Nichols' testimony, and from evidence that Taylor was the person who communicated with Nichols and provided him as a witness.  *See* Opp. to Taylor Mot. at pp. 4-5, 13-17

Taylor's creation of Nichols' testimony conformed with the Department's custom of fabricating evidence.  Other Ayer officers were known to have coerced false witness testimony, including the false accusations against Officer Downing discussed in Section II.B.3, *supra*. Likewise, Taylor's pattern of fabrication through witness coercion did not begin with the Goss

---

[8]  Unlike the standard for municipal liability for a custom, Maher need not prove deliberate indifference on the part of the municipality for a *Monell* claim based on an official policy or the decision of a policymaker.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("where action is directed by those who establish governmental policy, the municipality is…responsible.").

[9]  The Town also claims that because Maher has not identified any Town policy requiring officers to engage in misconduct, his *Monell* claim must necessarily rely on a custom.  (Town's Mot.. at 7.)  This argument reflects the Town's fundamental misunderstanding of *Monell* liability.  "A policy may be facially constitutional, but municipalities will still be liable if the policy can be shown to produce constitutional violations." *Burrell v. Hampshire County*, 307 F.3d 1, 10 (1st Cir. 2002).

investigation.  Taylor pressured a female witness, Lisa Frawley, into making false rape accusations against Stanley Randall, who was leading the Ties investigation because she was friendly with the officers who were being investigated.  CSF ¶ 68.  During the Waters investigation, Taylor threatened a witness in order to secure her false testimony against Waters. *Id.* ¶ 62.

The Town, through its Chief of Police and Board of Selectmen, was on notice of this pattern of misconduct.  The allegations raised in the Downing trial were reported to the media and brought to the Selectmen's attention.  *Id.* ¶¶ 69-70.  The Town was also aware of the Randall allegations, and was party to a civil lawsuit relating to the misconduct.  The Ayer Chief of Police regularly reported to the Board of Selectmen to keep the Selectmen apprised of the goings-on at the Department (CSF ¶ 88), so the Board of Selectmen had constructive, if not actual, knowledge of the practices in place at the Department.  *See Bordanaro*, 871 F.2d at 1157 (knowledge of conduct could be imputed to Chief of Police where his review process should have alerted him to the conduct).  Despite the complaints and media coverage, there is no evidence in the record that the Town took any actions to stop this pattern of misconduct.

There is sufficient evidence from which a reasonable jury could find that the Town's custom of fabricating evidence was a moving force behind Taylor's fabrication of Nichols' testimony and the resulting violation of Maher's constitutional rights.  Taylor had no training in police investigative practices, other than a four-day rape investigation course and a class on interviews and interrogations, and had never seen a written policy manual for the Department.  CSF ¶¶ 72, 78.  As a result, she followed the unwritten custom of the Department, under which it was acceptable to fabricate evidence in order to make a case.[10]  *Id.* ¶ 78.  Here, a reasonable jury

---

[10]  It is clear from the APD's own daily logs – which were open to the department and a tool used by supervisors to keep apprised of officers' activities – that Taylor and other APD officers understood and appreciated that falsehoods

could find that the need for training was obvious to the Town, and that violations of constitutional rights were likely to result because of the inadequacy of training.  Thus, the Town "can reasonably be said to have been deliberately indifferent."  *Harris*, 489 U.S. at 390.  As a result, summary judgment should be denied.

The Town tries to exclude evidence of prior misconduct by arguing that unadjudicated allegations of past misconduct are inadmissible.  (Town's Mot. at 9-10).  This is not the standard followed by the First Circuit.  Evidence of misconduct is sufficient to place a municipality on notice that there is a widespread pattern of unconstitutional behavior even if that misconduct was never subject to legal adjudication.  In *Miller v. Kennebec County*, the court found that there was sufficient evidence to infer the official's knowledge of an unconstitutional practice of strip searches, based solely on testimony that these searches occurred routinely.  219 F.3d 8, 12 (1st Cir. 2000) (reversing district court's grant of summary judgment for defendants).  Similarly, in *Bordanaro*, the court found that there was evidence of a custom of breaking down doors without a warrant, based on testimony and other evidence of prior occasions in which this had occurred.  *Bordanaro*, 871 F.2d at 1156.

### 3. <u>Taylor's Failure To Disclose Exculpatory Evidence Resulted From The Town's Customs And From Its Failure To Train Its Officers Or Provide Adequate Policies.</u>

As described in the Opposition to Taylor's Motion, Taylor failed to disclose exculpatory evidence – including material impeachment evidence relating to the Commonwealth's two main witnesses at trial – in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and Maher's Due Process rights.  *See* Opp. to Taylor Mot. at pp. 5-6, 17-20.  There is sufficient evidence from which a reasonable jury could find the Town is liable for these violations because it failed to

---

told by witnesses at a criminal trial could have a dispositive impact on the result:  "PW Taylor & Jones clear from Camb. Super. Ct..  Herman Williams found not guilty of rape, the jury is still out on the A&B and the kidnapping

train its officers, and failed to provide any policies on officers' obligations to disclose exculpatory evidence.  These failings allowed a custom of withholding exculpatory evidence to pervade the Department.  "A custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the City and the causal connection to the constitutional violations experienced by Plaintiff."  *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006).

In 1983 – twenty years after the 1963 Supreme Court decision in *Brady* – the Town had no written policies concerning the disclosure of exculpatory information.  Officers were merely told that they should turn over all information that was "relevant" or, recounted even more vaguely, "everything."  CSF ¶ 81.  Telling officers to disclose "relevant" evidence or "everything" is inadequate because it does not give officers any guidance or standards as to what *must* be disclosed.  "The Supreme Court has laid down very specific obligations of police officers on the disclosure of exculpatory materials," *Gregory*, 444 F.3d at 753, and officers cannot be expected to adhere to those specific obligations are, absent proper training and guidance.  The *Gregory* court found that this deficiency in training posed an obvious risk to a defendant's constitutional rights under *Brady*—"[w]idespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations."  *Id.* at 753-54 (reversing summary judgment for defendants, and noting that there was "no evidence of any formal training on exculpatory materials") (citation omitted).

Indeed, the "highly predictable consequence" of the Town's failure to train its officers regarding their *Brady* obligations was not merely hypothetical.  In the absence of proper training and policies, a custom of nondisclosure was followed by Ayer officers.  Ayer officers falsified

---

was dismissed.  Lots of lying blacks, and army dropouts put the reasonable doubt in the jury's mind."  CSF ¶ 89-90.

reports and thus failed to disclose information that should have been included in the reports to the prosecutor.  CSF ¶¶ 66, 71.  Ayer officers were found to have stolen drugs when they arrested and booked suspects for possession, which was never disclosed to the prosecutors in those cases.  *Id.* ¶ 66; *see Atkins v. County of Riverside*, 151 F. App'x 501, 505 (9th Cir. 2005) (attached hereto as Exhibit 1) (finding that evidence of officer's role in fabricating evidence undermines officer's credibility and must be disclosed).  In two separate cases that led to the convictions of innocent men, Taylor withheld material exculpatory evidence.

A reasonable jury could find that the Town's failure to train its officers or adopt policies concerning disclosure of exculpatory evidence, and the custom of nondisclosure that developed in the absence of such training or policies, were "closely related" to Maher's constitutional injuries, which were caused by Taylor's failure to disclose impeachment evidence.  *See Harris,* 489 U.S. at 391.  Again, a jury could find that the need for training was obvious to the Town, and that violations of constitutional rights were likely to result because of inadequate training.  Thus, the Town "can reasonably be said to have been deliberately indifferent."  *Id*. at 390.  In addition, a reasonable jury could find that Taylor followed Department custom when she withheld material exculpatory information from Maher's prosecutor.  Because Ayer officers had no proper training or guidance in disclosing exculpatory information, summary judgment must be denied. *Gregory*, 444 F.3d at 754.

### 4.        The Town Failed To Train Its Officers Or Provide Policies On Securing A Crime Scene, And Collecting And Testing Evidence.

Taylor's fabrication of Nichols' testimony and her concealment of her agreement with Goss occurred several months after the assault.  But Taylor's investigation was woefully inadequate from the start.  Those inadequacies later allowed her to build a case against Maher because she had failed to collect information or evidence available at the crime scene that could

have established Maher's innocence or implicated other suspects.  Although Taylor knew by 9:00 a.m. on August 18, 1983, that Goss had been assaulted at the Caza Manor Motel, she made no effort to ensure the crime scene was secured.  RSF ¶¶ 17-18; CSF ¶ 13.  Taylor knew from Goss's account of the assault that the assailant had likely touched a drinking glass in the motel room, yet Taylor made no effort to communicate that information to MacDonald so that he could collect the glass, nor did she make any effort to collect the glass herself.  CSF ¶¶ 9-12.  Though MacDonald arrived at the crime scene before the room had been cleaned, he only collected the bed sheets.  *Id.* ¶ 10.  The failure to secure the motel room or to collect the glass in a timely manner may have led to the loss of important, and potentially exculpatory evidence.  *Id.* ¶¶ 12-13.  A reasonable jury could find that Taylor's failure to take these investigative steps was a result of the Town's failure to provide training or policies concerning crime scenes and evidence collection and testing.

The Town did not train its officers on how to handle crime scenes and evidence, and had no written procedures governing crime scene preservation or the collection of evidence.  Taylor received no forensics training, and to this day she fails to recognize its importance in rape investigations.  *Id.* ¶ 83.  Neither Taylor nor MacDonald had any training in collecting fingerprints from a crime scene.  *Id.* ¶ 84.  This is sufficient evidence from which a jury could find that the Town's failure to train posed obvious risks to the rights of citizens who were investigated by these inadequately trained officers.  Absent training on preserving crime scenes and collecting fingerprints, officers cannot appreciate the evidentiary value of a crime scene, which may result in the loss or destruction of critical evidence.  Indeed, that is precisely what happened in Maher's case.

For example, Ayer officers only collected fingerprints from items if a smudge was visible on the item. *Id.* ¶ 85. This custom, which developed to fill the void where a written fingerprint policy should have been, dictated that fingerprints were taken from a crime scene or from evidence *only* if they were visible to the naked eye, and were not taken even if the victim of a crime indicated that a perpetrator had touched an item. *Id.* Even though fingerprints are usually invisible, this custom was followed. *Id.* Given the serious risks of allowing this custom to continue in place of a fingerprint policy (*id.*), the Town acted with deliberate indifference in not adopting a written fingerprint policy.

There is more than enough evidence from which a reasonable jury could infer that Maher's injuries are causally related to the Town's failure to provide training or adopt policies on this crucial aspect of criminal investigations, and that the Town acted with deliberate indifference to the rights of Maher and other citizens. *See A.M.*, 372 F.3d at 583 (finding that jury could infer that defendant's failure to adopt policy was "causally related" to plaintiff's constitutional violations, where jury could find that defendant's failure to establish policy disregarded risk of harm to those in its custody and plaintiff was harmed while in defendant's custody).

### 5. The Town Failed To Provide Policies And Procedures Concerning Identification Procedures.

In January 1984, months after the assault, Taylor went to Goss's home with ten photographs, including a photograph of Maher, to conduct a photo array. CSF ¶ 37. During the course of the identification procedure, Taylor made improperly suggestive comments. *Id.* ¶ 39. As a result of the improperly suggestive and unconstitutional procedure, Goss mistakenly identified Maher as the perpetrator. *Id.* ¶ 79. The Town did not have written policies and procedures concerning the proper methods for conducting identification procedures. In failing to

adopt such policies and procedures, the Town disregarded the risk that officers would conduct

identifications in a suggestive manner.  *Id.* ¶ 80; *see also A.M.*, 372 F.3d at 583 ("[B]y failing to

establish [a policy on reviewing incident reports] the Center disregarded an obvious consequence

of its action, namely, that residents of the Center could be at risk if information gleaned from the

incident reports was not reviewed and acted upon.").  Because there is sufficient evidence from

which a jury could find that the Town disregarded an obvious risk in failing to provide these

policies and procedures, the Town is liable for the violation of Maher's constitutional rights and

is not entitled to summary judgment.  *See A.M.*, 372 F.3d at 583-85 (district court erred in

granting summary judgment for defendants where a reasonable jury could conclude that

defendant failed to establish a policy and disregarded the obvious consequences of its action).

### 6.        **The Town failed to adequately supervise and discipline its officers.**

A reasonable jury could also find the Town liable for its failure to provide adequate

supervision or discipline of its officers.  *See Bordanaro*, 871 F.2d at 1159 (liability can arise

from municipality's failure to "provide minimally acceptable standards of…supervision or

discipline of its police force").  By failing to discipline officers who engaged in misconduct, the

Town sent a signal to Ayer police officers that misconduct would be tolerated.  *See id.* at 1160

(there was evidence to support *Monell* claim based on city's failure to supervise and discipline

where discipline was "meted out haphazardly, inconsistently, and infrequently," and officers

were given too much discretion).

The Town treats Maher's failure to discipline claim as based solely on Taylor's coercion

of testimony from Marsh and Frawley in other investigations.  (Town's Mot. at 7-8.)  However,

as described above, there was a widespread pattern of misconduct in the Department, and the

Town failed to discipline officers involved in such misconduct.  While some officers were

eventually disciplined in connection with the Ties vandalism, there is no record evidence that

any discipline was meted out in connection with Ayer officers' fabrication of evidence or failures to disclose exculpatory evidence.  Likewise, there is no evidence in the record that the officers involved in the false accusations against Downing were disciplined.

A jury could also find that the Town also failed to provide adequate supervision for its officers.  Even though Taylor had not attended the police academy, was not a qualified officer, and lacked sufficient training, she was permitted to conduct investigations on her own, and incredibly, was considered the primary investigator on rape cases.  CSF ¶ 75.  Supervisors in the Department did not fully review their subordinate officers' reports, nor did they review lab reports issued in connection with their investigations.  *Id.* ¶ 86.  Such a system of supervision failed to provide adequate oversight of Ayer officers.  *Id.* ¶ 87.  When viewed in the light most favorable to Maher, "such a policy and custom could be found by a fact finder to be 'deliberately indifferent' to the rights of the [Town's] inhabitants." *Wyniemko v. Ostin*, No. 03-CV-74749-DT, slip op. at 50 (E.D. Mich. Mar. 3, 2005) (attached hereto as Exhibit 2) (denying summary judgment for the town where a policy and custom of failing to supervise could be found to be "'deliberately indifferent' to the rights of the Township inhabitants").

Because there is evidence from which a reasonable jury could find that the Town's failure to discipline and supervise its officers caused violations of Maher's constitutional rights, *see A.M.*, 372 F.3d at 583, the Town's motion for summary judgment should be denied.

**B.**     **The Town is Not Immune From State Law Claims of Negligent Training and Supervision.**[11]

The Town claims that it is immune from liability under the negligent training and supervision claim (Count XXI) because of M.G.L. c. 258, § 10(j).[12]  This exemption does not

---

[11] Maher does not oppose the Town's Renewed Motion for Summary Judgment as it relates to the state law claim for false imprisonment (Count XIX).

apply to Maher's claim against the Town, which is based on the Town's own failure to prevent

the harmful consequences of a situation that it created, through its decision to place an untrained

clerk and dispatcher in the position of leading rape investigations.  CSF ¶¶ 73-75; *see Gendron v.*

*Semidi*, 13 Mass. L. Rep. 87, 2001 Mass. Super. LEXIS 160, *17-18 (Mass. Super. Ct. 2001)

(attached hereto as Exhibit 3) (Commonwealth was not immune from liability for its hiring of

correctional officer, who then beat plaintiff).  Because a jury could find that the Town was

responsible for the condition that caused Maher's harm, the Town is not entitled to summary

judgment on the negligent training and supervision claim.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Maher respectfully requests that this Court deny the Town of

Ayer's Renewed Motion for Summary Judgment.

Respectfully submitted:

**DENNIS MAHER**

By his attorneys,

/s/ Joseph F. Savage, Jr.
Joseph F. Savage, Jr. (BBO # 443030)
Jennifer L. Chunias (BBO # 644980)
Lisa M. English (BBO  # 660975)
Marcy D. Smirnoff (BBO # 663662)
Yvonne W. Chan (BBO #669223)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000 (Tel.)
(617) 523-1231 (Fax)
jsavage@goodwinprocter.com
jchunias@goodwinprocter.com
lenglish@goodwinprocter.com

---

[12] This law exempts municipalities from liability for "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer."

msmirnoff@goodwinprocter.com
ychan@goodwinprocter.com

Robert N. Feldman (BBO# 630734)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA  02210-1108
Telephone:  (617) 307-6100
Fax:  (617) 307-6101
feldman@birnbaumgodkin.com

Dated: December 3, 2008

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 3, 2008.

/s/ Joseph F. Savage, Jr.